**2024-1589**

# United States Court of Appeals for the Federal Circuit

SAMSUNG ELECTRONICS CO., LTD.,
*Appellant*

*v.*

ALMONDNET, INC.,
*Appellee*

*Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2022-01259.*

**BRIEF FOR APPELLANT SAMSUNG ELECTRONICS CO., LTD.**

NAVEEN MODI
DANIEL ZEILBERGER
VLADIMIR J. SEMENDYAI
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
(202) 551-1700

*Counsel for Appellant*

FILED: AUGUST 5, 2024

## EXAMPLARY CLAIM AT ISSUE

## Claim 35 of U.S. Patent No. 8,200,822

35. A system comprising one or more computers programmed to implement a method of directing electronic advertisements, the method comprising:

for each of a multitude of different electronic visitors to a first media property, responsive to receiving information about at least one of a plurality of profile attributes possibly applicable to the visitor, automatically electronically authorizing a third-party second media property to allow display, to the electronic visitor when the visitor visits the second media property at a time after the visitor visits the first media property, of an advertisement correlated with the profile-attribute information received about the visitor, subject to a visitor-specific condition for display of the advertisement that a price charged by the second media property is less than a profile-attribute-dependent price that an advertiser is willing to pay for display of the advertisement.

## CERTIFICATE OF INTEREST

Counsel for Appellant Samsung Electronics Co., Ltd. certifies the following:

| 1. Provide the full names of all entities represented by undersigned counsel in this case. | 2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | 3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
|---|---|---|
| Samsung Electronics Co., Ltd. | Samsung Electronics America, Inc. | None |

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

Paul Hastings: Joseph E. Palys, Kevin Stewart

5. Other than the originating case(s) for this case, are there related or prior art cases that meet the criteria under Fed. Cir. R. 47.5(a).

*See* Dkt. No. 9

6. Information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

Not Applicable

August 5, 2024

/s/ Naveen Modi
Naveen Modi

## TABLE OF CONTENTS

**Page**


STATEMENT OF RELATED CASES .......... v

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 4

I. THE CHALLENGED PATENT .......... 4

II. THE PRIOR ART .......... 8

A. Perry .......... 8

B. Wilson .......... 11

C. Bronson .......... 12

III. THE PROCEEDINGS BELOW .......... 13

A. Samsung's Petition .......... 13

B. AlmondNet's Response .......... 15

C. Samsung's Reply .......... 18

D. AlmondNet's Sur-Reply .......... 22

E. The Board's Decision .......... 23

SUMMARY OF ARGUMENT .......... 25

STANDARD OF REVIEW .......... 27

ARGUMENT .......... 29

I. THE BOARD'S DECISION IS FUNDAMENTALLY AT ODDS WITH ITS CLAIM CONSTRUCTION .......... 29

II. THE BOARD'S REJECTION OF THE OBVIOUSNESS GROUNDS IS ARBITRARY AND CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE ........................................................................................33

A. Under the Board's Construction, Samsung Showed That the Challenged Claims Are Obvious Over Perry in View of Wilson and Bronson ........................................................................................35

1. Samsung Demonstrated in the Petition That Perry Discloses the "Authorizing . . . to Allow Display" Limitation ........................................................................................36

2. Although Ignored by the Board, Samsung's Reply Provided Additional Evidence and Argument Demonstrating Perry's Critical Disclosure ....................................39

3. AlmondNet's Sur-Reply Did Not Meaningfully Address the Relevant Portions of Samsung's Reply ....................................51

B. The Board Rejected Samsung's Ground Without a Reasoned Analysis or Substantial Evidence ..........................................................54

CONCLUSION ........................................................................................63

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applications in Internet Time, LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018) ....................61, 62

*Aqua Prods., Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017) (en banc) ....................28, 54, 61, 62

*Becton, Dickinson & Co. v. Baxter Corp. Englewood*,
998 F.3d 1337 (Fed. Cir. 2021) ....................28

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ....................53, 62

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010)....................61

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) ....................53, 62

*Data Engine Techs. LLC v. Google LLC*,
10 F.4th 1375 (Fed. Cir. 2021) ....................42

*Honeywell Int'l, Inc. v. Arkema Inc.*,
939 F.3d 1345 (Fed. Cir. 2019) ....................28

*K/S Himpp v. Hear-Wear Techs., LLC*,
751 F.3d 1362 (Fed. Cir. 2014) ....................28

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ....................61, 62

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................28

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) ....................62

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) ....................28, 30, 32

*Ultratec, Inc. v. CaptionCall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017) ....................................................................29

**Statutes**

5 U.S.C. § 706(2)(A)...........................................................................................28

28 U.S.C. § 1295(a)(4)(A) ......................................................................................3

35 U.S.C. § 311 .......................................................................................................3

Administrative Procedure Act.......................................................................*passim*

## STATEMENT OF RELATED CASES

This appeal involves U.S. Patent No. 8,200,822 ("the '822 patent"). The '822 patent is at issue in *AlmondNet, Inc. et al. v. Samsung Electronics Co., Ltd. et al.*, Case No. 4-22-cv-07515 (N.D. Cal.), which is presently stayed.

## INTRODUCTION

In upholding the challenged claims of U.S. Patent No. 8,200,822 ("the '822 patent"), the Patent Trial and Appeal Board ("the Board") ignored critical record evidence and arguments, and otherwise failed to comply with the requirements of reasoned decisionmaking under the Administrative Procedure Act ("APA").

As Samsung established in its petition, both the '822 patent and Samsung's primary prior-art reference, U.S. Patent Publication No. 2004/0215515 ("Perry"), are directed to serving targeted online advertisements. When an online user visits a website (called a "third-party second media property" in the '822 patent and a "publisher webpage" in Perry), both the '822 patent and Perry disclose an advertising server (called a "BT Company" comprising "one or more computers" in the '822 patent and an "Advertising Service Company" ("ASC") in Perry) that authorizes a targeted advertisement to be served for display on that website based on the user's prior behavior (e.g., searching online for airline tickets) that was stored in what is commonly called a "cookie" or a "tag."

Despite the close parallel between Perry and the '822 patent, the Board found "no teaching or suggestion" in Perry "that ASC 140 authorizes any other component or entity that might be termed a third-party second media property, relative to itself, to display ads." Appx55. Instead, the Board concluded that "[i]n Perry's system, ASC 140 itself is disclosed to serve advertisements," and from that concluded that

the "ASC 140 [is] displaying ads." Appx55. In so concluding, however, the Board conflated *serving* an advertisement with *displaying* it. And it did so without addressing Samsung's very evidence and arguments directly on this issue or otherwise providing any explanation of why the two should be considered the same.

From the outset, Samsung demonstrated in its petition that a person of ordinary skill in the art ("POSITA") would have understood Perry to disclose distinct roles for its ASC and publisher—the ASC authorizes display of an advertisement by serving it to the publisher, and the publisher then displays it within its webpage. *See, e.g.*, Appx95; Appx524-525, ¶ 78. When AlmondNet challenged this argument in its response, Samsung replied with additional, significant evidence and arguments confirming this disclosure in Perry and making clear that Perry's service and display are *not* the same. Had the Board considered in any meaningful way Samsung's evidence and arguments demonstrating the very teaching in Perry that the Board thought lacking, it would have reached a different conclusion.

Making matters worse, although the Board considered and correctly adopted Samsung's claim construction, it did not apply it. The Board correctly found that the recited third-party second media property only had to be distinct from the recited "one or more computers," not from the overall claimed "system." Appx23. Yet in reaching its flawed decision on the merits, the Board appeared to contradict its adopted construction by grouping Perry's ASC and publisher websites together to

find that "neither 'automatically electronically authoriz[es] a third-party second media property' to display advertisements." Appx54. This makes no sense given, as the Board itself acknowledged, "the Petition identifie[d] 'a publisher's web page' in Perry—which is distinct from the ASC—as being the recited 'third-party second media property.'" Appx55 (citing Appx94-95).

By ignoring Samsung's evidence and arguments, the Board violated its duty of reasoned decisionmaking, which is reason enough to set aside its decision. And because the evidence contradicts the Board's decision and demonstrates that Perry discloses the "authorizing . . . to allow display" limitation (which, under the Board's construction, is the only limitation AlmondNet argued was not disclosed in the prior art), that decision is also unsupported by substantial evidence and should be reversed.

## STATEMENT OF JURISDICTION

Samsung appeals the final written decision of the Board in IPR2022-01259. The Board had jurisdiction under 35 U.S.C. § 311. Samsung filed a timely notice of appeal to this Court on March 22, 2024. This Court has jurisdiction of the appeal under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1. Did the Board violate the APA by failing to consider Samsung's evidence and arguments that demonstrated the challenged claims were obvious

because Perry discloses an advertising server (ASC) that authorizes its publisher to allow display of an advertisement, as the challenged claims require?

2. Was the Board's decision, which overlooked such evidence regarding how Perry's ASC interacts with its publisher, not supported by substantial evidence?

## STATEMENT OF THE CASE

### I. THE CHALLENGED PATENT

The '822 patent "relates to electronic advertisement placement based on expected profit from the placement." Appx69, 1:21-23; *see* Appx494-495, ¶¶ 35-36. In the '822 patent's advertisement system, "BT companies" ("'BT' stands for behavioral targeting") serve targeted ads on a "publisher's website" visited by users by placing a cookie/tag containing information about a user's prior behavior (for example, a user's online search results) "on the computers of visitors" or in a publisher website's "central database." Appx69, 1:62-2:3; *see id.*, 2:4-12; Appx70, 4:38-51; Appx72, 8:31-34, 8:56-58; *see also* Appx495, ¶ 37. A BT company can place the cookie/tag itself or request that the publisher website place it. Appx72, 8:37-44; *see* Appx495, ¶ 37.

The '822 patent calls websites (and other media that can display advertisements) "media properties." Appx70, 3:38-46. For example, a first media property may be a first website a user visits to run a web search, and a second media property may be a second website a user visits on which targeted advertisements are

displayed to the user based on that web search. Appx70, 3:21-55, 4:4-23; *see* Appx68, Fig. 3; Appx72, 7:49, 7:58 (referencing numeral 20 in Figure 3 to refer alternately to "media properties" and a "page/site").

The '822 patent explains that automatically electronically authorizing a publisher website to display an advertisement by serving it based on cookie information was known in the prior art. *See* Appx69, 1:27-34 (describing "DoubleClick's 'Boomerang'" service that uses cookies to serve targeted ads); *id.*, 2:13-21 (describing "BT compan[ies]" like AlmondNet that "plac[e] cookies on the computers of publisher's visitors for the purpose of delivering targeted ads"); *see also* Appx70, 3:9-4:23. The '822 patent also confirms that using advertisement servers, cookie tagging, user profile analysis, and the like for targeted advertising was known in the art. Appx69, 1:27-5:42; *see* Appx495-496, ¶ 38. The only purported point of novelty in the '822 patent is the addition of a profit check for these well-known cookie-tagging advertisement systems to ensure the profit exceeds "the cost of ad space" and "deliver[s] satisfactory margins." Appx71, 6:1-18; *see* Appx69-71, 1:27-6:8; Appx75-77 14:11-18:20; *see also* Appx496, ¶ 39. Service and display of an advertisement were already undisputedly well known.

Figure 3 depicts an exemplary embodiment:




Appx68 (annotated); *see* Appx72-73, 7:39-9:44.

In Figure 3, BT company (30) (blue) obtains information about a visitor's (e.g., a web user's) prior online behavior and stores that information in a user profile. Appx72, 7:40-8:7 (steps 200-300). For example, the BT company may record a visitor's search for airline tickets to Florida on a travel site (i.e., first media property 20). Appx72, 8:1-7. The BT company then calculates expected profit from delivering advertisements to the visitor based on the visitor's profile and selects those websites (i.e., second media properties 40 (green)) where displaying a targeted advertisement (e.g., an advertisement related to travel or Florida) would be sufficiently profitable. Appx72, 8:8-36 (steps 400-500). The BT company next arranges for the visitor to be tagged with a tag readable only by those selected websites. *Id.* (steps 610-620). When the visitor visits a selected website on the Internet 80 (yellow), the website recognizes the tag and arranges for the BT company

to serve a targeted advertisement, which then displays "with the media content" (e.g., within the webpage) requested by the visitor. Appx72-73, 8:64-9:3 (steps 710-730).

The '822 patent also discloses that delivering an advertisement "requires only control of the ad space and not necessarily control of the entire media property visited by the visitor." Appx70, 3:34-38. That ad space on a second media property may be controlled by the second media property itself. *See* Appx70, 3:21-4:3; Appx73, 9:65-66; Appx75, 14:1-3 (claim 12).

Claim 35—the only challenged independent claim—requires that the system described above includes "one or more computers programmed to implement a method of directing electronic advertisements." Appx76, 16:11-27 (claim 35). That method in turn includes a step of "automatically electronically authorizing a third-party second media property to allow display . . . of an advertisement." *Id.* Although this authorizing step must be performed by the recited "one or more computers" (as opposed to the claimed third-party second media property), dependent claims permit the third-party second media property to take part in the authorization process. For example, claim 47, which depends from claim 35, recites that "authorizing . . . comprises arranging for placement of a tag associated with the electronic visitor by the third party second media property." Appx77, 18:1-4. And claim 49, which depends from claim 47 (and thus, indirectly from claim 35), recites that "arranging for placement of a tag comprises . . . the [third party] second media

property . . . plac[ing] a tag on the electronic visitor." *Id.*, 18:8-12; *see, e.g.*, Appx72, 8:39-44.

## II. THE PRIOR ART

### A. Perry

Like the '822 patent, Perry describes a method of serving targeted advertisements based on, for example, a user's online search terms, which are stored in a unique identifier or cookie associated with each user. *See* Appx941, Abstract; *see* Appx498-500, ¶¶ 43-46. Figure 1 depicts Perry's preferred embodiment:




Appx942 (annotated).

In Figure 1, similar to the '822 patent, Perry depicts a targeted advertising system that includes Internet 120 (yellow); Internet users/visitors (user computer systems 101-104); publisher computer systems and websites visited by those users/visitors (publisher systems 131, 132 (green)); and an ASC (advertising service

system 140 (blue)), including CPUs 141 for executing computer programs. Appx942, Fig. 1; Appx946, ¶¶ 15, 17-18, 21.

Perry discloses that when "an Internet advertiser, through the ASC, has purchased advertising space on one of several Web pages provided to the Internet customer computer system by one of the Internet publisher computer systems, the Web page contains code calling for" advertisements from ASC 140. Appx946, ¶ 17. "When a customer computer system receives a Web page that contains such a reference [i.e., code]," it "sends a request to the ASC" for "data comprising an advertising message, such as a banner advertising message." *Id.*; *see* Appx946-947, ¶ 24. Perry further discloses that "conventional banner ads . . . hold a reserved placement location on a [publisher's] web page." Appx946, ¶ 24; *see* Appx947, ¶ 33 (disclosing that "the advertisement may be an embedded placement"' and "banner" refers "to any and all embedded placements"); *see also* Appx501, ¶ 47. When the ASC receives this request, "it selects an advertising message to transmit to the Internet customer computer system." Appx946, ¶ 18. Upon "receiv[ing] the selected advertising message, the Internet customer computer system displays it within the [publisher] Web page." Appx946, ¶ 19; *see* Appx501, ¶ 47.

Figure 3 is a flow chart illustrating the operation of an alternative embodiment with targeted advertising:




FIG. 3

Appx944. In Figure 3, the ASC "contracts with Advertisers" and for each creates "one of more advertising strategies . . . designed for a selected subset of users." Appx948, ¶ 41 (step 300). The ASC then selects "search terms . . . that users in the selected desired subset are likely to employ." Appx948, ¶ 42 (step 302). Similar to the '822 patent, when a user conducts a search with one or more of those terms, the returned results page "includes an 'extended data action tag' that is ASC code," which the user's browser executes to "cal[l] to an ASC server that queries the user's computer for a unique identifier or cookie." Appx948, ¶ 45 (step 304); *see* Appx500, ¶¶ 45-46. "[T]he ASC collects the cookie" and the user's search terms, stores both in a database, and "assign[s]" the cookie "to a search strategy," which may

"include[e] determining if the search terms associated with the cookie are a match for any of the strategies." Appx948-949, ¶¶ 46-49 (steps 306-312); *see* Appx500, ¶ 46. If "several advertising strategies" match, "the advertiser that more highly values the opportunity to reach that use[r] [may be] given priority, to maximize the advertising revenue for the publisher." Appx949, ¶ 50.

Like the '822 patent, when the user visits a webpage of a publisher that "has contracted with the ASC to serve advertisements," the webpage "includes an action tag that facilitates the ASC determining the user's cookie." Appx949, ¶ 52 (step 316); *see* Appx501, ¶ 47. If the ASC "determine[s] [that] the cookie exists," it selects "the advertising strategy assigned to the cookie" and "serves the advertisement of the selected strategy to the user." Appx949, ¶ 53 (steps 320-322); *see* Appx501-502, ¶¶ 47-48. As in Perry's other embodiment, that advertisement is then displayed "within the [publisher] Web page." Appx946, ¶ 19; *see* Appx501, ¶ 47.

### B. Wilson[1]

Wilson discloses "a system and method for targeting" advertising "based on the integration of diverse data into profile data relating to" selected users (called

[1] U.S. Patent No. 7,805,332 ("Wilson"). Samsung relied on Wilson to modify Perry to perform the authorizing step recited in claim 35 of the '822 patent to the extent "Perry is read not to disclose" that authorizing step or the step "is read to require a tag to be placed on the device of an electronic visitor as specified in the dependent

"audience members") that "may be initially collected from an offline source" and "supplemented periodically with data reflecting online activity by the audience member." Appx1167, Abstract; Appx1176, 1:16-22. Wilson discloses a "Targeting Engine" that creates "a unique identifier for the audience member" in a "domain cookie." Appx1179, 7:22-32; Appx1174, Fig. 6. The Targeting engine may also create "a segment-targeting cookie" with "a segment identifier" that includes user-specific activity data (called "segment affinity data"). Appx1179, 7:32-41. Advertising "content" (such as "website page advertisements") "may be delivered to the audience member based on the segment identifier in the segment-targeting cookie stored in the audience member computer." Appx1179, 7:41-44, 7:62-64; *see* Appx503-504, ¶¶ 49-51.

### C. Bronson[2]

Bronson discloses "a method and apparatus for an [online] advertising system" that serves targeted advertisements if certain conditions are met. Appx975, 1:10-15; Appx978, 7:24-42; Appx974, Fig. 4. Such conditions may include an

---

claims of the '822 patent." Appx527, ¶ 80 (emphasis omitted); *see* Appx42; Appx97. Samsung argued that although Perry discloses the claimed authorizing step, Wilson "provide[s] 'further details' and 'additional information' that allows for tagging for authorization." Appx274 (quoting Appx2446-2454, 75:19-83:1).

[2] U.S. Patent No. US 7,899,801 ("Bronson"). Some of Samsung's grounds relied on additional references, *see* Appx85-86, but the Board's decision focused only on the Perry-Wilson-Bronson combination, *see* Appx57-59, so the other references are not relevant here.

evaluation (based on "e.g., clickthrough rate") of "whether providing one or more ads will result in net or a threshold monetary gain or loss for the ad system." Appx978, 7:62-66. In other words, "such a condition may be based on the ad system determining whether an amount to be paid to the publisher or other entity for providing one or more ads . . . exceeds the (expected) return for the ad system," i.e., "will gross return/revenue exceed cost for the ad system if one or more ads are rendered." Appx978, 8:21-28; *see also* Appx978, 8:4-9, 8:21-38; Appx505-507, ¶¶ 53-54.

## III. THE PROCEEDINGS BELOW

There is one central question on appeal: whether Perry discloses that its ASC (corresponding to the claimed "one or more computers") authorizes a publisher webpage (corresponding to the claimed "third-party second media property")—which is distinct from the ASC—to allow display of an advertisement to a visitor to the publisher website. Samsung limits its recitation of the proceedings below to this question.

### A. Samsung's Petition

In its petition, *see* Appx78-151, Samsung advanced six invalidity grounds, all of which relied primarily on Perry and secondarily on Wilson and Bronson, *see* Appx85-86; *see also* Appx85-107. Samsung's petition was supported by the testimony of its expert, Dr. Schonfeld. *See* Appx471-605.

With respect to the authorization step, Samsung explained that "Perry discloses that the [ASC] and the publisher 'contrac[t]' to facilitate targeted advertising." Appx95 (citing Appx948, ¶ 41; Appx524-525, ¶ 78). To provide that targeted advertising, "the publisher web page includes an 'action tag,'" which, when "executed pursuant to the contract with the ASC," causes the publisher" to be "'automatically electronically authoriz[ed]' 'to allow' an ad to be served when a user visits the publisher webpage." *Id.* (citing Appx949, ¶ 52; Appx524-525, ¶ 78). Thus, the action tag is executed only if the publisher webpage is authorized to display an advertisement. Appx949, ¶¶ 52-53. That authorization process in Perry may begin when "the publisher web page includes the action tag pursuant to the contract." Appx95 (citing Appx524-525, ¶ 78).

Samsung also explained that once authorized by the ASC, Perry's publisher webpage displays the advertisement, which may be "conventional banner ads, which . . . display on an area of the publisher webpage." Appx95 (citing Appx946-947, ¶ 24; Appx524-525, ¶ 78); *see* Appx501, ¶ 47; Appx946-947, ¶¶ 17, 24, 33. Finally, Samsung explained that Perry's "automatic electronic authorization is 'responsive to' receiving the search information" of a user (i.e., the users "profile information"). Appx95-96; *see* Appx525-526, ¶ 79.

Alternatively, Samsung argued that the authorization "feature would have been obvious" in view of Wilson, which discloses "'automatically electronically

authoriz[ing]' the [publisher] website 'to allow display'" of an advertisement by "caus[ing] the website to send the unique identifier to a Targeting Engine to deliver an ad to the user." Appx97 (citing Appx527-529, ¶ 80; Appx1178-1179, 5:13-18, 5:66-6:13, 7:20-44, 7:63-64).

For claim construction, Samsung argued for a plain-and-ordinary-meaning interpretation, stating that "no special constructions are necessary." Appx88-89.

### B. AlmondNet's Response

In its response,[3] AlmondNet purported to parse five separate theories of authorization from Samsung petition by cherry-picking Samsung's statements out of context. Setting up these five strawmen, AlmondNet attacked each one in isolation. *See* Appx232-252. But at bottom, all of AlmondNet's arguments contended that Samsung did not show how the ASC authorizes "the publisher . . . 'to allow display' of an advertisement." Appx237-252.

AlmondNet argued that Perry does not disclose authorizing by the publisher's action of placing an "action tag" because that is an action "performed by the publisher web page itself," which AlmondNet asserted the patentee purportedly disclaimed. Appx238; *see* Appx239-240. AlmondNet also argued that the execution

---

[3] AlmondNet waived filing a preliminary response, *see* Appx157-159, and the Board instituted Samsung's petition, *see* Appx160-200. The Board expressly acknowledged Samsung's arguments concerning authorization and display. *See* Appx187-189.

of an action tag by Perry's ASC cannot be the claimed authorizing step because, according to AlmondNet, "the publisher takes no further steps in the ad-serving process" after that execution "that allow such an advertisement to be displayed." Appx244; *see* Appx240-243; *see also* Appx246 (arguing that the ASC's use of a user's "search information" still does not show the publisher "'allow[ing] display' of an advertisement"). The ASC's action of placing a cookie on a user's computer with a user's prior search history also could not qualify as authorizing, according to AlmondNet, because "Perry's publisher is not even aware of" the cookie until "an advertisement . . . is displayed."[4] Appx246-247 (emphasis omitted); *see* Appx247-250.

AlmondNet also attacked Samsung's reliance on Wilson and Bronson. AlmondNet argued that Wilson's disclosure of using a "unique identifier" to "authoriz[e] 'the www.domain2.com website'" could not be the "claimed 'authorizing' because" Samsung purportedly did not map that website to a third-party second media property. Appx250 (cleaned up).[5] And AlmondNet asserted that Bronson had no relevant disclosure of authorization at all, Appx252, ignoring

[4] Of course, Perry's publisher at least becomes "aware" of the advertisement (or cookie) when the advertisement is served to it. Display comes afterward.

[5] That is incorrect. Samsung mapped Wilson's "www.domain2.com" website to the third-party second media property. *See* Appx97.

that Samsung relied on Bronson for disclosing not authorization, but the visitor-specific-condition limitation, Appx101-107.

For claim construction, AlmondNet argued that the claimed third-party second media property must be "distinct from the '*system comprising* one or more computers,' because . . . the latter directs authoriz[ation] [of] the former to allow display of an advertisement." Appx223 (emphasis added). In other words, AlmondNet assumed that the overall recited "system comprising" performs the method with the authorizing step, and argued that the system cannot authorize "itself," Appx224-225, ignoring that claim 35 recites "one or more *computers programmed to implement* [that] method," Appx76, 16:11-19 (emphasis added). In support, AlmondNet pointed to the Board's construction in a decision denying institution of a petition challenging related claims in IPR2022-01262 (an unrelated proceeding), even though petitioner there never had a chance to address this flawed construction. *See* Appx224-225; Appx2892, Appx2900-2901.

AlmondNet also relied on the prosecution history of the related U.S. Patent No. 7,747,745 ("the '745 patent"), asserting that the applicant there disclaimed a system from authorizing itself by adding "third-party" to the claimed "second-media property." Appx224-225. AlmondNet contented this amendment only made "explicit" what the claims of the '745 patent "already made . . . clear"—"the

authorizing is being done of an *unrelated* site." *Id.* (cleaned up) (quoting Appx2609).

### C. Samsung's Reply

In its reply, Appx255-288, Samsung responded to all of AlmondNet's newly raised arguments, *see* Appx257-285.

First, Samsung explained that "the claims do not exclude authorization-related action from the [third-party second media property]—it is specifically contemplated by" the specification and "dependent claims [47 and 49]." Appx275-276 (citing Appx94-96; Appx948-949, ¶¶ 45, 52; Appx498-502, ¶¶ 41-48; Appx524-527, ¶¶ 77-79). Those dependent claims expressly recite that the authorizing step "comprises" the third-party second media property placing an action tag. Appx77, 18:1-4, 18:8-12; *see* Appx72, 8:39-44.

Second, Samsung showed that Perry's publisher does take steps to display an advertisement after receiving it. Samsung explained that Perry discloses actions "performed by the ASC" that "may result in the advertisement being served *and* displayed"—two separate actions—"on the publisher's webpage." Appx278-279 & n.16 (emphasis added). "In this sense, the ASC authorizes *the webpage to allow display* of a targeted advertisement because no such advertisement is displayed without execution of the action tag." Appx279 (emphasis added). Samsung also explained that by "'*plac[ing]* [the advertisement] *on publisher web sites* to users

visiting those sites,'" the ASC is authorizing those publisher websites *to display* the advertisement because the advertisement is placed *within those websites*. Appx280 (emphasis altered) (quoting Appx946, ¶ 15). Accordingly, "the ASC has a role in allowing the publisher website to display the advertisement by serving the advertisement," and the "publisher website [also] ha[s] a role": "the advertisement is displayed *on* the publisher's website." Appx280 (emphasis added) (citing Appx945-946, Appx949, ¶¶ 9, 17, 19, 53).

Samsung further explained that this aligns precisely with how the '822 patent describes the claimed "authorizing . . . to allow display": "Just as ads can be delivered for display by an entity that has some control over the ad space in the '822 patent's system, Perry's ASC can serve an ad for display at the user's browser in ad space provided in the page provided by the publisher." Appx280 (citing Appx945-949, ¶¶ 3, 15, 23-27, 30-33, 52-53; Appx2157, 128:8-19) (other citations omitted). Samsung provided the following examples from the '822 patent, *see* Appx280-281: disclosure of "delivering ads and filling ad space temporarily controlled by ad network media property," Appx70, 3:21-4:3; disclosure that the third-party "'second media property' can 'control[] ad space,'" Appx73, 9:65-66; *see* Appx75, 14:1-3 (claim 12 reciting same); and disclosure of "BT company 30 determining tag placement based on price for delivering an ad," Appx73, 10:11-20. Samsung made clear that the '822 patent's disclosure of "BT company 30 serving [an] ad . . . that

appears with media content (webpage) . . . requested by the visitor" is "similar to Perry's ASC serving an ad." Appx281 (citing Appx68, Fig. 3; Appx72, 8:64-9:3; Appx942, Fig. 1).

Summarizing, Samsung explained that "'[a]uthorizing' in the claimed method step does not stand alone, but more fully states 'authorizing . . . to allow display . . . of an advertisement.'" Appx281. "[C]oupled with the understanding that claim 35 and the specification d[o] not exclude a second media property from taking part in the 'authorizing' (e.g., tagging a visitor's computer) or specify/exclude components/devices from participating in such authorization to allow display of the ad" demonstrate that the Perry's publisher displays the advertisement once it is served to it by the ASC. Appx281-282.

Samsung also addressed AlmondNet's remaining arguments. Samsung explained that what AlmondNet claimed was a failure to show authorization by the ASC's use of a user's profile information or placing a cookie on a user's computer was actually Samsung showing that Perry's authorization is done "responsive to receiving [user profile] information," as claim 35 requires. Appx282-283; *see* Appx76, 16:14-19. Samsung also explained in detail its reliance on Wilson and Bronson, including by pointing out that Bronson discloses the same profit-based condition that AlmondNet itself previously adopted for the '745 patent. Appx283-284 (quoting Appx2608-2609; citing Appx979, 9:20-29).

With respect to claim construction, Samsung explained that “[t]he preamble of claim 35 uses the open-ended transitional phrase, ‘comprising,’ to indicate that the ‘system’ may include ‘one or more computers’” and other components like a third-party second media property. Appx257-258 (footnote omitted). Samsung also explained that “the phrase, ‘programmed to implement a method of directing electronic advertisements’” recited in the preamble of claim 35 “more naturally modifies ‘one or more computers’” because, as AlmondNet’s expert agreed, it is “the computers [that] are being programmed.” Appx259 (emphasis omitted) (quoting Appx 2112, 83:1-18). By contrast, AlmondNet’s construction would exclude the embodiment in Figure 3 of the ’822 patent, which depicts such a system that includes both a BT company (“one or more computers”) and a second media property (“third-party second media property”)—just like Perry’s system includes both an ASC and a publisher:







Appx258-259 (citing Appx68); Appx266-267 (reproducing the ’822 patent’s Fig. 3 and Perry’s Fig. 1 (annotation altered by removing outlines and adding green color

to Perry's publisher and the '822 patent's third-party second media property, blue color to Perry's ASC and the '822 patent's BT company ("one or more computers"), and yellow color to the Internet in both references)).

Turning to prosecution history, Samsung explained that adding the "third-party" modifier to claims that did not recite a system that could authorize display could not have clearly and unmistakably disclaimed including a third-party second media property in a "system" like the one recited in claim 35. Appx263 (citing Appx2678-2679). Moreover, "the applicant sought to overcome a rejection based on *the same structure* in the prior art as *both* the '*one or more computers*' and the 'second media property.'" Appx263 (citing Appx2609). Samsung explained that the Board's construction in IPR2022-01262 was inapposite for the same reason—the petitioner there mapped "the *same* servers" to "*both* the claimed 'one or more computers' and the 'third-party server computer.'" Appx264-265 (citing Appx2900-2902, Appx2906-2908).

### D. AlmondNet's Sur-Reply

AlmondNet filed a sur-reply in which it largely repeated its arguments from its response and failed to meaningfully challenge Samsung's reply arguments. Appx293-317.

### E. The Board's Decision

The Board addressed claim construction first. *See* Appx13-27. After reciting the parties' arguments, the Board correctly concluded "that the recited 'system' of claim 35 does not necessarily exclude a 'third-party second media property.'" Appx23. The Board agreed with Samsung that by using the open-ended term "comprising," claim 35's system could include a third-party second medial property. The Board also agreed that the recited "one or more computers" are the components "programmed to implement [the claimed] method," including authorization. Appx23 (citing Appx257; Appx259). The Board held that claim 35 is "a system claim rather than a method claim." Appx26.

The Board further held that "the third-party second media property must be distinct from [the recited] 'one or more computers.'" Appx23 (emphasis omitted). The Board pointed to the prosecution history of the related '745 patent, concluding it "[h]ighliht[ed] the significance of the modifier 'third-party.'" Appx23-24.

The Board also explained that dependent claims 47 and 49 were consistent with its construction. But there the Board appeared to misunderstand Samsung's arguments concerning those dependent claims, apparently believing that Samsung relied on them to argue that the third-party second media property could be included in "one or more computers." Appx24. Not so. Samsung consistently argued that

the third-party second media property could be part of the recited "system"—not "one or more computers." *See, e.g.*, Appx94-95; Appx257-259; Appx268-269.

Turning to obviousness, the Board recited some of the parties' arguments, *see* Appx39-54—but did not even acknowledge Samsung's reply beyond page 19 (Appx275), *see* Appx49-53. The Board found "no teaching or suggestion" in Perry "that ASC 140 authorizes any other component or entity that might be termed a third-party second media property, relative to itself, to display ads." Appx55. But the Board ignored Samsung's evidence of that purportedly missing teaching in Perry. Without considering the full record, the Board found that "[i]n Perry's system, ASC 140 itself is disclosed to serve advertisements," and from that concluded that the "ASC 140 [is] displaying ads." Appx55. The Board did not explain how "serving" and "displaying" were equivalent. *See id.*

In reaching that flawed decision, the Board appeared to contradict its own construction by grouping Perry's ASC and publisher websites together to find that "neither 'automatically electronically authoriz[es] a third-party second media property' to display advertisements." Appx54. But, as the Board acknowledged, "the Petition identifie[d] 'a publisher's web page' in Perry as being the recited 'third-party second media property'"—not the ASC. Appx55 (citing Appx94-95).

The Board did not conduct an independent obviousness analysis of dependent claims 36-51. *See* Appx58-59.

## SUMMARY OF ARGUMENT

**I.** The Board's decision on the merits is inconsistent with its adopted claim construction and should be reversed or at least vacated. The Board agreed with Samsung and held "that the recited 'system' of claim 35 does not necessarily exclude a 'third-party second media property,'" but only requires "the third-party second media property [to] be *distinct from* [the recited] 'one or more computers.'" Appx23. This claim construction holding is correct, because it is supported by the claim language, the written description, and the prosecution history of the related '745 patent. As the Board found, "claim 35 uses the open-ended transitional phrase 'comprising,'" meaning "that the recited 'system comprising one or more computers' may include components other than the recited 'one or more computers,'" like the "third-party second media property." *Id.* Moreover, claim 35 recites that it is the "one or more computers" that are "programmed to implement a method" that includes the "authorizing . . . to allow display" limitation. Appx76, 16:11-13. Accordingly, as the Board found, "the phrase 'programmed to implement a method' . . . more naturally modifies 'one or more computers,' rather than 'system.'" Appx23.

When resolving the merits of Samsung's obviousness arguments, however, the Board appears to have applied a different construction, grouping Perry's ASC and publisher together and finding that neither authorizes what could be called a

third-party second media property to display an advertisement. This was error, because Samsung consistently mapped Perry's publisher—which is distinct from its ASC—to the claimed third-party second media property. Had the Board applied the construction it adopted, it would have correctly recognized that in Perry's system, the ASC authorizes a publisher (a separate structure) to allow display of an advertisement.

**II.** Applying the construction the Board adopted (and should have applied), Samsung showed how Perry discloses claim 35's "authorizing . . . to allow display" limitation. Samsung explained that dependent claims 47 and 49 expressly contemplate having the third-party second media property perform some authorization-related actions, like placing an action tag. Samsung also explained that Perry's publisher displays an advertisement after receiving service of it from the ASC. Samsung explained that because the advertisement is displayed *within* the publisher's website, inherently it is the publisher's website that displays it. Samsung pointed to significant disclosure in Perry, the testimony of Samsung expert, the nearly identical functionality disclosed in the '822 patent, and AlmondNet's admissions, all of which supported Samsung's arguments.

The Board ignored all of this evidence and arguments. Instead, without properly considering the full record, the Board agreed with AlmondNet and concluded that "there is no teaching or suggestion in [Perry] that a publisher's web

page or publisher computer systems 131 and 132 display ads" after they are served by the ASC. In doing so, the Board wrongly conflated *serving* an advertisement with *displaying* it. This was reversible error because reasoned decisionmaking requires the Board to consider all record evidence, especially when that evidence bears directly on the issue before it. Samsung presented evidence and arguments demonstrating that Perry contains the very teaching the Board erroneously concluded Perry lacked. Had the Board considered Samsung's evidence and arguments, it would have understood that service and display are not the same and recognized that Perry contains the very teaching it thought was missing. By ignoring this evidence and arguments, the Board's decision violates the APA. And because that evidence contradicts the Board's decision, that decision is not supported by substantial evidence. The Court should therefore reverse the Board's decision, or at the very least, vacate it.

## STANDARD OF REVIEW

Under the APA, this Court holds unlawful and sets aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Honeywell Int'l, Inc. v. Arkema Inc.*, 939 F.3d 1345, 1348 (Fed. Cir. 2019) (citing 5 U.S.C. § 706(2)(A)). To pass muster under this standard, the Board must (1) "make the necessary findings and have an adequate evidentiary basis for its findings," and (2) "examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice made." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (cleaned up). The Board "must take account of all the evidence of record, including that which detracts from the conclusion the agency ultimately reaches." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) (en banc).

With respect to obviousness, this Court "review[s] the Board's legal conclusions de novo and its factual findings for substantial evidence." *Becton, Dickinson & Co. v. Baxter Corp. Englewood*, 998 F.3d 1337, 1339 (Fed. Cir. 2021) (cleaned up). Similarly, the Court "review[s] the Board's ultimate claim construction and any supporting determinations based on intrinsic evidence de novo," and any "subsidiary fact findings involving extrinsic evidence for substantial evidence." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1364 (Fed. Cir. 2014) (citation omitted). This Court "must judge the propriety of [the Board's] action solely by the grounds invoked by the [Board]" and "may not supply a reasoned basis for the [Board]'s action that the [Board] itself has not given." *Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1274 (Fed. Cir. 2017) (cleaned up).

## ARGUMENT

The core merits dispute before the Board was whether Perry discloses that the ASC (i.e., "one or more computers") "authoriz[es]" a publisher webpage (i.e., "third-party second media property") "to allow display" of an advertisement to a visitor, as required by independent claim 35. Appx76, 16:17-19; *see* Appx54-58. Samsung showed that, under the claim construction that the Board adopted, a POSITA would have understood Perry to contain such disclosure because Perry teaches that its ASC serves an advertisement to the publisher webpage, which then displays it to an online user. Thus, because AlmondNet did not challenge that the prior art discloses all limitations of the challenged claims under the Board's construction other than this "authorizing . . . to allow display" limitation, *see* Appx252-253; Appx285, the Board should have found all challenged claims obvious. But the Board ignored Samsung's critical evidence and argument on this core issue, and, applying what appears to be a different claim construction from the one it adopted, found that Perry was missing this disclosure. By doing so, the Board committed reversible error.

### I. THE BOARD'S DECISION IS FUNDAMENTALLY AT ODDS WITH ITS CLAIM CONSTRUCTION

After adopting Samsung's proposed claim construction, the Board failed to actually apply it. Instead, when considering the merits of Samsung's petition, the Board appears to have conflated Perry's ASC with its publisher, finding that neither performs the claimed authorizing step. But this conclusion is inconsistent with

Samsung's evidence and arguments, and the Board's adopted claim construction. Accordingly, the Board's decision is not supported by substantial evidence and should be reversed or at least vacated.

Adopting Samsung's argument, the Board correctly held "that the recited 'system' of claim 35 does not necessarily exclude a 'third-party second media property.'" Appx23. The Board also held that "the third-party second media property must be *distinct from* [the recited] 'one or more computers'" of claim 35. *Id.* The Board's construction is supported by the intrinsic record. *See Seabed*, 8 F.4th at 1287 ("For claim construction," this Court "begin[s] with the intrinsic evidence," to which this Court "give[s] primacy." (cleaned up)). And as explained in Argument Section II.A, *infra*, that claim construction is fatal to the Board's conclusion that Perry discloses no "component in [its] system [that] implements a method that includes 'automatically electronically authorizing a third-party second media property' to display . . . advertisements." Appx54.

Here, the parties disputed the meaning of claim 35's preamble, which recites "[a] *system* comprising *one or more computers* programmed to implement a method of directing electronic advertisements." Appx76, 16:11-13 (emphasis added to critical terms). The dispute centered on whether (1) the recited "system" is coextensive with the "one or more computers" and cannot include other components (for example, the claimed "third-party second media property") (AlmondNet's

argument, *see* Appx223-232), or (2) the recited "system" is broader than the "one or more computers" and thus can include a "third-party second media property" in addition to the "one or more computers" (Samsung's argument, *see* Appx257-266).

This distinction is important because claim 35 recites that the "one or more computers" are "programmed to implement a method of directing electronic advertisements" and that method includes "automatically electronically authorizing a third-party second media property to allow display" of an advertisement. Appx76, 16:11-13, 17-19. If, as AlmondNet contended, the recited "system comprising" is coextensive with "one or more computers" (which authorize), then the entire recited "system" is the authorizing component/structure and mapping the third-party media party to any portion of that component/structure would defeat invalidity. On the other hand, if, as Samsung argued (and the Board agreed), the claimed "system" is broader than the "one or more computers" that authorize, the claimed "third-party second media property" could be both distinct from the "one or more computers" and still be part of the claimed system.

The Board correctly rejected AlmondNet's proposed construction and agreed with Samsung, basing its decision primarily on intrinsic evidence. Appx23-27; *see Seabed*, 8 F.4th at 1287. The Board agreed that by "us[ing] the open-ended transitional phrase 'comprising, . . .' the recited '*system comprising* one or more computers' may include components other than the recited 'one or more

computers,'" such as the third-party second media property. Appx23 (emphasis added) (citing Appx257). The Board also agreed with Samsung that the recited "phrase 'programmed to implement a method of directing electronic advertisements' more naturally modifies 'one or more computers,' rather than 'system.'" Appx23 (citing Appx259); *see* Appx2112, 83:8-13 (AlmondNet's expert agreeing that it is "the computers [that] are being programmed . . . to implement a method"); Appx2115, 86:7-15 (AlmondNet's expert testifying that "the system of claim 35 . . . reads on a third-party second media property"). The Board concluded that "claim 35 is . . . a system claim rather than a method claim," Appx26,[6] which further supports its interpretation that the claimed "system" is broader than the recited "one or more computers," which are "programmed to implement a method," Appx76, 16:11-13. The Board also recognized AlmondNet's admission that it "doesn't interpret the language '[a] system comprising' itself as excluding particular elements," such as a third-party second media property. Appx19 (quoting Appx294 n.2). Accordingly, the Board held that the claimed third-party second media property could be part of the recited "system," but had to be "distinct from" the recited "'one or more computers.'" Appx23 (emphasis omitted).

[6] As the Board noted, this was AlmondNet's position. Appx25-26; *see* Appx299.

The Board's claim construction is correct and should be affirmed. But this construction is inconsistent with the Board's decision on the merits. Instead, it appears that the Board applied the construction that AlmondNet proffered because it grouped Perry's ASC and publisher together to find that "neither 'automatically electronically authoriz[es] a third-party second media property' to display advertisements." Appx54. This was error, because the Board's adopted construction requires only that the third-party second media property structure be distinct from the "one or more computers," Appx23, and that is precisely how Samsung argued Perry's publisher and ASC are arranged, *see, e.g.*, Appx94-95; Appx269; Appx279-281. Accordingly, as explained below, applying the correct construction demonstrates that the challenged claims are obvious.

## II. THE BOARD'S REJECTION OF THE OBVIOUSNESS GROUNDS IS ARBITRARY AND CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

On the merits, Samsung provided significant evidence and arguments addressing the central issue facing the Board: whether Perry discloses that its publisher website (i.e., "third-party second media property") is the component that displays an advertisement to an online user once authorized by its ASC (i.e., "one or more computers").

Applying the construction the Board adopted, Samsung explained in its petition that it is Perry's publisher that allows display of an advertisement after being authorized to do so by the ASC's service of that advertisement. *See, e.g.*, Appx94-

95; Appx524-525, ¶ 78. After AlmondNet attacked this disclosure in Perry by mischaracterizing Samsung's petition, Samsung provided additional—and critical—evidence and arguments demonstrating a POSITA's understanding of these distinct roles played by the ASC and the publisher in Perry's system. *See, e.g.*, Appx278-282. Specifically, Samsung explained that Perry's ASC authorizes a third-party website to display a targeted advertisement by executing an action tag if it is present within the website's code and then serving the advertisement to that third-party publisher website. *See, e.g.*, *id.* Once the publisher website receives the authorization via service of the advertisement, it displays that advertisement. *See, e.g.*, *id.* In other words, Samsung showed that in Perry, *service* is distinct from *display*. Thus, Samsung demonstrated that its Perry-Wilson-Bronson combination[7] renders the challenged claims obvious.

Without considering or even acknowledging Samsung's evidence and arguments regarding this disclosure in Perry, and instead relying on AlmondNet's

---

[7] Samsung relied on Wilson to modify Perry to perform the authorizing step recited in claim 35 to the extent "Perry is read not to disclose" that authorizing step or the step "is read to require a tag to be placed on the device of an electronic visitor as specified in the dependent claims of the '822 patent." Appx527, ¶ 80 (emphasis omitted); *see* Appx42; Appx97. Samsung argued that although Perry discloses the claimed authorizing step, Wilson "provide[s] 'further details' and 'additional information' that allows for tagging for authorization." Appx274 (quoting Appx2446-2454, 75:19-83:1). Samsung relied on Bronson to "provide low-level details for how [Perry's] ASC actually turns a profit," Appx102, to meet the profit-based "visitor-specific condition" limitation of claim 35, Appx101-107.

mischaracterizations of Samsung's arguments, the Board concluded that it is Perry's ASC, not the publisher website, that purportedly displays the advertisements because the ASC serves them. *See* Appx54-57. But Samsung demonstrated that a POSITA would have recognized from Perry that *serving* an advertisement is distinctly different from *displaying* it. Because the Board did not consider Samsung's evidence and argument directed at the very issue on which the Board's decision turned, that decision is arbitrary and capricious and unsupported by substantial evidence.

### A. Under the Board's Construction, Samsung Showed That the Challenged Claims Are Obvious Over Perry in View of Wilson and Bronson

Under the construction that the Board adopted, Perry discloses that the ASC ("one or more computers") authorizes a publisher webpage (a "third-party second media property") to allow display of an advertisement to a visitor, satisfying the authorizing step limitation of independent claim 35. In reaching the opposite conclusion, the Board ignored critical evidence and arguments on this dispositive issue that Samsung presented in its reply. *See* Argument Section II.B, *infra*. To provide context for those arguments, Samsung begins the discussion below with the petition. Samsung then continues by showing how, in its reply, Samsung addressed all of AlmondNet's flawed arguments and further demonstrated how Perry discloses the very teaching that the Board improperly found lacking. Lastly, Samsung

explains how AlmondNet's sur-reply had no meaningful answers to Samsung's evidence or arguments.

### 1. Samsung Demonstrated in the Petition That Perry Discloses the "Authorizing . . . to Allow Display" Limitation

In the petition, Samsung explained that to implement targeted advertising, Perry teaches that "the publisher web page includes an 'action tag,'" which, when "executed" by the ASC, causes the publisher" to be "'automatically electronically authoriz[ed]' 'to allow' an ad to be served when a user visits the publisher webpage." Appx95 (citing Appx948-949, ¶¶ 41, 52; Appx524-525, ¶ 78). In other words, the ASC executes the action tag only if the publisher webpage is permitted to display an advertisement, thereby authorizing such display. Appx949, ¶ 53; *see* Appx524-525, ¶ 78. Perry's authorization is also automatic if the action tag is present, Appx949, ¶ 53, and is "responsive to" the ASC receiving the user's "search information" (i.e., its "profile information"), which the ASC receives either as a result of a user's "first visit to the publisher website" or its visit to "a search engine website," Appx95-96 (citing Appx949, ¶ 52; Appx525-527, ¶ 79). Lastly, Samsung explained that the authorization process may begin when "the publisher web page includes the action tag pursuant to the contract." Appx95; *see* Appx524-525, ¶ 78.[8]

---

[8] For additional detail, Samsung also pointed to similar and more detailed disclosure in Wilson of "us[ing] cookies and other forms of tagging," including adding a "unique identifier" to a visitor's computer, which a POSITA would have been

Once authorized via service of an advertisement, Perry's publisher "allow[s] display" of that advertisement. Appx95. Specifically, Perry teaches that "served advertisements may include conventional banner ads, which . . . *display on an area of the publisher webpage*." Appx95 (emphasis added) (citing Appx946-947, ¶ 24; Appx525, ¶ 78). In other words, such advertisements are displayed *within* the publisher webpage, meaning that the publisher webpage is displaying the advertisement in response to receiving it from the ASC (i.e., in response to being authorized).

Thus, Samsung demonstrated that every requirement of the authorizing limitation in claim 35 is met under its proposed construction, which the Board adopted. *See* Appx23. But as evident from the above discussion, Samsung's petition showed that Perry discloses every requirement of the authorizing limitation even under AlmondNet's characterization of what claim 35 requires. *See* Appx238 (arguing that the authorizing step requires: "(1) the authorization must be provided to a 'third-party second media property'; (2) the authorization must be done 'automatically'; (3) the 'authorizing' must authorize the recipient 'to allow display'

---

motivated to include in Perry to perform the authorizing step. Appx97 (citations omitted); *see* Appx527-529, ¶ 80 (citations omitted); Appx42.

of an advertisement subject to a visitor-specific condition;[9] and (4) the 'authorizing' must be 'responsive to' receiving profile information about the visitor" (emphasis omitted)).[10]

Moreover, Samsung explained that this authorization process is nearly identical to the one described in the '822 patent. *See* Appx97 (explaining how "the '822 patent describes the tagging process" disclosed similarly in Wilson and Perry (citing Appx72-73, 8:37-50, 8:64-9:3)); Appx529, ¶ 80; *see also* Appx72-73, 8:64-9:3 ("When a selected media property 40 recognizes a tagged visitor 10 . . . visiting (710) its ad space, the media property 40 will arrange for the BT [advertising] company 30 *to serve an ad (720) to the visitor 10 (which will appear with the media content (730) requested by the visitor*) . . . ." (emphasis added)); Appx7-8.

---

[9] Samsung explained that whereas Perry suggests authorization based on price, Bronson discloses the profit-based "visitor-specific condition" limitation in significant detail. *See* Appx101-107.

[10] Indeed, Samsung showed that alternatively, the challenged claims are invalid even under AlmondNet's flawed construction. Samsung explained that Perry's ASC is also a "system" that could be mapped to the claimed "system comprising one or more computers" because it "is at least programmed with computer programs to deliver targeted advertisements to users" and "includes one or more computers." Appx268 (cleaned up) (quoting Appx91). The only argument AlmondNet was able to muster in response to this alternative argument was to assert (incorrectly) that Samsung did not raise it in its petition for the "system" term. *See* Appx303 (arguing that Samsung only raised this argument in its "analysis for limitation 35(a)"). But limitation 35(a) *is* the preamble that contains the "system comprising" term, and Samsung was clear that the ASC could alternatively satisfy that term. *See* Appx89-90.

### 2. Although Ignored by the Board, Samsung's Reply Provided Additional Evidence and Argument Demonstrating Perry's Critical Disclosure

The Board acknowledged the above arguments Samsung presented in its petition. *See* Appx41-43. But, after AlmondNet challenged Samsung's arguments with respect to the authorizing step, Samsung provided in its reply additional, significant evidence and arguments, explaining that AlmondNet's arguments were flawed because they were based on its incorrect claim construction, misconstrued Samsung's petition, and failed to show that Perry (or Perry in view of Wilson and Bronson) did not perform the authorizing step. *See* Appx275-285. The Board wholly ignored this evidence and arguments. *See* Argument Section II.B, *infra*.

In its opposition, AlmondNet attempted to muddy the waters by transforming Samsung sole explanation of Perry's authorization disclosure into *five* purportedly separate theories, attacking each component of Samsung's explanation individually and out of context. Appx237-251. But each of those five arguments were based on one core premise—that Samsung supposedly did not show that the ASC authorizes "the publisher . . . 'to allow display' of an advertisement." Appx241 (citing Appx2344-2348, ¶¶ 72-80). In the portion of its reply ignored by the Board, Samsung addressed this core premise and each of AlmondNet's five defective

arguments. *See* Appx275-285.[11] However, Samsung addresses only the first two arguments here because the others are not relevant to this appeal.

First, AlmondNet argued that "includ[ing] an action tag" by the publisher webpage cannot be the claimed authorizing step because that is an action that is "performed by the publisher web page itself" and the patentee purportedly "explicitly disclaimed 'authorizing' being performed by the 'third-party second media property" because the latter cannot authorize itself. Appx239 (citing Appx2609).[12]

In reply, Samsung explained that the '822 patent refutes this argument because "the claims do not exclude authorization-related action from the" third-party

---

[11] AlmondNet's "addition[al]" half-hearted argument attacking Samsung's reliance on Bronson was also rooted in this core premise: AlmondNet argued that Samsung purportedly did not explain how the Perry-Bronson combination "would *authorize the publisher site* to allow display of the advertisement subject to [a profit-based] condition." Appx252. Samsung addressed this argument in detail, explaining that Perry's ASC, in view of Bronson's disclosure of profit-based conditions for delivering advertisements, would authorize the publisher in part based on price. *See* Appx283-285 (citing Appx102-105). But the Board did not rely on AlmondNet's argument and so Samsung does not address it further here.

[12] AlmondNet also argued that "inclusion of the action tag on the publisher site is not performed 'automatically'" because a programmer supposedly must manually insert the action tag. Appx240 (citations omitted). In response, Samsung explained that even if a programmer must create code to place an action tag (all software code is written by a programmer), that code is 'ultimately . . . executed by a processor and thus adding the action tag [is] performed automatically." Appx276-277 (citing Appx2430-2433, 59:18-61:7, 62:6-10). The Board did not rely on this defective argument and thus Samsung does not address it further here.

second media property—they expressly recite it. Appx275-276 (citing Appx94-96; Appx948-949, ¶¶ 45, 52; Appx498-502, ¶¶ 41-48; Appx524-527, ¶¶ 77-79). Claim 47, which depends from claim 35, recites that "authorizing . . . comprises arranging for *placement of a tag . . . by the third party second media property*." Appx77, 18:1-4 (emphasis added). And claim 49, which depends from claim 47 (and thus, indirectly, from claim 35), recites that "arranging for placement of a tag comprises . . . *the [third party] second media property . . . plac[ing] a tag* on the electronic visitor." Appx77, 18:8-12 (emphasis added); *see, e.g.*, Appx72, 8:39-44. These claims poignantly illustrate the flaw in AlmondNet's argument because they contemplate that placing a tag—a part of the claimed authorizing step—is performed by the third-party second media property (i.e., Perry's publisher).[13] By taking part in the authorization process, Perry's publisher is not "authorizing itself," Appx307,

[13] In its claim construction discussion, the Board found that by "arranging" for the placement of the tag by the third-party second media property, claims 47 and 49 require that the tag placement is done "with the authorization of the one or more computers." Appx24. But this contradicts the claim language, because such arranging and placement is part of the claimed authorizing step, *see* Appx77, 18:1-12 (claims 47 and 49), and thus authorization is not yet complete when the third-party second media property places a tag. To the extent the Board only meant to suggest that the third-party second media property could not itself complete the entirety of the authorizing step, that is consistent with Samsung's position. But, if the Board meant to suggest that the third-party second media property cannot take any authorization-related action, that contradicts the claim language and the written description, *e.g.*, Appx77, 18:1-12; Appx72, 8:39-44—and even AlmondNet's own admission that the that the third-party second media property does perform authorizing-related actions, Appx310; *see* Appx2155, 126:7-25.

because under the Board's construction, it remains separate from the ASC (which authorizes) and thus does no more than what the claims and written description of the '822 patent expressly permit. After receiving such broad claims, AlmondNet cannot now "twist [those] claims, like a nose of wax . . . to avoid invalidity." *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1381 (Fed. Cir. 2021) (cleaned up). But the Board did not consider this evidence and argument. *See* Argument Section II.B, *infra*.

AlmondNet's contention that the patentee "disclaimed 'authorizing' being performed by the 'third-party second media property,'" Appx239 (citing Appx2609), is a strawman. During prosecution of the related '745 patent, the applicant sought to overcome a rejection based on the *same structure* in the prior art as *both* the "one or more computers" and the "third-party second media property." *See* Appx2609 (arguing that the prior art taught "a method performed by . . . a 'website B,'" such that the authorizing step "is being done *by the website itself*," whereas the claimed 'authorizing . . . does not seem to cover a site deciding something on its own" (underline omitted)); *id.* (explaining that the addition of "third-party" was meant to indicate "it is not *under common ownership* with the *machine* performing the claimed process" (emphasis added)). Accordingly, based on those same prosecution history statements, the Board previously "distinguished [a] petitioner's prior art mapping where the petitioner identified the *same* servers . . . as being *both* the

claimed 'one or more computers' and the 'third-party server computer.'" Appx19 (quoting Appx265; citing Appx2900-2901; Appx2906-2908). But, as Perry makes clear (and as Samsung consistently argued), Perry's publisher is a distinctly different structure than its ASC. And, although the publisher can take some authorization-related actions—as the '822 patent's claims expressly permit and AlmondNet admitted—Samsung never argued that Perry's publisher performs the entirety of the claimed authorizing step.

Second, AlmondNet argued that executing Perry's action tag (instead of placing it) could not be the claimed authorizing step because, according to AlmondNet, Perry's publisher takes no further action after "serv[ing] to the user certain code on the publisher page, which causes the user's computer to communicate directly with the ASC." Appx243. Thus, AlmondNet contended, Perry's publisher cannot be said "to display" the advertisement. Appx244-245. Instead, that display is purportedly performed by the ASC. *Id.*

Samsung explained that this argument also wholly misses the mark because Perry makes clear that by "*plac[ing]* [the advertisement] on publisher web sites to users visiting those sites," the ASC is authorizing those publisher websites to *display* the advertisement. Appx280 (emphasis altered) (quoting Appx946, ¶ 15); *see* Appx2423-2424, 52:20-53:21. Thus, just like "the ASC has a role in allowing the publisher website to display the advertisement by serving the advertisement," the

"publisher website [also] ha[s] a role": "the advertisement is displayed *on* the publisher's website." Appx280 (emphasis added) (citing Appx945-949, ¶¶ 3, 9, 15, 17-20, 23-24, 30-33, 38-53); *see* Appx2438-2439, 67:18-68:16 (Samsung's expert testifying that Perry's ASC "would allow a publisher website to be authorized *to display* an ad" (emphasis added)).

Samsung also pointed to AlmondNet's acknowledgment that "execution of the tag" in Perry "'*causes*' the user computer"—on which the publisher webpage is running—"to communicate with the ASC so the ASC can collect profile information, which may result in the advertisement being served and *displayed on the publisher's webpage*." Appx279 (second emphasis added) (citing Appx243-244; Appx946-949, ¶¶ 15, 17-20, 25-33, 38-53). "In this sense," Samsung continued, "*the ASC authorizes the webpage to allow display* of a targeted advertisement because no such advertisement is displayed without execution of the action tag." Appx279 (emphasis added); *see* Appx524-525, ¶ 78. In other words, as Samsung's expert confirmed in unrebutted testimony, because the served advertisement is received by Perry's publisher webpage (even when the webpage is running on a user's browser) and is displayed within Perry's publisher webpage, it is that publisher webpage that is performing the display action. *See* Appx2491, 120:2-3 (Samsung's expert confirming that Perry's publisher displays the advertisement once authorized by the ASC because "the authorization is to allow the Publisher's

website *to display the advertisement*" (emphasis added)); *see also* Appx2489-2491, 118:24-120:3 (explaining that the ASC's authorization by "serv[ing] the advertisement" "ultimately results in the advertisement being displayed on the user's computer *as part of the website of the publisher*" and that "*the publisher is the one that controls everything* by initiating the action tag [to start the authorizing step] and . . . [then] *allowing for the advertisement to be displayed*" (emphasis added)).[14] This testimony further confirms that *service* of an advertisement is distinct from its *display*.

It is important to understand just how Perry's publisher website operates. As with all Internet websites, Perry's publisher website consists of code that, when a user requests the website (i.e., "visits" the website), is sent by the publisher to the user's computer to run and display within a browser window thereon. *See* Appx946, ¶ 15 ("An Internet customer . . . connect[s], via the Internet 120, to an Internet publisher computer system, such as Internet publisher computer systems 131 and 132, to retrieve and display a Web page."); Appx277 ("A webpage contains

[14] The testimony of AlmondNet's expert supports this understanding. *See* Appx249 ("The plain meaning of 'authorizing' an entity to allow display of an advertisement, in the context of the '822 Patent, requires that the authorized entity must at very least be able to receive some evidence indicating that an authorization has occurred." (citation omitted)). Certainly, Perry's publisher webpage receives some evidence of authorization when the ASC delivers an advertisement to it to be displayed therein. *See* Appx282-283.

code . . . .” (emphasis omitted)). This website code is indisputably created by the publisher; it thus remains the publisher’s website despite being displayed on a user’s computer. A POSITA would have understood that Perry’s disclosure that the user’s computer communicates with the ASC, read in context, means that it is the publisher website displayed on the user’s computer that handles that communication—because it is the publisher website that ultimately receives an advertisement for display within the publisher webpage. *See* Appx946, ¶ 17 (Perry teaching that “the [publisher] Web page contains code calling for information or images (e.g., an advertisement)”); *see also* Appx947, ¶ 26 (describing that when “a user visits a web page of a publisher . . . . *[a] code on the pag[e] is served to the user[] and causes the user’s computer to communicate with the ASC*, in the manner of conventional Internet advertisement service” (emphasis added)).[15] This again makes clear that *service* and *display* are not the same.

---

[15] Perry discloses an additional preferred embodiment where the ASC sends an “unembedded” advertisement directly to the user’s computer to be opened within a separate browser window, such that “[t]he served advertisement does not occupy the [publisher’s] page that the user was seeking.” Appx947, ¶ 26; *see* Appx946-947, ¶ 24. However, Samsung relied primarily on Perry’s alternate embodiment disclosing displaying “conventional” “banner” advertisements, which require a “reserved placement location on a [publisher] webpage.” *Id.*, ¶¶ 24, 33; *see* Appx280 (citing Appx946-947, Appx949, ¶¶ 15, 17, 23-27, 30-33, 52-53); Appx525, ¶ 78. In other words, these conventional banner advertisements are displayed within—and thus, by—the publisher webpage.

Indeed, without the publisher webpage running on a user's computer, Perry's system could not provide embedded advertisements at all because no request to the ASC could be sent and no advertisements could be displayed to the user—and the same is true of the system claimed in the '822 patent. Thus, Perry's publisher website is authorized *to display* an advertisement after that advertisement is *served* to it. *See* Appx946-947, ¶ 24 (teaching that "conventional banner ads . . . hold a reserved placement location on a [publisher] web page" and describing "[a]n alternative embodiment [that] involves the same approach with banner placements being served" to the publisher webpage for display); *see also* Appx2489-2491, 118:24-120:3. Just like Samsung explained it its reply, a POSITA would have understood that "Perry's ASC can serve an ad for display at the user's browser in ad space provided in the page provided by the publisher." Appx280 (emphasis omitted) (citing Appx945-947, 949, ¶¶ 3, 15, 23-27, 30-33, 52-53; Appx2157, 128:8-19) (other citations omitted); *see* Appx501, ¶ 47 (Samsung's expert explaining that for "the display feature, Perry discloses that served advertisements may include conventional banner ads, which a POSITA would have understood display *on an area of the publisher webpage*" (emphasis added)); *see also* Appx524-525, ¶ 78; Appx2386-2387, 15:4-16:8; Appx2393, 22:3-24; Appx2489-2491, 118:24-120:3.

Moreover, this disclosure is even clearer to a POSITA when considered alongside the process described in the '822 patent, as Samsung also explained. *See*

Appx280-281. The ’822 patent explains that delivering an advertisement “requires only control of the ad space and not necessarily control of the entire media property visited by the visitor.” Appx70, 3:34-38. Accordingly, “a media property (in the present context) can also be defined as *any equipment that controls an ad space viewed by a visitor, including a web site*.” Appx70, 3:38-40 (emphasis added). As examples of this, the ’822 patent discloses: (1) delivering ads and filling ad space temporarily controlled by ad network media property, *see* Appx70, 3:21-4:3; (2) that the “[third-party] second media property” can “control[] ad space,” Appx73, 9:65-66; *see* Appx75, 14:1-3 (claim 12 reciting same); (3) determining tag placement within “ad space” on specific portions of a website based on price, Appx73, 10:11-20; and (4) “BT company 30 serving ad that appears *with media content (webpage) requested by the visitor*,” *id.* (emphasis added, citations omitted); *see also* Appx68 (Figure 3 of the ’822 showing that the “BT company server” populates “ad space” on the “third-party second media property” with an advertisement that is served to the “user/visitor computer”). Indeed, that is why to be authorized, the third-party second media property only “needs to know that the visitor 10 has been profiled by the BT company 30,” which will “deliver an ad to this visitor 10 *within the ad space of the second media property 40*.” Appx9:39-44 (emphasis added). Each of these disclosures references an advertising server (or “BT company” in the parlance of the ’822 patent) serving an advertisement to a website to be displayed within a space on

that website running on a user's computer. And just like the '822 patent, Perry discloses having the "ASC serv[e] an ad for display on web page visited by user's computer." Appx281 (citations omitted).

Thus, the '822 patent itself refutes AlmondNet's argument that Perry's publisher webpage purportedly takes no steps to display an advertisement after being authorized because the website code that Perry's publisher displays on the user's browser necessarily already includes code to display the advertisement once it is authorized (i.e., served to it). The '822 patent does not include a temporal requirement for when the code to display the received advertisement must be generated (and neither does Perry). Rather, the only requirement in the challenged claims is that the third-party second media property allow display of an advertisement once authorization is received—which is precisely what Perry's publisher webpage does. In other words, the publisher webpage code *does* take steps after authorization—that code may be written prior to authorization, but it executes to allow display of an advertisement only after authorization is received from the ASC via service of the advertisement.

AlmondNet's own arguments and its expert's testimony also confirm that there is a difference between serving an advertisement to the publisher website (the role of Perry's ASC) and displaying that advertisement (the role of Perry's publisher website). In its response, AlmondNet argued that with respect to placing an action

tag, "*the publisher itself must be responsible* for including the action tag on the publisher site, *even if the [ASC] originally provided code* for the action tag to the publisher." Appx239 n.1 (emphasis added) (citing Appx2342-2343, ¶¶ 67-68); *see* Appx240 (AlmondNet recognizing that "execution" of an action tag is distinct from "placement"). But what is good for the goose is good for the gander—if this is true for placement of an action tag, it must equally be true for placement of the advertisement on the publisher website. In other words, the ASC merely serves the advertisement to the publisher website; it is the publisher website that then displays the advertisement to the user.[16]

Had the Board considered this critical evidence and argument that Samsung presented in the reply, it would not have conflated *serving* an advertisement with *displaying* it in its decision and would have recognized that Perry discloses the very

[16] The Board did not base its decision on any of the other three arguments AlmondNet presented, *see* Appx246-251, and so Samsung only addresses them here to explain that they are fiction concocted by AlmondNet. For example, in its petition, Samsung explained that Perry's authorization step is performed in response to receiving a user's search information for two reasons—either as a result of a user's "first visit to the publisher website" or its visit to "a search engine website." Appx95-96. AlmondNet transformed this into two separate theories of authorization, Appx246-250, even though Samsung's point was merely that Perry's authorization is done "responsive to receiving [user profile] information," as claim 35 requires. Appx76, 16:14-19. And the fifth purported theory AlmondNet identified, Appx250-251, was no more than Samsung explaining that in addition to Perry, Wilson also discloses "us[ing] cookies and other forms of tagging" to perform the claimed authorization step, Appx97 (citations omitted); *see* notes 8-9, *supra*.

teaching the Board thought missing. *See* Appx56. The Board, however, violated the APA by failing to consider Samsung's reply evidence and arguments that went to the core issue in the case. *See* Argument Section II.B, *infra*.

### 3. AlmondNet's Sur-Reply Did Not Meaningfully Address the Relevant Portions of Samsung's Reply

Instead of considering the relevant portions of Samsung's reply, the Board instead moved directly to AlmondNet's sur-reply. *See* Appx53. But AlmondNet's sur-reply had no meaningful answers to Samsung's arguments.

For example, to cover the defects in its first argument that Samsung identified, AlmondNet argued that there was an "ambiguous question of what 'authorization-*related* action'" Perry's publisher "is allowed" to take. Appx307. Again, that argument is belied by the '822 patent's disclosure that placing a tag is an authorization-related action a third-party second media property can take. *See* Appx275-276; Appx77, 18:1-12. Indeed, AlmondNet and its expert admitted that all five steps of the claimed method (including placing a tag) are "authorizing" or "relate to or form the basis for th[e] authorizing step." Appx310; *see* Appx2155, 126:7-25; *see also* Appx267-268.

AlmondNet also did not meaningfully address Samsung's explanation of how Perry's publisher displays an advertisement after receiving it from the ASC, other than to mischaracterize Samsung's arguments. AlmondNet primarily (and incorrectly) asserted that Samsung's "reply hides what role [Perry's] publisher has

in [the advertisement display] process." Appx311; *see* Appx308 (contending that the publisher's "steps leading to display of an ad" were "unidentified"). AlmondNet also asserted that Samsung did not "contest that, after the action tag code is served to the user by the publisher, 'the publisher takes no further steps in the ad-serving process that allow such an advertisement to be displayed.'" Appx311 (citation omitted). Both assertions are demonstrably incorrect.

First, Samsung was clear that a POSITA would have understood that service and display are different, and the "role" of Perry's publisher is to "displa[y]" the advertisement "*on* the publisher's website" after the ASC serves it. Appx280 (emphasis added); *accord id.* (explaining that by "plac[ing] [the advertisement] on publisher web sites," the ASC is authorizing *those publisher websites to display the advertisement* (emphasis added)). Samsung also explained that once Perry's publisher webpage receives an advertisement from the ASC—i.e., is authorized to display the advertisement—it can display it as a conventional banner "in ad space provided in the page provided by the publisher." *Id.* (emphasis omitted); *see* Appx947, ¶ 24 (describing display of "conventional banner ads"). And second, Samsung expressly contested AlmondNet's flawed argument that Perry's publisher webpage "takes no further steps in the ad-serving process" by explaining that Perry expressly discloses that the publisher webpage displays the advertisement in an ad

space within that page. Appx279-281. Samsung hid nothing about its theory of how Perry's publisher is authorized to allow display—and displays—an advertisement.

* * *

In short, the Board failed to consider Samsung's evidence and arguments that addressed the very issue on which its decision turned. *See* Appx54-58. That evidence and arguments demonstrated that—under the Board's construction, *see* Argument Section I, *supra*, and when viewed in the context of the '822 patent, including its express recitations that a third-party second media property may take part in the authorization step (e.g., by placing an action tag)—Perry discloses that its ASC authorizes the publisher website "to allow display" of an advertisement by serving it, which the publisher website then displays. Because this record evidence allows for no other reasonable conclusion and AlmondNet did not dispute that all other limitations of the challenged claims are disclosed in the prior art, this Court should reverse the Board's decision. *See Corning v. Fast Felt Corp.*, 873 F.3d 896, 901 (Fed. Cir. 2017) (reversing where "there is only one possible evidence-supported finding" and "the prior-art combinations at issue disclose all of the elements of the claims"); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1077 (Fed. Cir. 2015) (reversing, rather than remanding, when "the record is one-sided").

### B. The Board Rejected Samsung's Ground Without a Reasoned Analysis or Substantial Evidence

The Board rejected Samsung's obviousness combination and concluded that Samsung failed to show that either Perry's "Publisher Systems 131 and 132" or "ASC 140" "'automatically electronically authoriz[es] a third-party second media property' to display advertisements." Appx54. But the Board reached its conclusion without even considering Samsung's arguments and evidence that explained how Perry's publisher webpage displays an advertisement after being authorized to do so by the ASC. *See* Appx54-57. Its decision thus failed to comply with the APA's requirement of reasoned decisionmaking, which requires the Board to "take account of all the evidence of record," especially "evidence bearing on the issue before it." *Aqua Prods.*, 872 F.3d at 1325. And, because the Board's decision is inconsistent with the evidence that it ignored, it is not supported by substantial evidence.

The Board's analysis was flawed from the outset. The Board began by reciting the parties' arguments, but skipped critical portions of Samsung's reply that addressed the very issue that formed the basis of the Board's incorrect decision. *See* Appx41-49. Instead, the Board relied on AlmondNet's mischaracterizations of Samsung's reply. For example, the Board quoted AlmondNet's incorrect statement that Samsung purportedly "d[id] not contest that, after the action tag code is served to the user by the publisher, 'the publisher takes no further steps in the ad-serving process that allow such an advertisement to be displayed.'" Appx53 (quoting

Appx311). But, as explained above, Samsung did contest this issue in the very portions of its reply that the Board ignored. *See* Appx279-281.

The Board also agreed with AlmondNet that there was "no teaching or suggestion" in Perry "that ASC 140 authorizes any other component or entity that might be termed a third-party second media property, relative to itself, to display ads." Appx55. But the Board did not consider (or even acknowledge) the relevant portions of Samsung's reply that showed the very teaching in Perry that the Board believed was missing. Appx279-282. Instead, the Board concluded that "ASC 140 itself is disclosed to serve advertisements," which the Board equated with "displaying ads." Appx55. But, again, the Board reached that conclusion without considering (or even acknowledging) Samsung's evidence and arguments in its reply explaining that the ASC plays a different role from the publisher and that the ASC's authorization and service of an advertisement is a distinct action from the publisher's display of the advertisement, Appx280-281.[17]

Indeed, it appears that the Board did not even reach the relevant pages of Samsung's reply, because its decision cites nothing past page 19 of that reply. *See*

---

[17] To support its finding that the ASC purportedly displays advertisements, the Board relied on Samsung's statement in the Petition that "Perry teaches that the ASC controls when an ad is rendered on a website." Appx57 (quoting Appx107). But as the discussion surrounding that quoted text illustrates, Samsung's point was only that the ASC *authorizes* the display of an advertisement. *See* Appx107.

Appx52-53 (citing page 19 of Samsung's reply (Appx275) as the last page considered); Appx54-57 (never citing beyond page 19 of the reply). But the section addressing the issue the Board found dispositive *began* on page 19, with the critical discussion appearing on pages 23-26. *See* Appx275; Appx279-282.

The Board's analysis of Perry's disclosure lays bare the Board's error. For example, the Board acknowledged that Perry's ASC "communicate[s] via the Internet to *serve* advertisements *place[d] on publisher web sites* to users visiting those sites." Appx55-56 (emphasis added) (quoting Appx946, ¶ 15). It then concluded without any explanation that "there is no teaching or suggestion in that paragraph that a publisher's web page or publisher computer systems 131 and 132 display ads." Appx56. But Samsung expressly explained in its reply that *placing* advertisements on a publisher website inherently means that the *publisher website displays* them. Appx280 (quoting Appx946, ¶ 15; citing Appx945-949, ¶¶ 9, 17, 19, 53). Samsung even explained how Perry's disclosure of a publisher website displaying advertisements that were served to it by an ASC was near-identical to the '822 patent's disclosure of displaying an advertisement. *See* Appx280-281 (explaining that "BT company 30 serving [an] ad . . . that appears with media content (webpage) . . . requested by the visitor" is "similar to Perry's ASC serving an ad . . . for display on web page visited by user's computer" (citing Appx72-73, 8:64-9:3)).

Likewise, the Board emphasized that Perry's paragraph 53 discloses that "the ASC serves the advertisement," apparently believing that to be the same as displaying an advertisement. Appx56 (emphasis omitted). But again, the Board failed to consider Samsung's argument and evidence that serving an advertisement is distinct from displaying it, because the ASC's role is to "serv[e] the advertisement for display," whereas the publisher webpage's role is to display the advertisement. Appx280; *see* Appx279-281. Indeed, as Samsung explained, Appx280-281, the '822 patent also discloses that an advertising server ("BT company" in the '822 patent; "the ASC" in Perry) "*serve[s]* an ad (720) to the visitor" that then "will *appear* with the media content (730) requested by the visitor," Appx72-73, 8:64-9:3 (emphasis added). Thus, serving an advertisement must be distinct from displaying it. The Board apparently decided what Perry discloses without ever considering or even referencing Samsung's arguments bearing directly on that issue. Had the Board considered Samsung's evidence and argument, as required by the APA, it would have recognized that the portions of Perry it cited fail to support its conclusion that Perry's publisher takes no steps to display the served advertisement.[18]

[18] The Board also pointed to Perry's paragraphs 21, 41, and 46, stating that they do not "mention[n] publishers' web pages or systems." Appx56. But the Board provided no explanation for its reference to these paragraphs, which merely describe the ASC system's computer components, Appx946, ¶ 21, the ASC's establishment of "advertising strategies," Appx948, ¶ 41, and the ASC's use of cookies and databases to obtain and store a user's "search terms," Appx948, ¶ 46. There is no

By contrast, the Board did not discuss, cite, or even acknowledge other paragraphs in Perry that Samsung cited in support of its argument that the publisher system displays an advertisement in a dedicated ad space on the publisher webpage after it is served to it by the ASC. For example, Samsung cited Perry's paragraphs 17, 30, and 33, *see* Appx280, which disclose that "the [publisher] Web page contains code calling for information or images (e.g., an advertisement), which, when running on an "Internet customer computer syste[m,] sends a request to the ASC computer system to return data comprising an advertising message, such as a banner advertising message," Appx946, ¶ 17; *see* Appx947, ¶¶ 30, 33 (describing the ASC serving conventional banner ads that are "embedded" in a publisher webpage). As explained above, *see* Argument Section II.A.2, *supra*, a POSITA would have understood this disclosure to mean that the publisher webpage's code must execute to embed the received advertisement and display it to the user.

Samsung also cited Perry's paragraph 19, *see* Appx280, which states that "[w]hen the Internet customer computer system receives the selected advertising message, the Internet customer computer system displays it *within the Web page*," Appx946, ¶ 19. Again, a POSITA would have understood this to mean, in context, that the publisher webpage running on the "Internet customer computer system"

---

reason for Perry to mention the publisher webpages in these paragraphs that address different characteristics of Perry's ASC and the Board's discussion provides none.

displays the advertisement because without the publisher webpage's code, the customer computer system alone could do nothing with respect to such advertisements.

For the same reason, Samsung also cited Perry's paragraphs 23 and 24, *see* Appx280, which describe the difference between unembedded advertisements and those, like "conventional banner ads," which "hold a *reserved placement location on a web page*," Appx946-947, ¶¶ 23-24 (emphasis added). This disclosure likewise demonstrates that the advertisement is displayed by the publisher within its webpage. *See also* Appx947, ¶ 31 (disclosing that "the publisher . . . reserve[s] advertising space on its page"); Appx949, ¶ 51 (describing that if no advertisement is served by the ASC, "the publisher . . . can place an ad for its own products or services" "in [that] particular slot on [its] page").

Not only was the Board's analysis inconsistent with Perry's disclosure, it was even inconsistent with the Board's own claim construction—a flaw the Board would have recognized had it considered the entirety of Samsung's reply. In its flawed nonobviousness analysis, the Board apparently assumed (based on AlmondNet's mischaracterizations of Samsung's arguments, *see, e.g.*, Appx229) that Samsung purportedly grouped Perry's "Publisher System 131 and 132" together with its "ASC 140" to be part of the "one or more computers" recited in the preamble of claim 35. Appx54. According to the Board, Samsung's arguments were thus inconsistent with

its adopted claim construction, under which "the recited 'system'" need not "exclude the 'third-party second media server,'" but the latter "still must be separate and distinct from the 'one or more computers programmed to implement [the recited] method.'" Appx54-55; *see* Appx23; *see also* Argument Section I, *supra*.

But Samsung consistently separated Perry's publisher (i.e., the third-party second media property) from the ASC (i.e., the claimed "one or more computers") within Perry's system (i.e., the "system" recited in claim 35's preamble). *See* Appx94-95 (mapping Perry's "Publisher System 131 and 132" to the claimed third-party second media property and Perry's ASC to the component that performs the authorizing step (i.e., the claimed "one or more computers"); *see* Appx90; Argument Section I, *supra*. Samsung's reply did so as well:




FIG. 1

Appx269 (reproducing Appx942 (annotated)); *see* Appx259; Appx268 (citing Appx91)); *see also* Appx279-281. The Board even recognized as much in its partial recitation of Samsung's arguments. *See* Appx51 (referring to Perry's figure 1 and

acknowledging Samsung's argument that "Perry discloses a [third-party second media property] (e.g., publisher system/website 132 (green above) different/distinct from ASC 140 (blue above[)]" (cleaned up)). Thus, Samsung's invalidity argument is fully consistent with the Board's construction, which was, after all, *Samsung's* construction. Had the Board considered the entirety of Samsung's evidence and arguments in its reply, the Board would have recognized this flaw in its reasoning.

In short, it appears that the Board believed that once it was persuaded by AlmondNet's argument that Perry's publisher takes no action to display an advertisement, it did not have to even consider Samsung's competing evidence and argument demonstrating the flaws in AlmondNet's Perry's argument. Appx54-57; *cf.* Appx279-282.

That was reversible error. Reasoned decisionmaking requires the Board to consider the entire record, including "the evidence" that "detracts from [its] conclusion." *Aqua Prods.*, 872 F.3d at 1325 (cleaned up). Even if the Board need not "expressly discuss each and every negative and positive piece of evidence lurking in the record to evaluate *a cursory argument*," *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017) (emphasis added), the Board's "refusal to consider evidence *bearing on the issue before it* is, by definition, arbitrary and capricious within the meaning of" the APA, *Aqua Prods.*, 872 F.3d at 1325 (emphasis added) (citing *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010));

*accord Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1352-53 (Fed. Cir. 2018) (holding that the Board's failure to "grapple with the facts . . . bear[ing] directly on the issue" squarely before it "does not pass muster under the APA").

Here, whether Perry's publisher (i.e., a third-party second media property) displays an advertisement after the ASC authorizes the display by serving the advertisement to the publisher was not a mere "cursory argument," *Novartis*, 853 F.3d at 1328—it was a core issue at the heart of the Board's decision, *see* Appx54-57. Thus, at a minimum, the Board was required to consider Samsung's evidence and argument on that central issue and weigh that evidence against AlmondNet's before reaching a conclusion. "Just as it may not short-cut its legal analysis, the Board may not short-cut its consideration of the factual record before it." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015). The Board's failure to meaningfully discuss Samsung's evidence and explanation or even cite to the relevant pages addressing the very disclosure it determined was purportedly lacking from Perry demonstrates that its decision violates the APA and is arbitrary and capricious. *See Applications in Internet Time*, 897 F.3d at 1352-53; *Aqua Prod.*, 872 F.3d at 1325. And because that evidence contradicts the Board's decision, it is not supported by substantial evidence and should be reversed. *See Corning*, 873 F.3d at 901; *Belden*, 805 F.3d at 1077.

## CONCLUSION

For the reasons stated above, the Court should reverse the Board's decision and hold the challenged claims unpatentable. Alternatively, the Court should vacate the decision below and remand for further consideration.

August 5, 2024

Respectfully submitted,

/s/Naveen Modi

Naveen Modi
Daniel Zeilberger
Vladimir J. Semendyai
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
(202) 551-1700

*Counsel for Appellant*
*Samsung Electronics Co., Ltd.*

# Addendum

## ADDENDUM TABLE OF CONTENTS


| Date | Description | Page No. |
|---|---|---|
| 2/2/2024 | Paper 28 - Final Written Decision | Appx1-61 |
| | Ex. 1001 - U.S. Patent No. 8,200,822 | Appx64-77 |

Trials@uspto.gov
571-272-7822

Paper 28
Dated: February 2, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SAMSUNG ELECTRONICS CO., LTD.,
Petitioner,

v.

ALMONDNET, INC.,
Patent Owner.

---

IPR2022-01259
Patent 8,200,822 B1

---

Before THOMAS L. GIANNETTI, STACEY G. WHITE, and CHARLES J. BOUDREAU, *Administrative Patent Judges.*

BOUDREAU, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I. INTRODUCTION

Samsung Electronics Co., Ltd. ("Petitioner" or "Samsung") filed a Petition requesting *inter partes* review of claims 35–51 ("the challenged claims") of U.S. Patent No. 8,200,822 B1 (Ex. 1001, "the '822 patent"). Paper 2 ("Pet."). Patent Owner AlmondNet, Inc. ("Patent Owner" or "AlmondNet") waived the opportunity to file a preliminary response (*see* Paper 6). We instituted an *inter partes* review of the challenged claims. Paper 10 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 14, "PO Resp."), Petitioner filed a Reply (Paper 18, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 23, "PO Sur-reply"). Petitioner filed a declaration of Dr. Dan Schonfeld (Ex. 1002) with its Petition. Patent Owner filed a declaration of Robert Sherwood (Ex. 2002) with its Response. The parties also filed transcripts of the depositions of Dr. Schonfeld (Ex. 2004) and Mr. Sherwood (Ex. 1046). We held an oral hearing on November 9, 2023, and a transcript of the hearing is included in the record. Paper 27 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6 (2018). Under the applicable evidentiary standard, Petitioner has the burden to prove unpatentability by a preponderance of the evidence. *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d) (2023). "Preponderance of the evidence means the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it." *United States v. C.H. Robinson Co.*, 760 F.3d 1376, 1383 (Fed. Cir. 2014) (internal quotations omitted). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons discussed below, we determine Petitioner has not established by a preponderance of the evidence that any of the challenged claims of the ’822 patent are unpatentable.

## II. BACKGROUND

### *A. Real Parties in Interest*

Samsung Electronics Co., Ltd. identifies itself and Samsung Electronics America, Inc. as the real parties in interest for Petitioner. Pet. 1. AlmondNet, Inc. identifies itself as the real party in interest for Patent Owner. Paper 8, 1 (Patent Owner’s Updated Mandatory Notices).

### *B. Related Matters*

The parties indicate that the ’822 patent is the subject of *AlmondNet, Inc. v. Samsung Electronics Co.*, Case No. 3:22-cv-07515 (N.D. Cal.), previously pending as Case No. 6:21-cv-00891 in the Western District of Texas. Pet. 1; Paper 8, 1.

### *C. The ’822 Patent*

The ’822 patent, titled “Media Properties Selection Method and System Based on Expected Profit from Profile-Based Ad Delivery,” issued June 12, 2012, from U.S. Patent Application No. 13/418,320, filed March 12, 2012, as a continuation of U.S. Patent Application No. 12/823,709, filed June 25, 2010 (now U.S. Patent No. 8,204,783), which was in turn a continuation of U.S. Patent Application No. 11/763,286 (“the ’286 application”), filed June 14, 2007 (now U.S. Patent No. 7,747,745, “the ’745 patent”). Ex. 1001, codes (21), (22), (45), (54), (63). The ’822 patent also claims priority from U.S. Provisional Application No. 60/804,937, filed June 16, 2006, and U.S. Provisional Application No. 60/805,119, filed June 19, 2006. *Id.* at code (60).

The ’822 patent discloses an automatic system that facilitates selection of media properties on which to display an advertisement, responsive to a profile collected on a first media property, where a behavioral-targeting (BT) company calculates expected profit for an ad correlated with the profile and arranges for visitors to be tagged with a tag readable by the selected media property. Ex. 1001, code (57), 3:21–26 (“A tag generally is a unique identifier used to mark a person electronically visiting a media property, such as a web site, TV channel, radio show, or the like, using a computer, a mobile device, a TV set, a TV set top box, or any other device.”), 9:4–9 (“media properties can be . . . web sites [] on the Internet . . . a TV channel on TV or a text message system on a mobile phone, etc.”). According to the ’822 patent, a profit can be calculated by deducting, from the revenues that are expected to be generated from an ad delivered based on the collected profile, at least the price of ad space at a media property where the BT company might like to deliver ads to the profiled visitor. *Id.* at code (57). When the calculated profit is positive (i.e., not a loss), the BT company arranges for the visitor to be tagged with a tag readable by the selected media property through which the BT company expects to profit. *Id.*

Figure 1 of the ’822 patent is reproduced below.




FIG. 1

Figure 1, above, is a flow diagram of a profit-based selection method. Ex. 1001, 6:39–40. With reference to Figure 1, the ’822 patent illustrates a method that, responsive to receiving (operation 1000) profile information (e.g., actions) of an electronic visitor with respect to a first media property, (i) determines (operation 2000) anticipated revenues or profit resulting from placing an advertisement targeted to the visitor based on the received profile and (ii) automatically selects (operation 3000) at least one media property for which it is anticipated that there will be a positive profit in delivering an ad to the profiled visitor. *Id.* at 6:50–62. The method then arranges (operation 4000), for each of the selected media properties, for electronic storage of a tag readable by the media property, the tag being associated with the visitor. *Id.*

Figures 2 and 3 of the '822 patent are reproduced below.




FIG. 2

Figure 2, above, illustrates further details of a profit-based selection method. Ex. 1001, 6:41–42.




FIG. 3

Figure 3, above, is a schematic of an exemplary embodiment of entities and associated equipment used with the profit-based selection method. *Id.* at 6:43–45. As shown in detail in Figures 2 and 3, the '822 patent illustrates a profit-based selection method that includes operations by which (i) profile supplier 20[1] redirects (step 100) site visitor 10[2] to BT company 30 (illustrated in Figure 3) along with the visitor's profile, and (ii) and BT company 30 recognizes (step 200) content read by visitor 10, a category to which content read by user 10 belongs, a keyword searched for by user 10, an ad clicked by user 10, or other action conducted on the page/site 20 by user 10 during the site visit. *Id.* at 7:40–63. In a next step (300) of the profit-based selection method, BT company 30 may categorize specific content read by user 10, or actions conducted by user 10. *Id.* at 7:64–8:7. For example, when BT company 30 receives information indicating that a visitor searched for an airline ticket to Florida on a travel site, BT company 30 records the search for the flight to Florida in the visitor's profile, and may further categorize the visitor under a "Travel" category and in a "Search for Flights" subcategory of "Travel." *Id.* at 8:1–7. BT company 30 then calculates (step 400) expected revenues from delivering ads based on the collected profile, and selects (step 500) media properties for the delivery of an advertisement based on the profile collected on a first media property 20 (illustrated in Fig. 3). *Id.* at 8:8–36. BT company 30 makes the selection in step 500 based on a calculated expected profit, and

---

[1] The '822 patent uses reference numeral 20 to refer alternately to a "profile supplier," a "media propert[y]," and a "page/site." *See, e.g.*, Ex. 1001, 7:41, 7:49, 7:58.

[2] The '822 patent uses reference numeral 10 to refer alternately to a "visitor" and a "user." *See, e.g.*, Ex. 1001, 7:41, 7:55.

then arranges for visitor 10 to be tagged with a tag readable by the selected media property 40 (shown in Fig. 3). *Id.* When selected media property 40 later recognizes a previously tagged visitor 10 that is visiting its ad space, media property 40 will arrange for BT company 30 to serve an ad to visitor 10, the ad appearing with the media content requested by the visitor. *Id.* at 8:64–9:3.

Although BT company 30 stores the visitor's collected profile, BT company 30 does not transfer the collected profile to second media properties 40, 50 (shown in Fig. 3) but simply asks second media properties 40, 50 to tag the visitor as a BT company visitor, or arrange for a tag to be placed that is readable by the second media property, and that marks the visitor as a BT company visitor. Ex. 1001, 9:26–44. As BT company 30 buys ad space from the proprietor of second media property 40 and delivers therein an ad based on the collected profile, BT company 30 has no economic incentive to transfer the profile information itself (such as the fact that the visitor searched for "car insurance") to second media property 40. *Id.* The second media company's proprietor is being paid for the ad space, and therefore just needs to know that visitor 10 has been profiled by BT company 30, which will pay the second media property's proprietor for an opportunity to deliver an ad to visitor 10 within the ad space of second media property 40. *Id.*

In a case where a second media property controls ad space with prices that fall within a range, BT company 30—in addition to arranging for a second media property to tag its visitor—may also provide second media property 50 with the price BT company 30 is willing to pay the second media property 50 for delivering an ad within the second media property's ad space. Ex. 1001, 9:65–10:20. The price delivered from BT company 30

enables the second media property 50 to determine which ad space it should allocate to BT company 30 when tagged visitor 10 visits the second media property 50. *Id.* Although some of the ad space (e.g., space on site 60 shown in Fig. 3) might be too expensive (i.e., above the cap defined by the price BT company 30 is willing to pay), other ad space (e.g., space on site 61) might have a cost that would be covered by the price BT company 30 is willing to pay. *Id.* However, BT company 30 will not arrange for tag placement if the price it is willing to pay for delivering an ad to a profiled visitor 10 is less than the lowest price demanded by second media property 50 for delivering an ad within that ad space. *Id.*

*D. Illustrative Claim*

Of the challenged claims, claim 35 reproduced below is the sole independent claim.

> 35. A system comprising one or more computers programmed to implement a method of directing electronic advertisements, the method comprising:
>
> for each of a multitude of different electronic visitors to a first media property, responsive to receiving information about at least one of a plurality of profile attributes possibly applicable to the visitor, automatically electronically authorizing a third-party second media property to allow display, to the electronic visitor when the visitor visits the second media property at a time after the visitor visits the first media property, of an advertisement correlated with the profile-attribute information received about the visitor, subject to a visitor-specific condition for display of the advertisement that a price charged by the second media property is less than a profile-attribute-dependent price that an advertiser is willing to pay for display of the advertisement.

Ex. 1001, 16:11–27.

*E. The Instituted Grounds*

We instituted *inter partes* review of claims 35–51 of the ’822 patent on the following grounds (Dec. 41), which were all the grounds presented in the Petition (Pet. 2–3):

| Claim(s) Challenged | 35 U.S.C. §[3] | Reference(s)/Basis |
|---|---|---|
| 35, 39–42, 45–47 | 103(a) | Perry,[4] Wilson,[5] Bronson[6] |
| 36 | 103(a) | Perry, Wilson, Bronson, Kang[7] |
| 37 | 103(a) | Perry, Wilson, Bronson, Kang, Howard[8] |
| 38, 43, 44, 47–49 | 103(a) | Perry, Wilson, Bronson, Howard |
| 42 | 103(a) | Perry, Wilson, Bronson, McFadden[9] |
| 50, 51 | 103(a) | Perry, Wilson, Bronson, Howard,[10] Burdick[11] |

[3] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (“AIA”), amended 35 U.S.C. § 103, effective March 16, 2013. Because the ’822 patent issued from an application filed before that date, we refer to the pre-AIA version of § 103.

[4] Perry, US 2004/0215515 A1, published October 28, 2004 (Ex. 1005).

[5] Wilson, US 7,805,332 B2, issued September 28, 2010 (Ex. 1015).

[6] Bronson et al., US 7,899,801 B1, issued March 1, 2011 (Ex. 1007).

[7] Kang et al., US 2004/0059632 A1, published March 25, 2004 (Ex. 1021).

[8] Howard et al., US 6,584,505 B1, issued June 24, 2003 (Ex. 1010).

[9] McFadden et al., US 2005/0086109 A1, published April 21, 2005 (Ex. 1011).

[10] Although the Petition omits Howard from the summary recitation of the sixth asserted ground at page 4 of the Petition, Howard is included in the detailed discussion of that ground at page 60 of the Petition.

[11] Burdick et al., US 2007/0260514 A1, published November 8, 2007 (Ex. 1034).

## III. ANALYSIS

### *A. Legal Standards*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (2012) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner except in limited circumstances not present here. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (citing 35 U.S.C. § 103(a)). The question of obviousness is resolved based on underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when presented, objective evidence of obviousness or nonobviousness, i.e., secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in

the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")). Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements," but "must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### *B. Level of Ordinary Skill in the Art*

Petitioner contends that a person of ordinary skill in the art would have had

> at least a bachelor's degree in computer science, electrical engineering, computer engineering, or the equivalent, and two or more years of experience with designing, programming, configuration, and/or analysis/research with Internet or similar network-related processes including, for example, user/entity profile management and/or web-based targeted content delivery, or a related field. (Ex. 1002, ¶¶20–21.) More education can supplement practical experience and vice versa. (*Id.*)

Pet. 4. Patent Owner represented that it did not challenge Petitioner's definition for purposes of its Response (*see* PO Resp. 6) and did not further address the definition in its Sur-reply.

We adopt Petitioner's articulation of the level of ordinary skill in the art, minus the phrases "at least" modifying the education and "or more" modifying the number of years of experience. As we explained in our Institution Decision, although Petitioner's articulation otherwise appears consistent with the level of skill in the art at the time of the invention as reflected in the asserted prior art, inclusion of such qualifiers render the articulation vague by being open-ended thus encompassing the level of

education and experience of an expert, someone with more than ordinary skill in the art. *See* Dec. 12. Thus, in summary, we find that one with ordinary skill in the art at the pertinent time period would have had a bachelor's degree in computer science, electrical engineering, computer engineering, or the equivalent, and two years of experience with designing, programming, configuration, and/or analysis/research with Internet or similar network-related processes including, for example, user/entity profile management and/or web-based targeted content delivery, or a related field, where more education could supplement practical experience and vice versa.

### *C. Claim Construction*

In an *inter partes* review, we apply the same claim construction standard as would be used by a district court to construe a claim in a civil action involving the validity or infringement of a patent. 37 C.F.R. § 42.100(b). Under that standard, claim terms are given their ordinary and customary meaning, as would have been understood by a person of ordinary skill in the art at the time of the invention, in light of the language of the claims, the specification, and the prosecution history of record. *Id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–19 (Fed. Cir. 2005) (en banc); *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012). "The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) (quoting *Vivid Techs., Inc. v. Am. Sci. Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

In the Petition, Petitioner submitted that "[f]or purposes of this proceeding, Petitioner believes that no special constructions are necessary to

assess whether the challenged claims are unpatentable over the asserted prior art." Pet. 5–6.

In its Response, Patent Owner stated that it "agrees that claim construction should not be necessary to resolve any issue, and that the plain and ordinary meaning of claims terms should be applied," but that "the Petition appears to apply a meaning to the claim phrase 'third-party second media property' that is inconsistent with the language of Claim 35, especially in view of the intrinsic record." PO Resp. 6. Patent Owner contends, "[i]t is apparent from the claim language of Claim 35 itself that the 'third-party second media property' must be different or distinct from the 'system comprising one or more computers,'" recited earlier in claim 35, "because Claim 35 specifies that the latter directs authorizes [sic] the former to allow display of an advertisement." *Id.* at 6–7 (citing Ex. 1001, claim 35). More particularly, Patent Owner argues, "[b]ecause the 'system comprising one or more computers' authorizes the 'third-party second media property,' the 'third-party second media property' must be distinct from the claimed 'system comprising one or more computers.'" *Id.* at 7.

In support of its argument, Patent Owner cites the Board's decision denying institution of trial in *Meta Platforms, Inc. v. AlmondNet, Inc.*, IPR2022-01262, Paper 9 (PTAB Feb. 2, 2023) (Ex. 2007, 1–21, "the '1262 Decision"), involving Patent Owner's related U.S. Patent No. 8,671,139 (Ex. 2006, "the '139 patent"). PO Resp. 7. In that case, the sole independent claim at issue recited, in relevant part, "[a] system comprising one or more computers programmed to implement a method of directing electronic advertisements, the method comprising . . . (a) automatically directing, to a third-party server computer controlling advertising space on a second media property, indicia of a condition for display of an

advertisement . . . ." Ex. 2006, 16:35–59 (claim 37). The Board determined that the recited "third-party server computer" must be different from the "system comprising one or more computers" recited earlier in the claim, finding that "the language of the claim compels this construction." Ex. 2007, 9–10. In particular, the Board explained: "If the third-party server computer were *not* separate from the 'system comprising one or more computers,' the system would be directing indicia to itself. This is not a reasonable construction." *Id.* at 10. Further, the Board pointed out, the requirement that the third-party server computer be separate from the recited system "also is supported by the prosecution history." *Id.* In particular, the Board explained, "third-party" was added "as a modifier to 'second media property' in the phrase 'automatically electronically authorizing, with at least one of the computers, a <u>third party</u> second media property to allow display, to the electronic visitor when later visiting the second media property, of an advertisement" in an Examiner's amendment during prosecution of the '745 patent (*see supra* § II.C), and "[t]he prosecution record reflects that this amendment was made to make it clear that the recited authorization was directed to an unrelated site, and was made to avoid prior art." PO Resp. 10–11 (citing IPR2022-01262, Ex. 2001, 22[12]). Based on the claim language and the prosecution history, the Board concluded that "the 'third-party server computer' cannot be part of the 'system comprising one or more computers.'" *Id.* at 12.

In further support of its argument, Patent Owner argues that the applicant made clear during prosecution of the '745 patent that "there is a distinction between the system performing the claimed process and the

[12] The cited page appears in the present record at page 58 of Exhibit 2005.

'third-party second media property' that is authorized to cause display of the advertisement," citing an April 7, 2010, examiner interview report in which the applicant stated that "the claim structure ***already*** made [it] clear" that "the authorizing is being done of an *unrelated* site," but that the amendment to specify a "third party second media property" made that requirement "explicit." *Id.* at 7–8 (quoting Ex. 2005, 58 (emphasis added by Patent Owner)). Patent Owner contends that, aside from recognition of that very basic requirement (i.e., that there is a distinction between the system performing the claimed process and the third-party second media property that is authorized to cause display of the advertisement), such that the "third-party second media property" cannot be part of the "system comprising one or more computers" of claim 35, no further construction is necessary. *Id.* at 8.

In response to Patent Owner's arguments, Petitioner argues that the intrinsic record undermines Patent Owner's construction and that Patent Owner did not demonstrate a clear and unmistakable disclaimer disavowing the system from including a third-party second media property. Pet. Reply 1–10. First, Petitioner contends, "[t]the preamble of claim 35 uses the open-ended transitional phrase 'comprising,' to indicate that the 'system' may include 'one or more computers' without exclusion of other devices from the 'system.'" *Id.* at 1 (citing *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("'[C]omprising' is well understood to mean 'including but not limited to.'")). Thus, Petitioner argues, "[a]ccording to claim 35's plain language, the 'system' can 'compris[e]' other computers/devices beyond the 'one or more computers,' *including the TPSMP* [*third-party second media property*]." *Id.* at 1–2. Petitioner further contends that Patent Owner's declarant Mr. Sherwood "agreed the 'system'

does not 'exclude[] other devices'" and that the word "system" does not suggest otherwise. *Id.* at 2 (citing Ex. 1046, 75:9–77:22; Ex. 1048, 6 (dictionary definition of "system" as "a working combination of hardware, software, and data communications devices")). Further, according to Petitioner, Patent Owner's construction would exclude preferred embodiments, insofar as Figure 3 of the '822 patent (reproduced in Section II.C., above) includes, *inter alia*, second media properties 40, 50. *Id.* at 2–3. Petitioner further contends that the phrase "programmed to implement a method of directing electronic advertisements" more naturally modifies "one or more computers," rather than "system," and thus, even if the preamble of claim 35 is limiting, nothing in the claim requires the "system" to exclude the third party second media property. *Id.* at 3 (citing Ex. 1046, 83:1–18). Moreover, Petitioner contends, Patent Owner "does not explain why the TPSMP *cannot* be part of the claimed 'system' while the 'first media property' *can be*, as its expert explained," "[n]or does [Patent Owner's] construction comport with its expert's testimony that the 'system' of claim 35 'read[s] on a second media property.'" *Id.* at 4 (citing Ex. 1046, 74:5–8, 82:2–83:18, 86:7–15).

Further, Petitioner alleges, "[d]ependent claim 43 requires that, the 'authorizing' 'comprises placing a tag on the electronic visitor,' which the specification explains may be done *by the second media property*," and similarly, "[d]ependent claims 47 and 49 require that the 'authorizing' comprises arranging for placement of a tag *by the TPSMP*." Pet. Reply 4 (citing Ex. 1001, 8:30–63, 9:23–33, 9:65–10:11, 12:25–29, 17:4–7, 18:1–4, 18:8–12). Therefore, according to Petitioner, "the scope of independent claim 35 must allow for actions by the TPSMP contrary to [Patent Owner's]

construction/arguments." *Id.* (citing *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013)).

Still further, Petitioner contends, "the body of claim 35 does not recite or otherwise link the 'system' or 'computers' of the preamble, which are therefore presumably not entitled to patentable weight." Pet. Reply 4–5 (citing *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002)).

Regarding Patent Owner's arguments based on the patent prosecution history (PO Resp. 7–8), Petitioner contends that those arguments "hinge[] on [Patent Owner's] assumption that the prosecution of the '745 patent . . . contains a disclaimer that applies to the '822 patent," but, according to Petitioner, "[Patent Owner] needed to show—but did not—a 'clear and unmistakable' disclaimer that was applicable." Pet. Reply 5–6 (citing *01 Communique Lab'y, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297–98 (Fed. Cir. 2012); PO Resp. 4–5; Ex. 2002 ¶¶ 68, 80). More particularly, Petitioner alleges that Patent Owner "did not explain—let alone prove—that statements concerning the addition of 'third-party' to claims in the '286 application unmistakably disavowed the system from including a TPSMP." *Id.* at 6. Moreover, Petitioner argues, Patent Owner's arguments "are at odds with a court's finding that ***no disclaimer*** was made during the prosecution of the '822 patent in finding the term 'third-party' to have its plain-and-ordinary meaning." *Id.* (citing Ex. 1047,[13] 23).

Further, Petitioner argues, Patent Owner's reliance on the prosecution history of the '745 patent is misplaced because, unlike challenged claim 35

[13] *AlmondNet, Inc. v. Microsoft Corp.*, No. 6:21-cv-00897-ADA, Doc. 73 (W.D. Tex. June 19, 2023) (Claim Construction Order and Mem. in Supp. Thereof).

here, which Petitioner contends recites "one or more computers" only in its preamble, claim 37 of the application that issued as the '745 patent expressly recited "one or more computers" both in its preamble and in its body, and it did not recite a "system." Pet. Reply 7 (citing Ex. 2005, 56–59, 127–28). Petitioner argues that Patent Owner's reliance on the Decision Denying Institution in IPR2022-01262 is similarly misplaced, because claim 37 of the '139 patent recites different features than claim 35 of the '822 patent, insofar as it recites "a third-party server computer," rather than "a third-party second media property," and recites a "system comprising one or more computers" in the body of the claim. *Id.* at 8 (citing Ex. 2007, 5–6). Petitioner acknowledges that "[t]he Board—relying on the '286 application history (discussed *supra*)—distinguished the petitioner's prior art mapping where the petitioner identified the *same* servers . . . as being *both* the claimed 'one or more computers' and the 'third-party server computer,'" but asserts that Patent Owner "does not demonstrate how the Board's discussions reflect a clear-and-unmistakable disclaimer . . . attributable to claim 35 of the '822 patent, nor is the decision in IPR2022-01262 binding here." *Id.* at 9–10 (citing Ex. 2007, 9–10, 15–17).

In its Sur-reply, Patent Owner responds that, although "Petitioner suggests that 'the "system" can "compris[e]" other computers/devices beyond the "one or more computers," *including the TPSMP*,'" "that is an interpretation of the claim language '[a] system comprising . . .' not an interpretation of the term 'third-party second media property.'" PO Sur-reply 2 n.2. Patent Owner represents that it "doesn't interpret . . . '[a] system comprising' itself as excluding particular elements, but rather interprets '*third-party* second media property' to define a specific, third-party relationship between the TPSMP and the claimed system." *Id.* Patent

Owner further contends that neither Petitioner nor Dr. Schonfeld disputes its arguments in the Patent Owner Response, supported by the testimony of Mr. Sherwood, that it is apparent from the claim language and the intrinsic record that the third-party second media property must be distinct from the system performing the claimed process, as the system "otherwise . . . would nonsensically be 'authorizing' ***itself*** to take an action." *Id.* at 2–4 (citing, e.g., PO Resp. 6–7). Addressing Petitioner's argument that the phrase "programmed to implement a method of directing electronic advertisements" more naturally modifies "one or more computers," rather than "system" (Pet. Reply 3), Patent Owner alleges that "[t]his allegation . . . is irrelevant, because the *Petition* clearly alleges that the 'one or more computers' includes the alleged TPSMP" (PO Sur-reply 3 n.3 (citing Pet. 7)).

Still further, Patent Owner contends "Petitioner mischaracterizes the specification and claims in alleging that adopting the plain meaning of 'authorizing' would exclude preferred embodiments," explaining that Petitioner's argument overlooks that "[a]lthough ***placing a tag on the electronic visitor*** may be done by a second media property, the ***'authorizing'*** cannot be." PO Sur-reply 4–5 (citing Pet. Reply 4; Ex. 1001, claims 43, 47, 49). Patent Owner points out that, contrary to Petitioner's argument that the "arranging" in claims 47 and 49 of the '822 patent is done by the second media property (Pet. Reply 4), those claims instead recite that the arranging is performed by the system configured to practice the method, so as to allow the second media property to place the tag (PO Sur-reply 5). This is especially clear in claim 49, according to Patent Owner, where the claim recites that the "arranging" involves "redirecting the electronic visitor to the second media property," as "there would be no need for the second media property to redirect a visitor to ***itself***." *Id.* With regard to Petitioner's

argument that Patent Owner's construction would exclude the embodiment of Figure 3 of the '822 patent, Patent Owner responds that "this assumes that the ***entirety*** of Figure 3 would need to be the claimed 'system,' an assumption unsupported by any analysis in the Reply or any teaching in the '822 Patent." *Id.* at 6–7 (citing Pet. Reply 2). Rather, Patent Owner contends, "Figure 3 discloses the 'system' of claim 35 and *also* shows how the claimed system interfaces with the 'second media propert[ies]' A and B." *Id.* at 7 (emphasis added). Patent Owner points out that Figure 3 also depicts "'Internet (or other media)' 80 and 'user/visitor computer' 10, but no one argues that the 'system' ***as claimed*** must include those elements." *Id.*

Responding to Petitioner's argument that "the body of claim 35 does not . . . link the 'system' or 'computers' of the preamble," Patent Owner contends that "[t]his is incorrect for several reasons," arguing that "the body of claim 35 begins after the first instance of the word 'comprising,' not the second," such that "[t]he claim language 'one or more computers programmed' is part of the body of the claim and is limiting, as is the limitation that such computer(s) must be 'programmed to implement' the stated method." PO Sur-reply 7 (citing Pet. Reply 4–5). Moreover, Patent Owner contends, "the method acts referenced by the Reply beginning after the second instance of the word 'comprising' indeed 'link' to the 'one or more computers,' contrary to the Reply's argument, because they define the method that the 'one or more computers' is 'programmed to implement.'" *Id.*

Finally, in response to Petitioner's argument that Patent Owner did not show "'clear and unmistakable' disclaimer," Patent Owner argues that "[b]ecause plain meaning of the claim language supports Patent Owner's claim interpretation, there is no need to establish 'clear and unmistakable

disclaimer.'" PO Sur-reply 8 (citing Pet. Reply 5–6). Nonetheless, Patent Owner contends, there is in any event clear and unmistakable disclaimer of self-authorizing in the prosecution history of the '745 grandparent patent, where "the applicant clearly and unmistakably stated that the purpose of adding of the words 'third party' was to expressly guarantee that the TPSMP cannot be the same as the system performing the claimed 'authorizing.'" *Id.* (citing Ex. 2005, 58). Patent Owner points out that that amendment was made not only in claim 37 of the application for the '745 patent, cited by Petitioner, but also in claim 47 of that application, "which was a system claim, and which recites the exact same . . . language at issue here." *Id.* at 8–9 (citing Pet. Reply 6–7; Ex. 2005, 31–32). Patent Owner also contends that Petitioner relies on a mischaracterization of the court order in *AlmondNet, Inc. v. Microsoft Corp.* (*see supra* note 13) insofar as the court in that order *agreed* with Patent Owner that TPSMP should have its plain-and-ordinary meaning, where Patent Owner had argued that the plain meaning of the TPSMP was that the authorization must be provided to an unrelated site. PO Sur-reply 9 (citing Ex. 1047, 23; Ex. 2008,[14] 13–15).

Indeed, Patent Owner points out, although the court in the *AlmondNet, Inc. v. Microsoft Corp.* case did not expressly construe TPSMP, "the Court ***did*** construe 'third-party server computer,' a term found in patents in the same family as the '822 Patent at issue here," and in doing so, "agreed with Patent Owner's position that 'the "third-party server computer" is "distinct from the server computer performing the claimed process."''" PO Sur-reply 9–10 (citing Ex. 1047, 44–46). Thus, Patent Owner contends, "the

[14] *AlmondNet, Inc. v. Microsoft Corp.*, No. 6:21-cv-00897-ADA, Doc. 30 (W.D. Tex. June 16, 2022) (Pl. AlmondNet's Resp. Claim Construction Br.).

Court's understanding that no disclaimer existed in the '822 Patent's prosecution simply acknowledges that the claim language ***itself*** requires a distinction between the TPSMP and the system performing the method." *Id.* at 10.

Having considered the parties' arguments, we agree with Petitioner that the recited "system" of claim 35 does not necessarily exclude a "third-party second media property." As Petitioner points out, claim 35 uses the open-ended transitional phrase "comprising," such that the recited "system comprising one or more computers" may include components other than the recited "one or more computers." *See* Pet. Reply 1 (citing *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007)). Moreover, we agree with Petitioner that the phrase "programmed to implement a method of directing electronic advertisements" more naturally modifies "one or more computers," rather than "system." *Id.* at 3. Nonetheless, it is clear from the plain language of claim 35, as well as from the prosecution history of the related '745 patent, that the third-party second media property must be *distinct from* such "one or more computers." Petitioner's repeated use of the abbreviation "TPSMP" obscures the fact that claim 35 does not simply recite a "second media property" but instead specifically recites a "*third-party* second media property." Ex. 1001, 16:18–19 (emphasis added).

Highlighting the significance of the modifier "third-party," as Patent Owner points out, is the fact that that modifier was added to "second media property" in the phrase "automatically electronically authorizing, with at least one of the computers, a <u>third party</u> second media property to allow display, to the electronic visitor when later visiting the second media property, of an advertisement" in an Examiner's amendment during prosecution of the '822 patent's grandparent '286 application to avoid

certain prior art, and the prosecution record of the ’286 application reflects that this amendment was made to make it clear that the recited "authorizing is being done of an *unrelated* site." Ex. 2005, 58; *see* PO Resp. 10–11. More particularly, as Patent Owner points out, the applicant stated in the cited examiner interview report that "the claim structure already made [it] clear" that "the authorizing is being done of an *unrelated* site . . . because the phrase 'authorizing' a site does not seem to cover a site deciding something on its own," but that the amendment to specify a "third party second media property" made that requirement "explicit." Ex. 2005, 58; *see* PO Resp. 7–8 (quoting the same).

We are not persuaded otherwise by Petitioner's arguments regarding dependent claims 43, 47, and 49 or Figure 3 of the ’822 patent. *See* Pet. Reply 4. As Patent Owner explains, the identified dependent claims do not recite that any authorizing is performed by the third-party second media player. *See* PO Sur-reply 5. We find that claim 43 recites only that the third-party second media property be able to read a tag, not that it places the tag. Additionally, claims 47 and 49 are fully consistent with the arranging being performed by the "one or more computers programmed to implement [the recited] method," so as to allow the second media property to place the tag. *See id.* In other words, although the second media property is "placing a tag," the placement is done with the authorization of the one or more computers. We agree with Patent Owner's argument that this is especially clear in claim 49, where the claim recites that the "arranging" involves "redirecting the electronic visitor to the second media property." *Id.* As Patent Owner argues, "there would be no need for the second media property to redirect a visitor to ***itself***." *Id.* Regarding Figure 3, we agree with Patent Owner that Petitioner provides no support for the entirety of Figure 3 being

the claimed "system," and the fact that Figure 3 also depicts Internet (or other media) 80 and user/visitor computer 10 undermines Petitioner's contention. *Id.* at 6–7.

The parties dispute whether the preamble of claim 35 includes everything up to the second instance of the word "comprising" in the claim (i.e., "A system comprising one or more computers programmed to implement a method of directing electronic advertisements, the method"), as Petitioner contends, or whether it is simply "[a] system," as Patent Owner argues in its Sur-Reply. Pet. Reply 4–5; PO Sur-reply 7. At oral argument, Petitioner's counsel argued that Patent Owner's declarant, Mr. Sherwood, identified the preamble as including everything up to "the method . . . comprising," in agreement with Petitioner's position. Tr. 11:2–12:6 (citing Ex. 1046, 73:25–74:4). Petitioner additionally argued that the formatting of claim 35 in the '822 patent, including, for example, the claim's paragraph structure, punctuation, and indentation, also supports its position. *Id.* at 12:11–18. Notwithstanding Petitioner's argument, we agree with Patent Owner.

In general, a patent claim has three main parts: (1) a preamble; (2) a transitional phrase (i.e., "comprising," "consisting of," or "consisting essentially of"); and (3) a body reciting the elements of the invention. *See* Manual of Patent Examining Procedure ("MPEP") §§ 608.01(m), 2111.03 (9th ed. rev. 07.2022 Feb. 2023). The preamble is an introductory statement that indicates the statutory class of the invention and names or defines the thing that is to be claimed. Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* § 6, II-4 (4th ed. rev. Dec. 2002); *see also* 3 Donald S. Chisum, *Chisum on Patents* § 8.06[1][b][i] (2007) ("The preamble is an introductory statement that may summarize the invention, its relation to the

prior art, or its intended use or properties and implicitly indicates the statutory class of a claimed invention."). As explained in the MPEP, "35 U.S.C. 101 enumerates four categories of subject matter that Congress deemed to be appropriate subject matter for a patent: processes, machines, manufactures and compositions of matter." MPEP 2106.03. According to the Abstract of the '822 patent, the patent describes "[a]n automatic system [that] facilitates selection of media properties on which to display an advertisement." Ex. 1001, code (57). Similarly, the "SUMMARY OF THE INVENTION" states that "an automatic system is described to facility selection of media properties on which to display an advertisement." *Id.* at 6:12–18. Consistent with that disclosure, we understand claim 35 to be directed to a "system"—i.e., a machine or manufacture in the parlance of 35 U.S.C. § 101—and that claim 35 is therefore a system claim rather than a method claim, despite the fact that the claim goes on to recite a method that one or more computers in the recited system must perform. This understanding is supported by claims 36–51, each and every one of which begins with the phrase "[t]he system of claim 35." Claims 48–50 likewise begin with "[t]he system of claim 47," and claim 51 begins with "[t]he system of claim 50."

Further, Patent Owner did not present Mr. Sherwood as an expert on patent law or claim drafting, and we decline to give substantial weight to his testimony on this issue that is ultimately a matter of law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) (ruling that the interpretation of patent claims is a matter of law to be determined exclusively by the courts). Still further, Petitioner's counsel conceded that the formatting of the claim is not dispositive. Tr. 14:14–18.

In summary, we conclude that the third-party second media property is properly understood in view of both the language of claim 35 itself and the intrinsic record to be separate and distinct from the "one or more computers programmed to implement" the method recited in the claim.

### *D. Obviousness over Perry, Wilson, and Bronson (Petitioner's Ground 1)*

Petitioner alleges claims 35, 39–42, and 45–47 of the '822 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Perry, Wilson, and Bronson. Pet. 2, 6–34.

We begin our analysis with a brief overview of Perry, Wilson, and Bronson.

#### *1. Perry*

Perry, titled "Method of Distributing Targeted Internet Advertisements Based on Search Terms," describes a method of distributing ads based on a collection of search terms employed by users of a search engine or search provider, and a unique identifier or cookie associated with each user. Ex. 1005, code (57). Perry's method associatively stores the search terms and unique identifiers in a database, generates a number of selected advertising strategies, each having an associated desired search term or set of terms, and assigns identifiers associated with one or more of the desired search terms to an associated one of the advertising strategies. *Id.* In response to a user visiting a publisher website, the user's unique identifier is determined, the database is searched to determine an assigned advertising strategy, and an advertisement is served to the user based on the strategy. *Id.* Users not fitting any assigned advertising strategy may or may not receive an advertisement. *Id.*

Figure 1 of Perry is reproduced below.



FIG. 1

Figure 1, above, is a schematic block diagram of a system and environment in which a preferred embodiment of Perry's invention operates. Ex. 1005 ¶ 12. With reference to Figure 1, Perry discloses a system and environment that includes (i) Internet customers (depicted as user computer systems 101–104), (ii) Internet publisher computer systems (publisher systems 131, 132), (iii) an Advertising Service Company (ASC) (or third-party ad server) (advertising service system 140, including central processing units (CPUs) 141 for executing computer programs, memory 142 for storing programs and data, and media drive 143 for reading programs and data), (iv) advertisers (advertiser systems 161, 162), and (v) content distributors (content distributor systems 151, 152). *Id.* ¶¶ 15, 17–18, 21. An Internet customer connects, via Internet 120, to an Internet publisher computer system, such as Internet publisher computer systems 131 and 132, to retrieve and display a web page. *Id.* ¶ 15. ASC system 140, advertisers 161 and 162, and content distributors 151 and 152 communicate via the Internet to

serve advertisements placed on publisher websites to users visiting those sites. *Id.*

In cases where an Internet advertiser, through the ASC, has purchased advertising space on one of several web pages provided to the Internet customer computer system by one of the Internet publisher computer systems, the web page contains code calling for information or images (e.g., an advertisement) in the domain of ASC system 140. Ex. 1005 ¶ 17. When a customer computer system receives a web page that contains such a reference, the Internet customer computer systems sends a request to ASC system 140 to return data comprising an advertising message, such as a banner advertising message. *Id.* When ASC system 140 receives such a request, it selects an advertising message to transmit to the Internet customer computer system in response the request, and either itself transmits the selected advertising message or redirects the request containing an identification of the selected advertising message to an Internet content distributor computer system, such as content distributor systems 151 and 152. *Id.* ¶ 18. When the Internet customer computer system receives the selected advertising message, the Internet customer computer system displays it within the web page. *Id.* ¶ 19. The displayed advertising message may include one or more links to web pages of the pertinent Internet advertiser's website, and when the Internet customer selects or "clicks" one of these links in the advertising message, the Internet customer computer system uses the link to retrieve the web page from the appropriate Internet advertiser computer system, such as advertiser system 161 or advertiser system 162. *Id.* ¶ 20.

Figure 3 of Perry is reproduced below.




FIG. 3

Figure 3, above, is a flow chart illustrating operation of an alternative embodiment of Perry's invention. Ex. 1005 ¶ 14. With reference to Figure 3, Perry describes "[a]n alternative or enhanced method of operation [that] uses data gathered from the Internet and other types of searches conducted by users of any type of search facility" to serve advertisements. *Id.* ¶¶ 38–39, 52–53. In that alternative embodiment, a user conducting a search may submit a search with one or more terms or words, and an ASC contracts with advertisers, establishing advertising strategies, as indicated in step 300 of Figure 3. *Id.* ¶¶ 40–41. In step 302, a set of one or more search

terms is selected, the search terms being terms that the advertiser and its advisors have determined that users in the selected desired subset are likely to employ. *Id.* ¶ 42. In other words, users who use these terms are in the desired subset—a subset to which ads can be served regarding pertinent products. *Id.* ¶¶ 42–44. Step 304 indicates that a search engine was used to submit a search that returned results in a results page. *Id.* ¶ 45. "The results page includes an 'extended data action tag' that is ASC code (e.g., a one-pixel image that is not visible to the user)." *Id.* "To display the page, the user's web browser automatically triggers the ASC code (e.g., to retrieve the pixel associated with the action tag)," and "[t]his code calls to an ASC server that queries the user's computer for a unique identifier or cookie." *Id.*

"In step 306, the ASC collects the cookie, as well as recording the search terms through the ASC code placed with the search provider." Ex. 1005 ¶ 46. "The search terms may be recorded in conjunction with the action tag, with the tag having data fields not only for the cookie, but also to capture and record the search terms." *Id.* "In step 310, the search terms and cookie are stored in a database on an ASC server," where "[t]he search terms are associated with the cookie in one or more records of the database." *Id.* "In step 312, each cookie is assigned to a search strategy." *Id.* ¶ 48. The assignment of search strategies "can be conducted in real time, so that as each search occurs, the results are analyzed, and an advertising strategy assigned" or "[a]lternatively . . . could be conducted at intervals, on a batch basis," such as "daily, when the ASC's computers have surplus capacity due to reduced demand." *Id.* ¶ 49. "Some cookies may have multiple list matches ('hits') for several advertising strategies simultaneously." *Id.* ¶ 50. "For each ad to be served, one of the matching strategies must be selected." *Id.*

"In step 316, the user visits a publisher's web page," and "[t]he publisher has contracted with the ASC to serve advertisements, so the page includes an action tag that facilitates the ASC determining the user's cookie." Ex. 1005 ¶ 52. "In step 320, the ASC searches the database to determine if the cookie exists," and if it does, the ASC "determines the advertising strategy assigned to the cookie." *Id.* ¶ 53. Finally, "[i]n step 322, the ASC serves the advertisement of the selected strategy to the user." *Id.*

*2. Wilson*

Wilson, titled "System and Method for Segmenting and Targeting Audience Members," relates to "a system and method for targeting the delivery of content to selected audience members based on the integration of diverse data into profile data relating to the selected audience members." Ex. 1015, code (54), 1:16–22. According to Wilson, profile data for audience members is initially collected from an offline source, such as a registration or subscription database, and the data is stored in a dedicated database. *Id.* at code (57). The initial profile data may be supplemented periodically with data reflecting online activity by the audience member, and combined offline and online profile data is used to group the audience members into segments. *Id.* Audience member segments are used to identify audience members who are targeted to receive like content. *Id.* An audience member's inclusion in a segment may be indicated by storing a segment-targeting cookie on the audience member's computer, whereby content may be delivered to the audience member based on identification of the segment in the segment-targeting cookie. *Id.*

Figure 3 of Wilson is reproduced below.

FIG. 3




Figure 3, above, illustrates steps that generate audience member profiles. Ex. 1015, 3:7–9. As shown in Figure 3, audience member profiles are generated by (i) searching offline databases, such as registration and subscription databases, for profile data relating to individual audience members (step 210); (ii) storing the profile data extracted from offline sources in a data warehouse (step 212); (iii) assigning a unique identifier (such as a string of numeric, alphabetic, alphanumeric, or other characters) to the profile data, to enable identification of the audience member and determine profile data that is associated with particular audience members (step 214); (iv) using the unique identifier to identify content visited by the audience member (step 216), the identification being performed by including the unique identifier in a domain cookie associated with each website page visited by the audience member; and (v) determining the domain cookies that are stored on the audience member's computer (step 218). *Id.* at 4:48–

5:14. Thus, domain cookies may be used to identify each particular website page visited by the audience member as being associated with the unique identifier. *Id.* Because these domain cookies include the unique identifier that identifies the particular audience member, the cookies may be used to modify the profile data for a particular audience member to reflect that the audience member visited the website pages associated with the cookies. *Id.* at 5:13–23. By combining the profile data obtained from the offline databases with the profile data updates that occur as a result of the audience member visiting website pages, a complete set of profile data may be collected for an audience member, reflecting both offline and online behavior and characteristics for the audience member. *Id.*

Tracking the online history of an audience member requires the system to be able to uniquely identify audience members. Ex. 1015, 5:24–39. This tracking may be accomplished by combining the unique identifier for each audience member with website pages in the network that the audience member has visited. *Id.* For example, each of the domain cookies associated with the website pages visited by the audience member may be modified to include the unique identifier by designating one of the related website page domains as the primary website domain. *Id.* A primary domain cookie with the unique identifier is established for the primary website domain. *Id.* One of the domains in the network may be designated as the primary domain. *Id.*

*3. Bronson*

Bronson, titled "Determining Content to Be Provided by an Entity for Rendering Via a Resource in a Target Document or Notifying an Alternative Entity of the Availability of the Resource," relates to "a method and apparatus for an advertising system 'returning' a content-served ad resource

of a target document(s) when the advertising system determines that one or more ads should not be served using the resource." Ex. 1007, code (54), 1:10–15.

Figure 1 of Bronson is reproduced below.




FIG. 1

Figure 1, above, illustrates an environment within which Bronson's method and apparatus are implemented. Ex. 1007, 2:63–65. The environment illustrated in Figure 1 includes advertiser 110, which is a party that directly sells goods or services being advertised, or an agent authorized to act on the advertiser's behalf; advertising system 120, which interfaces with advertiser 110 and publisher 130; publisher 130, which is an entity (e.g., owner, author, or other provider of a target document) or mechanism (e.g., browser or other mechanism) that may request and/or obtain advertisements ("ads") from advertising system 120 to be output in conjunction with a target document; and advertising target 140, which is the user or set of users that ultimately receive the advertisement, e.g., the users viewing the advertisement as displayed on the target document provided by publisher 130. *Id.* at 3:35–62, 4:14–18. Advertising system 120 may provide the ads periodically to publisher 130. *Id.* at 3:55–58. When a user/advertising target requests a target document (e.g., using a browsing program), publisher 130 may issue a request to advertising system 120 for rendering of one or more ads vis-à-vis a resource of the target document. *Id.* at 3:55–62. Publisher 130 may obtain the requested advertisements from

advertising system 120 and present the advertisement to advertising target 140 in conjunction with the target document; or publisher 130 may refer to a mechanism that facilitates output of a target to advertising target 140 (e.g., the publisher may include a browser, document cache/database, or other mechanism that may not be directly associated with the target document). *Id.* at 3:63–67, 4:9–13.

When advertising target 140 navigates to the target document (e.g., by entering its URL into a browser used by advertising target 140, linking to it from another document, etc.), publisher 130 issues a request to advertising system 120 for rendering of one or more ads in conjunction with the target document for output to advertising target 140. Ex. 1007, 4:20–29.

Figure 4 of Bronson is reproduced below.




FIG. 4

Figure 4, above, is a flow diagram of a process allowing an advertising system to "return" a content ad resource of a target document associated with a publisher. Ex. 1007, 3:4–7. To implement the illustrated flow, ad system 120 (*see* Fig. 1) may provide publisher 130 with client-side JavaScript (referred to as "ad_consumer_creative") to have it hosted by its target document(s) for which ads may be requested by publisher 130. *Id.* at 7:1–11. In turn, ad system 120 may host server-side JavaScript ("show_ads.js") to interface with the ad_consumer_creative via a publisher interface. *Id.* For example, for a given target document, the

ad_consumer_creative may include a tag (referred to as "alternate_ad_url") that is an identifier of an alternative entity. *Id.*

The flow diagram illustrated in Figure 4 starts with receipt of an ad rendering request by an advertising system from a publisher, for rendering of one or more ads via a resource of a target document associated with, or provided by, the publisher (operation 410). Ex. 1007, 7:24–36. The ad system then determines, based on one or more criteria, whether to render one or more ads using a resource of the target document (operation 420). *Id.* at 7:37–42. Criteria include whether a set of one or more conditions are met, in which case ad(s) may be rendered by the ad system in conjunction with, and using a resource of, a target document. *Id.* The one or more conditions may include a determination, which may be based on an estimate or prediction, of ad performance (e.g., clickthrough rate), or whether providing one or more ads will result in net or a threshold monetary gain or loss for the ad system. *Id.* at 7:62–8:3. The determination may also be based on the ad system determining whether the (expected) revenue (including payment from one or more advertisers) if one or more ads are rendered by the ad system in conjunction with the target document exceeds the cost to the ad system if the one or more ads are rendered. *Id.* at 8:4–20. Such cost may include a fixed or variable payment the ad system expects to pay the publisher with which the target document is associated if the ad is rendered or the resource of the target document is otherwise used by the ad system. *Id.* The condition(s) may also be based on the ad system determining whether an amount to be paid to the publisher or other entity for providing one or more ads (or more generally, for using the resource of the target document to render ads or other content) exceeds the (expected) return for the ad system if those ads are rendered in conjunction with the target

document. *Id.* at 8:21–38. Thus, if the ad system determines that rendering an ad using the resource of the target document will likely result in a net gain for the ad system, this condition may be deemed to have been met, which case the publisher may service the ad rendering request. *Id.*

The flow diagram illustrated in Figure 4 continued at operation 430 where, depending on the determination at step 420 of whether one or more conditions are met or not, the ad system decides whether to render an ad using a resource of the target document. Ex. 1007, 8:39–50, Fig. 4. For example, if the ad system determines (at step 420) that expected revenue will exceed cost for rendering an ad, then in step 430, the ad system may decide to render an ad (operation 440). *Id.*

4. *Independent Claim 35*

a. *"A system comprising one or more computers programmed to implement a method of directing electronic advertisements, the method comprising: . . . ."*

Petitioner contends that the networked advertising system depicted in Figure 1 of Perry (*see supra* § III.D.1) is a system that "compris[es] one or more computers," citing Perry's Internet publisher computer systems 131 and 132 and advertising service company computer system 140. Pet. 6–7 (citing Ex. 1005 ¶¶ 15, 17, 21, 49, Fig. 1; Ex. 1002 ¶ 71). Petitioner further contends that "[t]he *Perry* networked advertising system is 'programmed to implement a method of directing electronic advertisements,'" citing disclosure that "advertising service company computer system 140" may execute "computer programs" ("programmed"), and that the advertising service company/ASC 140 targets a variety of Internet users with personalized advertisements. *Id.* at 7–8 (citing Ex. 1005, code (57), ¶¶ 21, 38–41, 53, Fig. 3). Thus, according to Petitioner, a person of ordinary skill

in the art would have understood that, "to perform personalized advertising actions, . . . the *Perry* networked advertising system (labeled as an Advertising Service System 140 in Figure 1) is at least programmed with computer programs to deliver targeted advertisements to users." *Id.* at 8 (citing Ex. 1002 ¶ 72).

Patent Owner does not respond explicitly to Petitioner's contentions concerning these limitations. Based on the evidence of record, we are persuaded that Petitioner has demonstrated Perry discloses a system comprising one or more computers programmed to implement a method of directing electronic advertisements.

> *b. "for each of a multitude of different electronic visitors to a first media property, responsive to receiving information about at least one of a plurality of profile attributes possibly applicable to the visitor, automatically electronically authorizing a third-party second media property to allow display, to the electronic visitor, . . . of an advertisement correlated with the profile-attribute information received about the visitor, . . ."*

Petitioner argues that Perry teaches, "for each of a multitude of different electronic visitors to a first media property, . . . receiving information about at least one of a plurality of profile attributes possibly applicable to the visitor," while either Perry alone or Perry in combination with Wilson teaches "responsive to [receiving the information], automatically electronically authorizing a third-party second media property to allow display, to the electronic visitor." Pet. 8–16. More particularly, Petitioner contends, "[i]n the Perry system, various 'users' browse the Internet and perform searches on websites, such as the Google search engine website." *Id.* at 9 (citing Ex. 1005 ¶¶ 38–39, 45). Petitioner argues that

"[t]hese 'users' qualify as 'a multitude of different electronic visitors' and the Google website or its host computer qualifies as 'a first media property.'" *Id.* (citing Ex. 1001, 3:24–26, 9:4–9, Fig. 3; Ex. 1005 ¶¶ 38–39, 45). Petitioner further contends that "[t]he *Perry* system '**receiv[es] information (website search information)** 'for each' of the Google search engine users," citing disclosure in Perry that the ASC records search terms ("information," in the parlance of the claims) that users enter on a search website, such as in a Google search, and the user search information is received at step 306 depicted in Figure 3 of Perry. *Id.* at 9–10 (citing Ex. 1005 ¶¶ 38–39, 45–46, 48, 50, 74, Fig. 3). Further, Petitioner contends, "*Perry* discloses that the search term information is 'about at least one of a plurality of profile attributes possibly applicable to the visitor,'" citing Perry's disclosures, for example, that an ASC database records user cookie identifiers and user search terms, that a website search for a "home theater system from Sony" may denote a "home theater" interest for the user, and that advertisers can select specific search terms that users in a desired subset are likely to employ. *Id.* at 10–11 (citing Ex. 1005 ¶¶ 42, 44–46, 49, 50; Ex. 1002 ¶ 76).

With regard to the "automatically electronically authorizing" limitation, Petitioner contends that Perry discloses that a user may visit a publisher's web page (i.e., a "third-party second media property," per the '822 patent) via a network connection and that the ASC and publisher "contract[]" to facilitate targeted advertising. Pet. 11–12 (citing Ex. 1001, 3:24–26, Fig. 3; Ex. 1002 ¶¶ 77–82; Ex. 1005 ¶¶ 15, 41, 52, Fig. 1). Pursuant to the contract and to enable targeted advertising, the publisher web page includes an "action tag" that, according to Petitioner, a person of ordinary skill would understand to automatically electronically authorize the

publisher to allow an ad to be served when a user visits the publisher's web page. *Id.* at 12 (citing Ex. 1005 ¶ 52; Ex. 1002 ¶ 78). Moreover, Petitioner argues, a person of ordinary skill in the art would understand that the served advertisements would be displayed, based on Perry's disclosure that the advertisements may include conventional banner ads or pop-up ads. *Id.* (citing Ex. 1005 ¶ 24; Ex. 1002 ¶ 78).

Petitioner contends that the "'automatically . . . authorizing' . . . 'to allow display'" feature also would have been obvious because the use of cookies and other forms of user tagging to allow automatic authorization to display ads was well understood before the time of the invention. Pet. 14 (citing Ex. 1002 ¶ 80). For example, Petitioner argues, Wilson discloses receiving a "unique identifier" that links to profile data when an audience member goes to a first website, thereby tagging the audience member with a cookie that gets sent to a "Targeting Engine" to deliver an ad when the audience member visits a second website, akin to the tagging process used by both the claimed system and the admitted prior art cited in the '822 patent. *Id.* at 14–15 (citing Ex. 1015, 5:13–18, 5:40–42, 5:55–57, 5:66–6:13, 7:20–44, 7:63–64; Ex. 1001, 3:4–33, 8:37–50, 8:64–9:3; Ex. 1002 ¶ 81). Citing Wilson and the testimony of Dr. Schonfeld, Petitioner contends that a person of ordinary skill in the art would have appreciated that modification of Perry to tag users as suggested by Wilson as part of Perry's targeted advertising methods "would have helped 'effectively deliver content to high-value consumers'" and would have involved no more than a combination of known technologies according to known methods to yield a predictable result. *Id.* at 15–16 (quoting Ex. 1015, 2:13–17) (citing Ex. 1002 ¶ 82).

Finally, Petitioner argues, the automatic electronic authorization is "responsive to" receiving the search information for at least two reasons: "First, *Perry* discloses authorizing the display of an ad as described above when the user visits the publisher website after the cookie and search information was received by the ASC during a first visit to the publisher website"; and "Second, *Perry* discloses authorizing the display of an ad as described above when the user visits a search engine website and the ASC receives cookie and search information before a user visits a publisher website." Pet. 12–13 (citing Ex. 1005 ¶¶ 46, 52, Fig. 3).

Petitioner argues that Perry discloses that the targeted advertisement that is displayed to the visitor is an "advertisement correlated with the profile-attribute information received about the visitor." Pet. 17–18. In particular, Petitioner contends that Perry discloses that user search information ("profile-attribute information," in the parlance of claim 35) is associated with a cookie identifier for the user and that the cookie is used to trigger a targeted advertisement, citing disclosure in Perry that "[i]n step 306, the ASC collects the cookie, as well as recording the search terms," that "[i]n step 310, the search terms and cookie are stored in a database on an ASC server," that "[i]n step 320, the ASC searches the database to determine if the cookie exists," and that "[i]f so . . . the ASC serves the advertisement of the selected strategy to the user." *Id.* (quoting Ex. 1005 ¶¶ 46, 53) (citing Ex. 1005 ¶¶ 48–49 (describing how user search terms are analyzed so that the user's cookie can be assigned an advertising strategy), Fig. 3). Thus, according to Petitioner, Perry teaches that the advertisement occurs whenever a user visits the publisher website and the ASC identifies that the user should receive a targeted ad based on the user's previous search information. *Id.* at 18.

In response to Petitioner's contentions, Patent Owner argues that "the Petition does not show that the cited prior art discloses or renders obvious a 'system comprising one or more computers programmed to implement a method . . . comprising . . . automatically electronically authorizing a third-party second media property to allow display . . . of an advertisement.'" PO Resp. 9. More particularly, Patent Owner contends that "[t]he Petition maps Perry's publisher website system to the 'third-party second media property'" but then "additionally maps the 'system comprising one or more computers' to the entire system depicted in Figure 1 [of Perry], which ***includes*** the publisher system 131 and 132." *Id.* at 9–10 (citing Pet. 6–8, 11–12). Patent Owner points out that "the Petition is explicit that Perry's 'Networked advertising system,'" which the Petition maps to the recited "system," "'comprises one or more computers,' in part, because it ***includes*** 'Internet publisher computer systems 131 and 132.'" *Id.* at 10–11 (citing Pet. 7). According to Patent Owner, "[b]ecause the Petition maps the 'system comprising one or more computers' to a system that ***includes*** the publisher system, the Petition cannot satisfy the claim limitation of a 'third-party second media property.'" *Id.* at 12. Further, Patent Owner argues, "[t]he Petition uses various disparate parts of Perry's Figure 1 (including publisher systems) to argue that Perry discloses . . . other claim limitations," pointing to Petitioner's explanation that Perry's advertising service company and a publisher website "'contract[]' to facilitate targeted advertising" and that, pursuant to that contract, "the publisher web page includes an 'action tag.'" *Id.* (quoting Pet. 12). Patent Owner contends, "the inclusion of the action tag by the publisher web page is action taken by the publisher system itself, and thus the publisher system ***must*** be part of the alleged 'system comprising one or more computers' under the Petition's theory." *Id.*

Further citing Petitioner's arguments regarding dependent claim 43, Patent Owner argues that, "under the Petition's theory, 'authorizing' clearly includes actions taken by the publisher system, even though the publisher system of Perry is what the Petition maps to the 'third-party server computer.'" *Id.* at 13–14 (citing Pet. 49; Ex. 2002 ¶¶ 47–54).

With respect specifically to the recited step of "automatically electronically authorizing a third-party second media property to allow display . . . of an advertisement," Patent Owner argues that "the Petition discusses several theories as to what constitutes the claimed 'authorizing,'" but that none of those theories satisfies all of the requirements of claim 35, namely: (1) that "the authorization must be provided to a 'third-party second media property'"; (2) that "the authorization must be done 'automatically'"; (3) that "the 'authorizing' must authorize the recipient 'to allow display' of an advertisement subject to a visitor-specific condition"; and (4) that "the 'authorizing' must be 'responsive to' receiving profile information about the visitor." PO Resp. 20–21.

First, Patent Owner contends (PO Resp. 21–23), Petitioner's theory that authorizing can occur in Perry's system "when . . . the publisher web page ***includes*** the action tag pursuant to the contract" with the advertising service computer (Pet. 12 (emphasis added)) fails for at least two reasons: First, "the 'publisher web page includ[ing] the action tag pursuant to the contract' is, by the Petition's own admission, performed by the publisher web page itself," whereas "the patentee expressly disclaimed 'authorizing' being performed by the 'third-party second media property.'" PO Resp. 22–23 (citing Ex. 2005, 58). Second, "inclusion of the action tag on the publisher site is not performed 'automatically'" in Perry's system but, as admitted by Dr. Schonfeld, the tag "would be placed 'by a programmer' who

was, for example, 'from the publisher company.'" *Id.* at 23 (quoting Ex. 2004, 123:13–124:7) (citing Ex. 2002 ¶¶ 69–70; Ex. 2004, 61:9–63:13).

Second, Patent Owner contends, Petitioner's theory that authorizing occurs in Perry's system "[w]hen the action tag is ***executed*** pursuant to the contract" between the publisher and the advertising service computer (Pet. 12 (emphasis added)) fails because "there is no action that constitutes an authorization for the ***publisher*** (i.e., the alleged 'third-party second media property') 'to allow display' of an advertisement." PO Resp. 23–24 (citing Ex. 2002 ¶¶ 72–80). With reference to Figure 3 of Perry (*see supra* § III.D.1), Patent Owner points out that "the first step in the execution of the action tag on the publisher site"—and indeed the only action taken by the publisher in connection with execution of the action tag on the publisher site—"is that the publisher serves to the user certain code on the publisher page, which causes the user's computer to communicate directly with the ASC." *Id.* at 26. However, according to Patent Owner, "[a]s noted above, action taken by the publisher itself cannot constitute the claimed 'authorizing.'" *Id.* (citing Ex. 2005, 58). Thus, Patent Owner contends, "some step ***after*** the publisher serving the action tag code to the user must constitute the claimed 'authorizing the third-party server computer to allow display' under the Petition's second ('execution') theory," but "whenever this alleged 'authorizing' later occurs, that alleged 'authorizing' could not be 'authorizing the [publisher site] to allow display' of an advertisement correlated with the user's profile information, because the publisher takes no further steps in the ad-serving process that allow such an advertisement to be displayed." *Id.* at 26–27 (citing Ex. 2002 ¶¶ 75–76).

Specifically, Patent Owner contends, "in Perry, after serving the action tag code which causes the user's computer to communicate with the

ACS, ***all subsequent actions*** until serving of the ad are performed ***by the*** ASC," and therefore "it follows that the publisher cannot take any actions that would constitute 'allow[ing] display' of an advertisement." PO Resp. 27 (citing Ex. 2002 ¶ 77). For example, Patent Owner argues, "after the publisher page has caused the user's computer to communicate with the ASC, the ASC in Perry's step 316 'determin[es] the user's cookie,'" and "[o]f course, a determination by the ***ASC*** cannot constitute the ***publisher site*** (i.e., the alleged 'third-party second media property') allowing display of an advertisement." *Id.* (citing Ex. 2002 ¶ 77). Likewise, Patent Owner points out, "in Perry's 'step 320, the ***ASC*** searches the database to determine if the cookie exists,'" and "'[i]f so, then ***it*** [i.e., the ASC] determines the advertising strategy assigned to the cookie.'" *Id.* (quoting Ex. 1005 ¶ 53 (emphasis and bracketing added)). Finally, Patent Owner contends, "in Perry's 'step 322, the ***ASC*** serves the advertisement of the selected strategy to the user'"; "[t]hus, the final step in the ad-serving process is the ***ASC's*** serving of the advertisement to the user," and "[n]owhere does Perry disclose that the publisher would have any role in serving the advertisement as part of Perry's step 322, and the Petition does not allege that having the publisher website play a role in serving the ad as part of Perry's step 322 would have been obvious." *Id.* at 28 (citing Ex. 1005 ¶ 53; Ex. 2002 ¶ 79; Pet. 11–16).

In conclusion, Patent Owner argues, "any 'authorizing' performed as part of the execution of the action tag on the publisher site cannot be the claimed 'authorizing' of the publisher site to allow display of an ad," as either "(1) the 'authorizing' would be performed by the publisher site itself, contrary to file history disclaimer" or "(2) the 'authorizing' would not authorize the publisher to 'allow display' of an advertisement, because at the

time the alleged 'authorizing' takes place the publisher would no longer be able to take any steps to 'allow display' of the advertisement, as claimed." PO Resp. 28 (citing Ex. 2002 ¶¶ 75–80). Further, Patent Owner contends, the Petition's third theory—i.e., that "Perry discloses authorizing the display of an ad as described above ***when the user visits the publisher website*** after the cookie and search information was received by the ASC during a first visit to the publisher website" (Pet. 12–13 (emphasis added))—fails for the same reasons. *Id.* at 29. In particular, Patent Owner argues, "'when the user visits the publisher website,' the 'action tag is executed pursuant to the [publisher's] contract with the ASC,'" as in the Petition's second theory. *Id.*

Regarding the Petition's fourth theory, that "Perry discloses authorizing the display of an ad . . . ***when the user visits a search engine website*** *and the ASC receives cookie and search information before a user visits a publisher website*" (Pet. 13 (emphasis added)), Patent Owner contends that the Petition does not explain ***how*** the ASC receiving 'cookie and search information' as a result of the search-engine visitation constitutes 'authorizing a third-party media property to allow display' of an ad," and that "the ASC's reception of information, without more, cannot constitute 'authorizing' the publisher site (i.e., the alleged third-party second media property) to 'allow display' of an advertisement." PO Resp. 29 (citing Ex. 2002 ¶ 82). Indeed, Patent Owner contends, "Perry's publisher is not even ***aware*** of the presence of the cookie before an advertisement correlated with the received profile-attribute information is displayed, and as a result placing the cookie could not possible be understood to 'authoriz[e]' the publisher to allow display of the ad." *Id.* at 30 (citing Ex. 2002 ¶ 84). Patent Owner points out that although Dr. Schonfeld provided several possible ways that a publisher might become aware of a cookie placed by the

ASC, such possibilities are not supported by Perry and would not meet the requirements of claim 35 in any event. *Id.* at 30–33 (citing Ex. 2004, 37:2–38:2, 38:4–9, 39:16–40:11; Ex. 2002 ¶¶ 73, 74, 85–88).

Lastly, with respect to the Petition's theory that Wilson's process of tagging an audience member "with a cookie containing [a] unique identifier" authorizes "the www.domain2.com website [of Wilson] 'to allow display, to the electronic visitor' because it causes the website to send the unique identifier to a Targeting Engine to deliver an ad to the user" (Pet. 14), Patent Owner argues that "this Wilson process cannot constitute the claimed 'authorizing' because the Petition does not allege that Wilson's www.domain2.com website is a 'third-party second media property.'" PO Resp. 33. Further, Patent Owner contends, "the Petition does not propose any actual modification to Perry, distinct from the analysis of Perry standing alone, to add Wilson's "domain2' as being a 'second third-party [sic] media property.'" *Id.* at 34. Accordingly, Patent Owner contends, "this 'fifth theory' relying on Wilson has the same defects as the 'fourth theory' (where 'authorizing' is allegedly found in Perry's placement of a cookie on the user's computer in response to the search information received from the search engine site)," and "[a]ny modification of Perry in view of Wilson thus fails for the same reasons as discussed above in connection with the 'fourth theory.'" *Id.* (citing Ex. 2002 ¶¶ 89–90).

In its Reply, Petitioner contends that Patent Owner's arguments do not overcome obviousness because they are based on Patent Owner's "inapt claim construction" "'requir[ing]' that the TPSMP cannot be included in the 'system.'" Pet. Reply 10. Petitioner argues that "the claims do not mandate [Patent Owner's] 'requirement' and *Perry* meets the requirement nonetheless." *Id.* More particularly, Petitioner argues, Patent Owner's

argument "rests on its position that, because 'the Petition maps the "system comprising one or more computers" to a system that includes the publisher system,' *Perry* 'cannot satisfy the claim,'" but, according to Petitioner, "the term 'comprising' does not exclude additional elements," and "[t]herefore, the presence of a publisher in *Perry*'s system of Figure 1 does not distinguish claim 35." *Id.* at 10–11 (citing PO Resp. 12; Ex. 1046, 75:11–76:10, 79:16–81:19). Petitioner further contends that "[Patent Owner's] assertion that including an action tag as described in *Perry* is action 'by the publisher' is immaterial" because "nothing in claim 35 precludes action by the TPSMP as part of the 'authorizing' step; dependent claims 43 and 47 and the specification provide for it." *Id.* at 11 (citing PO Resp. 12–14; Ex. 1001, 8:36–44, 9:23–33).

Moreover, Petitioner contends, "[Patent Owner's] arguments fail even under [its] misplaced construction," because "[w]hile *Perry*'s Figure 1 system undisputedly discloses a 'system,' the Petition did not limit its analysis to that system, contrary to [Patent Owner's] assertion." Pet. Reply 12 (citing PO Resp. 10–12). Rather, Petitioner argues, "[t]he Petition explained that 'the *Perry* **networked advertising system (labeled as an Advertising Service System 140 in Figure 1**) is at least programmed with computer programs to deliver targeted advertisements to users' and that the ASC includes one or more computers." *Id.* (quoting Pet. 8).

A version of Perry's Figure 1 with color-coding is reproduced below.




FIG. 1

Pet. Reply 13. The above version of Figure 1 shows Internet 120 highlighted in yellow, publisher system 132 highlighted in green, and advertising service system 140 highlighted in blue. Further responding to Patent Owner's arguments, Petitioner contends that "[t]aking into account [Patent Owner's] alleged distinction from the perspective of either the Petition's original analysis or the analysis here, the result is the same: *Perry* discloses a TPSMP (*e.g.*, publisher system/website [132] (green [above]) different/distinct from ASC 140 (blue [above], which is also an example of a 'system.'" *Id.* (citing Pet. 7–8, 11–13, Ex. 1005 ¶ 21). Further, Petitioner argues, "the Petition explains how *Perry* (alone or in combination with *Wilson* and *Bronson*) discloses/suggest the other limitations in the claimed method." *Id.* at 13–14 (citing Pet. 8–24; Ex. 1002 ¶¶ 74–79, 84, 92; Ex. 2004, 15:4–16:8, 54:15–56:6, 58:19–59:2, 137:7–138:5). Thus, Petitioner contends, "even under [Patent Owner's] alleged claim construction, the *Perry-Wilson-Bronson* combination still discloses and/or suggests claim 35." *Id.* at 14 (citing Pet. 25–65). "In the end," Petitioner

asserts, "*Perry*'s publisher website is a TPSMP under its plain meaning and under [Patent Owner's] representations during prosecution (being unrelated to, *i.e.*, having no common ownership with, *e.g.*, the ASC)." *Id.* (citing Ex. 1005 ¶¶ 15, 46, 52, 53; Ex. 2005, 58; Pet. 11–12).

Responding to Patent Owner's argument that the Petition failed to propose any actual modification of Perry's teachings in view of Wilson (PO Resp. 16–20), Petitioner contends that "while the Petition discusses different ways in which *Perry* discloses 'authorizing,'" "it alternatively proposes that it would have been obvious to modify *Perry*'s system in light of *Wilson* to include a computer programmed to implement the claimed 'authorizing' step by tagging a user's computer" (Pet. Reply 15 (citing Pet. 11–16)). According to Petitioner, "*Wilson* describes processes for delivering targeted content to an audience member based on segment affinity data where a unique identifier is received following a website visit, which links prior website visits and profile data," and "[i]n the combination, 'users of the *Perry* system would have been tagged as suggested by *Wilson*' rendering obvious a modified ASC 'to "automatically electronically authoriz[e]" the publisher "to allow display" of an ad responsive to receiving information through conventional user tagging processes, similarly to as described in *Wilson*.'" *Id.* at 16 (citing Pet. 15; Ex. 1002 ¶¶ 81–82). Further, Petitioner argues, "[c]ontrary to PO's reductive characterizations, Dr. Schonfeld explained that *Wilson*'s identifier was part of the analysis, including modifying 'the way the unique identifier is used by the Perry system, [a]nd in particular, by the ASC server.'" *Id.* at 17 (citing PO Resp. 18; Ex. 2004, 83:3–84:22). Still further, Petitioner contends Patent Owner's arguments "also ignore the premise of the *Perry-Wilson-Bronson* combination—which relies on *Wilson* for supporting obviousness where '*Perry* is read not to

disclose the "automatically electronically authorizing" . . . "to allow display" limitation.'" *Id.* at 19 (ellipsis in original) (citing Pet. 14; Ex. 2004, 92:16–93:7).

In its Sur-reply, Patent Owner contends that Petitioner's Reply essentially provides only attorney argument that fails to cure the Petition's defects and, to the extent that "Petitioner presents a ***new*** theory using the correct interpretation of TPSMP, . . . that belated theory still fails to disclose how the claimed system 'authoriz[es] the [TPSMP] to allow display . . . of an advertisement' as claimed." PO Sur-reply 1; *see also id.* at 12–14 (contending that Petitioner improperly shifted its theory of unpatentability in its Reply), 14–24 (arguing that, even if considered, Petitioner's Reply arguments fail to show unpatentability). For example, Patent Owner argues, "Petitioner does not contest that, after the action tag code is served to the user by the publisher, 'the publisher takes no further steps in the ad-serving process that allow such an advertisement to be displayed.'" *Id.* at 19 (quoting PO Resp. 26–27). According to Patent Owner, "Petitioner's Reply tellingly uses passive voice to state that '*the advertisement is displayed* on the publisher's website visited by the user' without specifying *which entity* controls or allows that display" and "hides what role the ***publisher*** has in that process, because the publisher ***has no role*** in that process (other than the initial serving of the action tag to the user, which again is not the claimed 'authorizing' because the record is clear that the TPSMP cannot authorize itself)." *Id.* (citing Pet. Reply 24; Ex. 2002 ¶¶ 76–79). Indeed, Patent Owner argues, "Petitioner takes the surprising position that 'the claims do not require "awareness" of authorization,'" but "Petitioner's position is nonsensical, because, if the TPSMP is never aware of the authorization, it could not 'allow display . . . of an advertisement' in response to that

authorization, as claimed." *Id.* at 20 (citing Pet. Reply 26; PO Resp. 32–33; Ex. 2002 ¶ 88).

Having considered the parties' respective contentions in light of the evidence of record, we conclude that Petitioner has not established by a preponderance of the evidence that claim 35 is unpatentable over the combination of Perry, Wilson, and Bronson. In particular, we are not persuaded that the cited prior art teaches or suggests "a system comprising one or more computers programmed to implement a method . . . comprising: . . . automatically electronically authorizing a third-party second media property to allow display . . . of an advertisement correlated with the profile-attribute information received about the visitor." Although Figure 1 of Perry depicts a "system" that includes computers programmed to implement a method of distributing advertisements to users over the Internet, we are not persuaded that any component in that system implements a method that includes "automatically electronically authorizing a third-party second media property" to display such advertisements. As Patent Owner points out, Petitioner identifies "Internet publisher computer systems 131 and 132" and "advertising service company computer system 140 comprising one or more CPUs 141" as the recited "one or more computers." Pet. 7; PO Resp. 11. Although there is no dispute that Publisher Systems 131 and 132 and ASC 140 are computers, we find that neither satisfies the remaining limitations of claim 35, particularly because neither "automatically electronically authoriz[es] a third-party second media property" to display advertisements.

As we explain in our claim construction discussion above, we are not persuaded by Patent Owner's arguments that the recited "system" necessarily must exclude the "third-party second media server." *See supra*

§ III.C. Nonetheless, the third-party second media server still must be separate and distinct from the "one or more computers programmed to implement [the recited] method," lest the modifier "third-party" be rendered meaningless.

In Perry's system, ASC 140 itself is disclosed to serve advertisements, and we find no teaching or suggestion that ASC 140 authorizes any other component or entity that might be termed a third-party second media property, relative to itself, to display ads. As noted above, the Petition identifies "a publisher's web page" in Perry as being the recited "third-party second media property" (Pet. 11–12 (citing Ex. 1005 ¶¶ 15, 41, 52, Fig. 1)), and Petitioner's Reply identifies Perry's "publisher system/website" (i.e., publisher system 132, per Petitioner's annotated version of Perry's Figure 1) with that element (Pet. Reply 13–14 (citing Ex. 1005 ¶¶ 15, 21, 46, 52, 53, Fig. 1)). Notwithstanding Petitioner's contentions, the portions of Perry cited in the Petition and Petitioner's Reply do not support a finding that either the publisher's web page or publisher system 132 is "authoriz[ed] . . . to allow display . . . of an advertisement." Rather, each of those portions, read in context, is consistent with ASC 140 displaying ads.

First, paragraph 15 of Perry, with reference to Figure 1, states, in relevant part, that "[a] Internet customer . . . uses [an] Internet customer computer system to connect, via the Internet 120, to an Internet publisher compute system, such as Internet publisher computer systems 131 and 132, to retrieve and display a Web page," whereas "[a]n Advertising Service Company (ASC) 140 (or third-party ad server),[15] advertisers 161, 162, and

[15] As quoted, Perry indicates that ASC 140 itself may alternatively be termed a "third-party ad server." Ex. 1005 ¶ 15 (referring to "An Advertising Service Company (ASC) 140 (or third-party ad server)"). As indicated

content distributors 151, 152 communicate via the Internet to serve advertisements place on publisher web sites to users visiting those sites." Ex. 1005 ¶ 15. In other words, there is no teaching or suggestion in that paragraph that a publisher's web page or publisher computer systems 131 and 132 display ads.

Second, paragraph 21 of Perry discloses that ASC 140 preferably includes one or more CPUs 141, memory 142, and a computer-readable media drive 143, but does not mention publishers' web pages or publisher systems 131, 132. Ex. 1005 ¶ 21. Likewise, paragraphs 41 and 46 state that the ASC in the alternative embodiment of Perry's Figure 3 contracts with advertisers and collects cookies and records search terms, but neither paragraph mentions publishers' web pages or systems. *Id.* ¶¶ 41, 46.

Finally, paragraph 52 of Perry states that "[t]he publisher has contracted with the ASC to serve advertisements, so the page includes an action tag that facilitates the ASC determining the user's cookie." Ex. 1005 ¶ 52. The immediately following paragraph of Perry makes it clear that "[i]n step 322, ***the ASC serves the advertisement*** . . . to the user." *Id.* ¶ 53 (emphasis added).

Nor does the addition of Wilson and Bronson cure Perry's deficiencies. As applied by Petitioner, Wilson provides additional detail

---

above, the Petition identifies ASC 140 as the "one or more computers" of claim 35, rather than the "third-party second media property," and Petitioner does not contend that any other computer in Perry's system is "programmed to implement a method . . . comprising: . . . responsive to receiving information about at least one of a plurality of profile attributes possibly applicable to [a] visitor, automatically electronically authorizing" ASC 140 to allow ad display. *See* Pet. 10–12. Accordingly, Petitioner also has not shown that claim 35 would be unpatentable.

regarding placement of a tag on a visitor's computer but does not change the fundamental operation of Perry's system. *See* Pet. 14–16, Pet. Reply 15–19. More particularly, although Wilson is relied upon for tagging an audience member with a cookie containing a unique identifier that Petitioner relates to the "automatically electronically authoriz[es]" language of claim 35, we find that it is ultimately still Perry's ASC, rather than the publisher's system or webpage, that would display the advertisement in the combination. *See* Pet. 17–18 (quoting Ex. 1005 ¶ 53 (Perry's disclosure that "the ASC serves the advertisement")). Likewise, the Petition relies on Bronson's disclosure of revenue/profit-based criteria as teaching the limitation "subject to a visitor-specific condition for display of the advertisement that a price charged by the second media property is less than" the price an advertiser is willing to pay for the display, not as teaching "automatically authorizing [the] third-party second media property to allow [such] display." *Id.* at 20–24. Accordingly, it is again Perry's ASC, rather than the publisher's system or web page, that would display the advertisement in the combination. *See id.* at 19 (quoting Ex. 1005 ¶ 53 (Perry's disclosure that "the ASC serves the advertisement")); *see also id.* at 24 ("*Perry* teaches that the ASC controls when an ad is rendered on a website (Ex. 1005, FIG. 3), and *Bronson* teaches additional control features that an ad can be rendered based on several conditions, including when the ad would be rendered for a profit (Ex. 1007, 7:37–8:38).").

*c. Conclusion Regarding Claim 35*

Because Petitioner has failed to show that the cited prior art teaches or suggests "one or more computers programmed to implement a method . . . comprising: . . . automatically electronically authorizing a third-party second media property to allow display . . . of an advertisement correlated with the

profile-attribute information received about the visitor," as recited in claim 35, we determine that Petitioner has not established by a preponderance of the evidence that claim 35 is unpatentable over the combination of Perry, Wilson, and Bronson.

#### 5. *Dependent Claims 39–42 and 45–47*

Each of claims 39–42 and 45–47 depends directly from independent claim 35. Ex. 1001, 16:55–17:3, 17:17–18:4. Petitioner contends that the additional limitations of these claims are variously taught or suggested by Perry, Wilson, and Bronson. Pet. 25–34. We conclude that Petitioner has not demonstrated unpatentability of any of dependent claims 39–42 and 45–47 over Perry, Wilson, and Bronson for the same reasons as set forth for claim 35.

### E. *Obviousness over Perry, Wilson, and Bronson in Further Combinations with Kang, Howard, McFadden, and Burdick (Petitioner's Grounds 2–6)*

Claims 36–38, 42–44, and 47–51 each depend directly or indirectly from claim 35. Ex. 1001, 16:28–54, 16:66–17:16, 18:1–20. Petitioner alleges that claim 36 is unpatentable as obvious over Perry, Wilson, Bronson, and Kang (Pet. 2, 34–40); that claim 37 is unpatentable as obvious over Perry, Wilson, Bronson, Kang, and Howard (*id.* at 2, 40–46); that claims 38, 43, 44, and 47–49 are unpatentable as obvious over Perry, Wilson, Bronson, and Howard (*id.* at Pet. 3, 46–57); that claim 42 is unpatentable as obvious over Perry, Wilson, Bronson, and McFadden (*id.* at 3, 57–59); and that claims 50 and 51 are unpatentable as obvious over Perry, Wilson, Bronson, Howard, and Burdick (*id.* at 3, 60–65). Petitioner relies on Kang, Howard, McFadden, and Burdick variously for the additional recitations of these dependent claims but does not allege that any of Kang,

Howard, McFadden, or Burdick remedies the deficiencies of Perry, Wilson, and Bronson with respect to the recitations of independent claim 35 as discussed above in Sections III.D.4. *See id.* at 34–65.

For the reasons set forth above with respect to claim 35 (*see supra* § III.D.4), we conclude that Petitioner has failed to show by a preponderance of the evidence that any of claims 36–38, 42–44, and 47–51 are unpatentable on the grounds presented.

## IV. CONCLUSION

For the reasons discussed above, Petitioner has not shown by a preponderance of the evidence that any of claims 35–51 of the '822 patent are unpatentable.

In summary:

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 35, 39–42, 45–47 | 103(a) | Perry, Wilson, Bronson | | 35, 39–42, 45–47 |
| 36 | 103(a) | Perry, Wilson, Bronson, Kang | | 36 |
| 37 | 103(a) | Perry, Wilson, Bronson, Kang, Howard | | 37 |
| 38, 43, 44, 47–49 | 103(a) | Perry, Wilson, Bronson, Howard | | 38, 43, 44, 47–49 |
| 42 | 103(a) | Perry, Wilson, Bronson, McFadden | | 42 |
| 50, 51 | 103(a) | Perry, Wilson, Bronson, Howard, Burdick | | 50, 51 |
| **Overall Outcome** | | | | 35–51 |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has not shown that any of the challenged claims are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Joseph E. Palys
Naveen Modi
Mark Consilvio
Kevin Stewart
PAUL HASTINGS LLP
josephpalys@paulhastings.com
naveenmodi@paulhastings.com
markconsilvio@paulhastings.com
kevinstewart@paulhastings.com

FOR PATENT OWNER:

Reza Mirzaie
Jonathan Link
James A. Milkey
Amy E. Hayden
Philip X. Wang
RUSS, AUGUST & KABAT
rmirzaie@raklaw.com
jlink@raklaw.com
jmilkey@raklaw.com
ahayden@raklaw.com
pwang@raklaw.com

US008200822B1

(12) **United States Patent** (10) **Patent No.: US 8,200,822 B1**
**Shkedi** (45) **Date of Patent: *Jun. 12, 2012**

(54) **MEDIA PROPERTIES SELECTION METHOD AND SYSTEM BASED ON EXPECTED PROFIT FROM PROFILE-BASED AD DELIVERY**

(75) Inventor: **Roy Shkedi**, New York, NY (US)

(73) Assignee: **Almondnet, Inc.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/418,320**

(22) Filed: **Mar. 12, 2012**

**Related U.S. Application Data**

(63) Continuation of application No. 12/823,709, filed on Jun. 25, 2010, which is a continuation of application No. 11/763,286, filed on Jun. 14, 2007, now Pat. No. 7,747,745.

(60) Provisional application No. 60/804,937, filed on Jun. 16, 2006, provisional application No. 60/805,119, filed on Jun. 19, 2006.

(51) **Int. Cl.**
***G06Q 30/00*** (2012.01)

(52) **U.S. Cl.** .................................... **709/225**; 705/14.66

(58) **Field of Classification Search** .................... 705/10, 705/14, 14.66, 78; 709/224, 225
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,710,884 A 1/1998 Dedrick
5,717,923 A 2/1998 Dedrick
5,724,521 A 3/1998 Dedrick
5,752,238 A 5/1998 Dedrick
5,794,210 A 8/1998 Goldhaber et al.
5,855,008 A 12/1998 Goldhaber et al.
5,918,014 A 6/1999 Robinson
5,948,061 A 9/1999 Merriman et al.
6,026,368 A 2/2000 Brown et al.

(Continued)

FOREIGN PATENT DOCUMENTS

KR 10-2001-0096343 11/2001

(Continued)

OTHER PUBLICATIONS

Engage Technologies, Inc.; Form S-1A; filed with the SEC; pp. 36-50; Jul. 19, 1999.*

(Continued)

*Primary Examiner* — Wing Chan
*Assistant Examiner* — Kostas Katsikis
(74) *Attorney, Agent, or Firm* — Louis J. Hoffman; David S. Alvai

(57) **ABSTRACT**

An automatic system facilitates selection of media properties on which to display an advertisement, responsive to a profile collected on a first media property, where a behavioral-targeting company calculates expected profit for an ad correlated with the profile and arranges for the visitor to be tagged with a tag readable by the selected media property. The profit can be calculated by deducting, from the revenues that are expected to be generated from an ad delivered based on the collected profile, at least the price of ad space at a media property where the BT company might like to deliver ads to the profiled visitor. When the calculated profit is positive (i.e., not a loss), the BT company arranges for the visitor to be tagged with a tag readable by the selected media property through which the BT company expects to profit.

**51 Claims, 3 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,055,513 A | 4/2000 | Katz et al. | |
| 6,073,241 A | 6/2000 | Rosenberg et al. | |
| 6,141,010 A | 10/2000 | Hoyle | |
| 6,216,129 B1 | 4/2001 | Eldering | |
| 6,285,987 B1 | 9/2001 | Roth et al. | |
| 6,285,991 B1 * | 9/2001 | Powar | 705/76 |
| 6,324,519 B1 * | 11/2001 | Eldering | 705/14.66 |
| 6,366,298 B1 | 4/2002 | Haitsuka et al. | |
| 6,377,986 B1 * | 4/2002 | Philyaw et al. | 709/219 |
| 6,385,592 B1 | 5/2002 | Angles et al. | |
| 6,484,492 B2 | 11/2002 | Meholic et al. | |
| 6,487,538 B1 | 11/2002 | Gupta et al. | |
| 6,615,247 B1 | 9/2003 | Murphy | |
| 6,832,207 B1 | 12/2004 | Shkedi | |
| 6,868,392 B1 * | 3/2005 | Ogasawara | 705/7.25 |
| 6,925,440 B1 | 8/2005 | Shkedi | |
| 6,973,436 B1 | 12/2005 | Shkedi | |
| 6,983,379 B1 | 1/2006 | Spalink et al. | |
| 7,039,594 B1 | 5/2006 | Gersting | |
| 7,043,531 B1 | 5/2006 | Seibel et al. | |
| 7,058,593 B1 | 6/2006 | Merritt | |
| 7,065,550 B2 | 6/2006 | Raghunandan | |
| 7,072,853 B2 | 7/2006 | Shkedi | |
| 7,155,508 B2 | 12/2006 | Sankuratripati et al. | |
| 7,181,438 B1 | 2/2007 | Szabo | |
| 7,188,076 B2 | 3/2007 | Bensemana | |
| 7,194,424 B2 | 3/2007 | Greer et al. | |
| 7,428,493 B2 | 9/2008 | Shkedi | |
| 7,454,364 B2 | 11/2008 | Shkedi | |
| 7,558,795 B2 | 7/2009 | Malik et al. | |
| 7,756,744 B2 | 7/2010 | Schiff et al. | |
| 7,822,637 B2 | 10/2010 | Shkedi | |
| 7,822,639 B2 | 10/2010 | Shkedi | |
| 7,861,260 B2 | 12/2010 | Shkedi | |
| 7,890,609 B2 | 2/2011 | Shkedi | |
| 7,979,307 B2 | 7/2011 | Shkedi | |
| 8,051,444 B2 | 11/2011 | Shkedi | |
| 2001/0020242 A1 | 9/2001 | Gupta et al. | |
| 2001/0039515 A1 | 11/2001 | Mayadas | |
| 2001/0044743 A1 | 11/2001 | McKinley et al. | |
| 2002/0002541 A1 | 1/2002 | Williams | |
| 2002/0072965 A1 | 6/2002 | Merriman et al. | |
| 2002/0072971 A1 | 6/2002 | DeBusk et al. | |
| 2002/0082910 A1 | 6/2002 | Kontogouris | |
| 2002/0082923 A1 | 6/2002 | Merriman et al. | |
| 2002/0091568 A1 | 7/2002 | Kraft et al. | |
| 2002/0099603 A1 | 7/2002 | Bandura | |
| 2002/0112013 A1 | 8/2002 | Walsh | |
| 2002/0123928 A1 | 9/2002 | Eldering et al. | |
| 2002/0133399 A1 | 9/2002 | Main | |
| 2002/0143632 A1 | 10/2002 | Walter et al. | |
| 2002/0161636 A1 | 10/2002 | Takahashi et al. | |
| 2002/0194058 A1 | 12/2002 | Eldering | |
| 2003/0028451 A1 | 2/2003 | Ananian | |
| 2003/0036944 A1 | 2/2003 | Lesandrini et al. | |
| 2003/0046156 A1 | 3/2003 | Cromer et al. | |
| 2003/0050827 A1 | 3/2003 | Hennessey | |
| 2003/0065558 A1 | 4/2003 | Shaw et al. | |
| 2003/0083931 A1 | 5/2003 | Lang | |
| 2003/0083938 A1 | 5/2003 | Smith et al. | |
| 2003/0110497 A1 | 6/2003 | Yassin et al. | |
| 2003/0135413 A1 | 7/2003 | Nishi et al. | |
| 2003/0135853 A1 | 7/2003 | Goldman et al. | |
| 2003/0149938 A1 | 8/2003 | McElfresh et al. | |
| 2003/0154126 A1 | 8/2003 | Gehlot et al. | |
| 2003/0171990 A1 | 9/2003 | Rao et al. | |
| 2003/0208404 A1 | 11/2003 | Michie | |
| 2003/0220837 A1 * | 11/2003 | Asayama | 705/14 |
| 2004/0024632 A1 | 2/2004 | Perry | |
| 2004/0059632 A1 | 3/2004 | Kang et al. | |
| 2004/0068436 A1 * | 4/2004 | Boubek et al. | 705/14 |
| 2004/0117322 A1 | 6/2004 | Bjorksten et al. | |
| 2004/0260605 A1 | 12/2004 | McIntyre et al. | |
| 2005/0010472 A1 | 1/2005 | Quatse et al. | |
| 2005/0021397 A1 | 1/2005 | Cui et al. | |
| 2005/0028188 A1 | 2/2005 | Latona et al. | |
| 2005/0038698 A1 | 2/2005 | Lukose et al. | |
| 2005/0038702 A1 | 2/2005 | Merriman et al. | |
| 2005/0080772 A1 | 4/2005 | Bem | |
| 2005/0086112 A1 | 4/2005 | Shkedi | |
| 2005/0120091 A1 | 6/2005 | Casais | |
| 2005/0131762 A1 | 6/2005 | Bharat et al. | |
| 2005/0165644 A1 | 7/2005 | Beyda et al. | |
| 2005/0216336 A1 | 9/2005 | Roberts et al. | |
| 2005/0216823 A1 | 9/2005 | Petersen et al. | |
| 2005/0222905 A1 | 10/2005 | Wills | |
| 2005/0278443 A1 | 12/2005 | Winner et al. | |
| 2006/0020508 A1 | 1/2006 | Gorti et al. | |
| 2006/0020510 A1 * | 1/2006 | Vest | 705/14 |
| 2006/0053047 A1 | 3/2006 | Garcia et al. | |
| 2006/0064351 A1 | 3/2006 | Hamor et al. | |
| 2006/0069614 A1 | 3/2006 | Agarwal et al. | |
| 2006/0095322 A1 | 5/2006 | Dierks | |
| 2006/0106710 A1 | 5/2006 | Meek et al. | |
| 2006/0116924 A1 | 6/2006 | Angles et al. | |
| 2006/0122879 A1 * | 6/2006 | O'Kelley | 705/14 |
| 2006/0161553 A1 | 7/2006 | Woo | |
| 2006/0183467 A1 * | 8/2006 | Stewart | 455/414.3 |
| 2007/0121843 A1 * | 5/2007 | Atazky et al. | 379/114.13 |
| 2007/0198385 A1 * | 8/2007 | McGill et al. | 705/36 R |
| 2007/0203794 A1 | 8/2007 | Hajdukiewicz et al. | |
| 2007/0294401 A1 | 12/2007 | Shkedi | |
| 2009/0049468 A1 | 2/2009 | Shkedi | |
| 2009/0172723 A1 | 7/2009 | Shkedi et al. | |
| 2009/0172728 A1 | 7/2009 | Shkedi et al. | |
| 2009/0299843 A1 | 12/2009 | Shkedi | |
| 2010/0325659 A1 | 12/2010 | Shkedi | |
| 2011/0035256 A1 | 2/2011 | Shkedi et al. | |
| 2011/0040607 A1 | 2/2011 | Shkedi | |
| 2011/0040620 A1 | 2/2011 | Shkedi | |
| 2011/0099576 A1 | 4/2011 | Shkedi et al. | |
| 2011/0131294 A1 | 6/2011 | Shkedi | |
| 2011/0225051 A1 | 9/2011 | Shkedi | |
| 2011/0246309 A1 | 10/2011 | Shkedi | |
| 2011/0246347 A1 | 10/2011 | Shkedi | |
| 2011/0252441 A1 | 10/2011 | Shkedi | |
| 2011/0258051 A1 | 10/2011 | Shkedi | |
| 2012/0017240 A1 | 1/2012 | Shkedi | |
| 2012/0047530 A1 | 2/2012 | Shkedi | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| KR | 10-2004-0099222 * | 11/2004 |
| WO | WO 2004084109 A1 * | 9/2004 |
| WO | WO 2005046237 A1 * | 5/2005 |

OTHER PUBLICATIONS

"The e-Marketing Report"; Morgan Stanley Dean Witter; May 2000; portions.*

"ClickOver, Inc. introduces ClickWise, the first inteligent, high-performance ad management system for electronic advertising", Business Wire;Mar. 24, 1997.

* cited by examiner


Receive profile information
1000
Determine anticipated profit
2000
Select media properties that will produce a profit
3000
Arrange storage of tag
4000

FIG. 1


Receive redirected computer and visitor profile information
100
Recognize action conducted on site
200
Categorize action (optional)
300
Calculate expected revenue
400
Select media properties for ad based on profit determination
500

FIG. 2


FIRST MEDIA PROPERTY/ PROFILE SUPPLIER (E.G., SITE SERVER)
20
USER/VISITOR COMPUTER
10
11
12
t1
t2
SECOND MEDIA PROPERTY "A" (E.G., SITE SERVER)
41
40
110
710
730
700
100
610
INTERNET (OR OTHER MEDIA)
80
620
720
630
30
BT COMPANY SERVER
31
50
SECOND MEDIA PROPERTY "B" (AD NETWORK SERVER)
AD SPACE ON SITE 1
AD SPACE ON SITE 2
60
61

FIG. 3

# MEDIA PROPERTIES SELECTION METHOD AND SYSTEM BASED ON EXPECTED PROFIT FROM PROFILE-BASED AD DELIVERY

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 12/823,709, filed Jun. 25, 2010, which is a continuation of application Ser. No. 11/763,286, filed Jun. 14, 2007, now U.S. Pat. No. 7,747,745, which claims the benefit of provisional application Ser. No. 60/804,937, filed Jun. 16, 2006, and provisional application Ser. No. 60/805,119, filed Jun. 19, 2006, which are herein incorporated by reference.

## FIELD OF THE INVENTION

The present invention generally relates to profile-based behavioral targeting advertisement placement methods. More specifically, the present invention relates to electronic advertisement placement based on expected profit from the placement.

## BACKGROUND OF THE INVENTION

DoubleClick's "Boomerang" is a service for advertisers that places a cookie on computers of visitors to an advertiser's site for the purpose of finding those visitors on other sites where DoubleClick is the ad server ("ad" is short for advertisement). When the same visitors are found on those other sites, additional advertiser's ads are served to them by the DoubleClick ad sever or by the advertiser's ad server following a redirect from the DoubleClick ad server.

The only server that can read a cookie on a user's computer is a server operating under the same domain as the server that placed the cookie on a user's computer to begin with. In other words, a cookie placed by a server operating under one domain cannot be read by another server working under a separate domain. That is why the advertiser cannot expect to place a cookie of its own (e.g., ford.com cookie) on a visitor to its site and then later expect the DoubleClick ad server (doubleclick.com) to be able to recognize the visitor when that visitor is visiting sites where DoubleClick serves ads by reading the ford.com cookies. Only a server operating under the DoubleClick domain can read a cookie placed by a server operating under the DoubleClick domain. So, DoubleClick needs to place a doubleclick.com cookie on visitors to the ford.com site for DoubleClick to later find those visitors within other sites, i.e., where the DoubleClick ad server is used to serve ads.

For a site to have its ad served by an ASP-hosted ad server, such as the one operated by DoubleClick, the site needs to redirect visitors from the site to the DoubleClick ad server, to fetch the ad from the server. Following the redirect from the site, the visitor accesses the DoubleClick ad server. Because the DoubleClick server is operating under the DoubleClick domain, it can read the DoubleClick cookie or cookies and then recognize that it encountered the same visitor in the past. In this example, the DoubleClick ad server recognizes the visitor as someone who visited the ford.com site.

AlmondNet, Tacoda, RevenueScience, and other companies (herein "BT companies"; "BT" stands for behavioral targeting) specialize in targeting ads based on observed behavior of sites' visitors. BT companies place a cookie (or cookies) on the computers of visitors to specific sections of a publisher's website or on the computers of visitors of the



publisher who conducted a specific action such as search, click content, click an ad, request information, acquire a product, etc.

The placement of cookies allows those publishers or the BT company itself to sell ads to advertisers. Those ads will be presented to the visitors when they are found later on the same site or on other sites. Such sites can be either a site where the BT company's software is used or a site where the BT company has bought media. The BT company may buy the media on behalf of itself or on behalf of the publisher, who is interested in delivering ads to its audience outside the publisher's site.

Although a BT company (AlmondNet, Tacoda, RevenueScience, etc.) acts as an agent that places cookies on the computers of publisher's visitors for the purpose of delivering targeted ads to the publisher's visitors on other sites, the publisher can work without an agent and place cookies or tags on the computers of the publisher's own visitors for the purpose of delivering ads to those visitors on other sites where the publisher buys ad space. Such a publisher, acting without an agent, is also included in the definition of a BT company.

A publisher may also be referred to as a "profile supplier" when it transfers profile information, such as behavioral information, demographic information, etc., to a BT company. Therefore, a publisher that is a BT company may also be its own profile supplier. Furthermore, although the name "BT company" implies the targeting of ads is based on collected behavioral profiles, a BT company may also collect other kinds of profile information, such as demographic information or user-provided information, and target ads to those visitors wherever found based on the collected profile information.

Another kind of a BT company is a company that has software installed on a person's computer, such as toolbar software, desktop search software, weather software, or any kind of software that is used by the computer's user. Such software also monitors the computer user's visits to different publishers' sites and media properties and collects profile information about the computer user for the purpose of delivering ads to the user within ad space of sites and media properties that the user visits based on the collected profiles.

A BT company using software installed on a user's computer does not need the cooperation of a visited media property to collect information about the visitor's visit because that software monitors whatever the user is doing on his or her computer. A BT company that has software installed on a user's computer is therefore its own profile supplier. Such software can place a cookie or another kind of tag on the user's computer. Because the software is installed on the user's computer, it can write cookies readable by any domain. That means that the BT company can place a tag or cookie of a second media property, if the BT company would like the second media property to recognize the visitor when the visitor visits that second media property site, by simply having the software place a cookie operating under the domain of the second property on the visitor's computer. The software may also report the collected profiles to a central server of the BT company.

The central server may also tag the visitor or arrange for the visitor to be tagged by operators of other media properties. A BT company can place a cookie on a site's section when a visitor's computer visits that section, if a code of the company was integrated into the page of that section by the site that owns the page. The code (e.g., HTML or Java) redirects to the BT company's server all visitors to the page. Also, in the case that the BT company is the publisher itself, the publisher will

simply "cookie" (by itself) all visitors that either read a specific content, search, click, ask for information, make a phone call, etc.

The BT company's server, which either gave the site a unique code for a page, received from the page its URL, or received access to the page's content that could be analyzed by the BT company's server, etc., identifies the content read by the page's visitor or the keyword searched for by the user, or an ad clicked on the page, etc. The content read by the page visitor could be identified by the BT company's server whether the content was reported by the site or whether the content was identified following the analysis of the page. The server then places a cookie on the user's computer indicating what content was read by the visitor on the page, what keyword was searched for by the user, or what ad was clicked on the page, etc. The placed cookie indicates that information (1) in the cookie per se, (2) in a central database operated by the server where the cookie ID is used as a record finder, or (3) both in the cookie and in the database.

Although the above description relates to cookies, a cookie is only one example of a possible tag. A tag generally is a unique identifier used to mark a person electronically visiting a media property, such as a web site, TV channel, radio show, or the like, using a computer, a mobile device, a TV set, a TV set top box, or any other device.

The tag is used for the purpose of delivering additional ads to a visitor to one media property when that visitor is found later on other media properties, based on the visitor's profile collected on the first media property. The profile could be the observed behavior of the visitor on the media property, demographic information collected on the media property, profile information provided by the visitor to the media property, etc.

Because the purpose of the tag is to enable the delivery of additional ads on other media properties visited by the visitor, and because the delivery of an ad requires only control of the ad space and not necessarily control of the entire media property visited by the visitor, a media property (in the present context) can also be defined as any equipment that controls an ad space viewed by a visitor, including a web site, an ad network's site (where the ad network represents the ad space of different sites), a TV program, some of the ad space within TV programs or TV channels (represented by a cable company), a TV network, or any ad space for which an entity is allowed to sell an advertisement and deliver it within the ad space; whether the ad space is owned by that entity, or whether the entity pays the owner of the ad space when using its ad space to deliver an ad sold by the entity. Ad space can be on a web site, in a TV program, in a text message, in a radio show, in any broadcasted material, in any streaming video or audio, etc. An ad space can be a fixed position on a page, or the ad space can be made available by a web site to an ad network (for example) only when the web site did not sell all of the site's ad inventory and therefore wishes to make some of the inventory available to the ad network.

In the case of a media property controlling an ad space viewed by a visitor, a specific ad space on a page might be controlled only temporarily. For example, in the case of the web site that did not sell all the ad impressions available to be delivered within an ad space on a page and therefore makes the unsold ad space available to the ad network to fill, the ad network will have temporary control of the ad space, i.e., when that ad space is given to it by the web site. Once the site redirects the ad space on the page to the ad network (so the ad network could fill the ad space with an ad sold by the ad network), the ad network controls the ad space and has access to the visitor viewing the ad space that was redirected to the ad network by the site, and therefore the ad network's equipment is considered a media property, as it controls an ad space viewed by a visitor.

The tag can be placed on the device used by the user to access the first media property where the user's profile was collected (in case of observed behavior, that behavior can be reading a specific content, searching, clicking an ad or content, making a phone call, asking for product information, acquiring a product, or taking any other kind of action). A tag placed on the device (1) could be read only by a server operating under the same domain as the server that placed the tag on the device to begin with as in the case of a cookie for example, (2) could be placed on the device when the user visited the first media property, and then the tag can be read by any second media property visited by the visitor, or (3) could be encrypted and, while accessed by any second media property visited by the visitor, the tag could be deciphered only by second media property computers that received the deciphering code from the first media property. In case of a tag placed by software installed on a user's computer, the tag could be whatever the software wants it to be, including a cookie of any domain.

A tag does not have to be placed on the user's device. A tag can also be used in a central database of a BT company or a central database of any second media property visited by the visitor, where the tag could be a unique identifier either of the device or of the user. In the case where the tag identifies the device, the tag might denote an IP address, a phone number, a device's manufacturer serial number, etc. A cookie placed on the device can also uniquely identify the device and the cookie therefore can be used as a tag in a central database. In the case where the tag identifies the user, the tag might denote the username and password used to access a media property, a user's name and address, a user's e-mail, a user's social security number, or any other personal identifiable information.

As already mentioned, the observed behavior of a visitor to a first media property is referred to as profile information about a specific visitor. A visitor's profile might be enhanced by the visitors' observed behavior on other media properties or by other profile information collected on other media properties.

A visitor's profile can be represented by a unique tag, or the profile can be stored with the tag, whether the tag is placed on the device, on a central database, or both. For example, the profile can be stored within a cookie (tag) on a visitor's device, or the profile can be stored in a central database where the tag connected to the profile is used as a unique identifier of the visitor's device or of the visitor personally. The profile can also be saved on both the device and a central database.

One of the major challenges in targeting a first site visitor on another site with an ad based on his observed behavior on sites visited by him previously (such as the first site) is actually finding the visitor on other sites.

Depending on the tag placed (or arranged to be placed) by the BT companies, the visitor could be recognized either by the entity that placed the tag to begin with (which requires access by that entity to the tag when the visitor visits a second media property) or by the second media property reading the tag (in which case the tag can be placed by the second media property if the BT company so arranges).

BT companies, acting as an agent, can find visitors tagged by them, when the tagged visitors are present on sites that use the BT companies' software (either to serve ads or in conjunction with those sites' ad servers). BT companies (whether it is acting as an agent, is the publisher itself, or is operating

with any other BT company) can find visitors tagged by them, when the visitors are present on sites and ad networks where the BT companies buy media.

To make the process of finding people who visited a first media property on other media properties more efficient, BT companies enable sites and ad networks (from whom the BT companies buy media) to also place their cookies on the computers of people (visitors) on whose computers the BT company has placed its own cookie. That technique is similar to the way DoubleClick's Boomerang system places cookies on visitors to an advertiser site for the purpose of finding those visitors later on other sites where Doubleclick serves ads.

An ad network ad server (or any other server of the ad network) or a site's ad server (or any other server of the site) can place their own cookies on the computers of visitors that are redirected to them by the BT companies, for the purpose of later recognizing those visitors within their own ad space (i.e., the ad space of the ad networks or the sites).

This process—where sites and ad networks place cookies on visitors' computers redirected to them by BT companies (or other entities interested in additional ads presented to their audience elsewhere)—is sometimes referred to as "cookie matching."

For example, weather.com might place a weather.com cookie on a user's computer marking him or her as a visitor to BT company #**1**, following a redirect from BT company #**1** server. Later, if and when the weather.com ad server recognizes that the same visitor (previously redirected to him by BT company #**1**) happened to visit weather.com (weather.com will recognize the visitor by reading its own weather.com cookie, which marked the visitor as a BT company #**1** visitor), the weather.com ad server can, if it wishes, redirect the visitor's computer to the BT company #**1** server, to have an ad served to the visitor, either by BT company #**1**'s ad server or another ad server to which BT company #**1** ad server further redirects the visitor. The weather.com ad server's decision, whether or not to redirect the visitor's computer to BT company #**1**'s server can be based on the price that BT company #**1** promised to pay weather.com for the presentation of an ad within weather.com's ad space, to a visitor previously redirected to weather.com by BT company #**1**'s server.

Although the above-described processes enable a second media property to recognize a first media property visitor, it is still a very inefficient process for the following reasons:

(1) Media properties' ad space prices vary.

(2) Profiles of media properties' visitors are worth different amounts to advertisers depending on the profiles. For example, a person who searched for a "mortgage" on a search engine might be presented with a mortgage-related ad, for which the advertiser is willing to pay $3 if that person clicks on that ad. A person who searched for "socks" on a search engine might be presented with a socks-related ad, for which the advertiser is willing to pay $0.50 if that person clicks on that ad. A person who visited the mutual fund section of a site might be presented with a mutual-fund related ad (wherever the person is found, i.e., either on the same site or on other sites), in which case the advertiser is willing to pay $25 for every thousand ads (CPM) presented to people who visited that mutual fund section.

(3) The same person might have several profile attributes in his or her profile (as a result, for example, of that person conducting several different searches and visiting different sites). Different advertisers might be willing to pay different amounts for delivering ads to the person based on the specific profile attribute or attributes that the respective advertisers are looking to target.

In summary, the cost of ad space at a second media property might not be covered by revenues generated for a BT company buying the space, i.e., from an ad delivered within the second media property ad space based on a profile collected in a first media property or properties. Alternatively, the revenues might cover the media cost but not deliver satisfactory margins to the BT company, when taking into account other costs, such as ad sales people cost, ad serving cost etc.

## SUMMARY OF THE INVENTION

According to various aspects of the invention, therefore, an automatic system is described to facilitate selection of media properties on which to display an advertisement, responsive to a profile collected on a first media property, where a BT company calculates expected profit for an ad correlated with the profile and arranges for the visitor to be tagged with a tag readable by the selected media property.

The profit can be calculated by deducting, from the revenues that are expected to be generated from an ad delivered based on the collected profile, at least the price of ad space at a media property where the BT company might like to deliver ads to the profiled visitor. When the calculated profit is positive (i.e., not a loss), the BT company arranges for the visitor to be tagged with a tag readable by the selected media property through which the BT company expects to profit.

The above summary does not include an exhaustive list of all aspects of the present invention, Indeed, the inventor contemplates that the invention may include all systems and methods that can be practices from all suitable combinations of the various aspects summarized above, as well as those disclosed in the detailed description below and particularly pointed out in the claims filed with the application. Such combinations have particular advantages not specifically recited in the above summary.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a flow diagram of an exemplary embodiment of a profit-based selection method.

FIG. **2** is a flow diagram of an exemplary embodiment of a profit-based selection method.

FIG. **3** is a schematic of an exemplary embodiment of entities and associated equipment used with a profit-based selection method.

## DESCRIPTION OF PREFERRED EXEMPLARY EMBODIMENTS

Referring to the embodiment of FIG. **1**, responsive to receiving (**1000**) profile information (e.g., actions) of an electronic visitor with respect to a first media property, the instant method includes (i) determining (**2000**) anticipated revenues and/or profit resulting from placing an advertisement targeted to the visitor based on the received profile, and (ii) automatically selecting (**3000**) at least one media property for which it is anticipated that there will be a positive profit in delivering an ad to the profiled visitor. The method includes, via an electronic communications media, for each of the selected media properties, arranging (**4000**) for electronic storage of a tag readable by said media property, wherein the tag is associated with the visitor.

Profit can be defined as:

(1) revenues expected to be generated, from an ad delivered based on the collected profile, minus the ad space cost at a specific media property (i.e., Pr=Rev (profile)−P(mp), where "Pr" is profit, "Rev" is revenue generated from advertising to

a visitor with a particular profile, and "P" is the price charged by media property "mp" for advertising in an ad space);

(2) revenues expected to be generated, from an ad delivered based on the collected profile, minus the sum of (a) the price for buying ad space on the specific media property, (b) ad serving cost, (c) ad sales associated cost, and (d) desired profit margin (i.e., Pr=Rev(profile)−P(mp)−C−Mar, where "C" represents costs and "Mar" represents desired profit margin), or

(3) in other ways.

If the calculated profit indicates that the BT company will lose (negative profit) from delivering an ad, based on the received profile on any of the possible media properties where it is buying ad space, the BT company won't arrange for the visitor to be tagged by a tag readable by any of those media properties, and the BT company might even decide not to collect the profile (so the visitor's profile will not be stored). Using the equation defining profit in item (2) just above, the question of whether the profit is positive or negative, as stated in this paragraph, equates to testing (4) whether Rev(profile)−P(mp)−C−Mar>0, which is the same as (5) whether Rev(profile)−P(mp)−C>Mar, or (6) whether Rev(profile)>P(mp)+C+Mar, or (7) whether P(mp)<Rev(profile)−C−Mar. Grouping the terms on the right-hand side of the equation in item (7) reduces that equation to the same as testing whether the price charged by a media property is less than a price cap, with the price cap being defined as the difference determined by subtracting from the revenue generated from advertising to a visitor with a particular profile a selected amount, here defined by the costs and desired profit margin.

Likewise, using the equation defining profit in item (1) just above, the question of whether the profit is positive or negative equates to testing (8) whether Rev(profile)−P(mp)>0, which equates to testing (9) whether P(mp)<Rev(profile), which again is the same as testing whether the price charged by a media property is less than a price cap, with the price cap being defined in this instance simply as the available revenue generated from advertising to a visitor with a particular profile.

The method includes the following basic steps, shown in FIGS. **2** and **3**:

1. A profile supplier **20** redirects (**100**) a visitor **10** to a BT company **30** along with the visitor's profile. In case the profile supplier **20** is also the BT company **30**, this step either does not take place or takes place internally, for example via an internal redirect from one server to another server operating under the same domain that belongs to the publisher/BT Company. In case the BT company **30** has software on a user's computer **11** that enables it to monitor the user's visits to media properties (e.g., **20**, **40**, **50**) without the cooperation of the media properties, this step either does not take place or takes place internally, e.g., by the software on the user's computer communicating the collected profile to the BT company's central server.

2. The BT company **30** recognizes (**200**) the content read by the user **10**, the category to which the content read by the user **10** belongs, the keyword searched for by the user **10**, an ad clicked by the user **10**, or any other action conducted on the page/site **20** by the user **10** (such as click on an item of content or an ad, purchase of a product, request for more information, etc) during the site visit (**110**). The recognizing might be as simple as pulling a keyword for which the visitor **10** searched from a URL used by the profile supplier **20** to redirect the visitor **10** to the BT company **30**, for example.

3. The BT company **30** optionally can categorize (**300**) specific content read by the user **10**, or an action conducted by a user **10**. An example action might be a search for a keyword. To illustrate, suppose a person searched for an airline ticket to Florida on a travel site. When the BT company **30** receives that information, in addition to recording the search for the flight to Florida in the visitor's profile (whether the profile is stored in the cookie or tag, the BT company's central database **31**, or both of those places), the BT company **30** may further categorize the person under the "Travel" category and in the "Search for Flights" subcategory of "Travel."

4. The BT company **30** calculates (**400**) expected revenues from delivering ads based on the collected profile (Rev(profile) in the equations above). The revenues are calculated based on the kind of collected profile: (a) Expected revenues from content read by the visitor **10** can be calculated by checking, for example, how much advertisers are willing to pay for delivering ads to visitors who read specific content. (b) Expected revenues from delivering ads based on a keyword searched by the visitor **10** can be calculated by checking, for example, how much advertisers are willing to pay for each click on an ad related to the keyword for which the visitor searched and multiplying that price per click by an assumed click-through rate on ads related to the searched-for keyword, up to 14 days after the visitor's search. In general, expected revenues can be calculated for the delivery of ads based on a category of content read by the visitor **10**, for specific content read by the visitor **10**, or for action taken by the visitor **10** (e.g., made a phone call, clicked an ad, clicked specific content, asked for information, acquired product, etc.).

5. The BT company **30** selects (**500**) media properties (e.g., **40**) for the delivery of an advertisement based on a profile collected on a first media property **20**. The BT company **30** makes the selection based on a calculated expected profit and then arranges for the visitor **10** to be tagged (**610** or **620**) with a tag readable by the selected media property **40**. The profit is calculated in any of the alternative manners stated above.

The BT company's arranging placement of the tag can be achieved in different ways:

A. The BT company **30** can redirect (**630**) a visitor to the selected media property **40**, **50** with a request to have the selected media property **40**, **50** tag (**620**) the visitor with the media property's own tag, which obviously is readable by the selected media property **40**, **50** (such a tag could be a cookie on the visitor's storage device **12**).

B. The BT company **30** can itself place (**610**) a tag that will be readable by the selected media property **40**.

C. The BT company **30** can place an encoded tag that, although accessible by any media property (e.g., **40**, **50**), can be read only by a selected media property **40** to which the BT company gave a deciphering code.

D. In cases when the BT company **30** has software installed on a user's computer **10**, the BT company **30** can arrange for the software to place (not shown) a tag readable by the selected media property **40** (such a tag could be a cookie operating under the selected media property domain).

E. The BT company **30** can arrange for the selected media property **40** to place a tag in the selected media property's central database **41**, in which case the tag can uniquely identify (**1**) the device **11** that the visitor **10** will use to access the selected media (IP address, set-top box ID, mobile phone number, manufacturer serial number, cookie readable by the selected media property, etc.), or (2) the user as a person (personal identifiable information).

When a selected media property **40** recognizes a tagged visitor **10** (tagged previously, at time t**1**) later (at time t**2**) visiting (**710**) its ad space, the media property **40** will arrange for the BT company **30** to serve an ad (**720**) to the visitor **10**

(which will appear with the media content (**730**) requested by the visitor), by redirecting (**700**) a visitor to the BT company **30**, for example.

The media properties can be of the same kind of media (e.g., two web sites **40**, **60** on the Internet **80**) or of different media (e.g., first media property can be a web site **40** on the Internet **80**, and the second media property can be a TV channel on TV or a text message system on a mobile phone, etc.). In the case (not shown) where the second media property operates within a different media than the first media, the tagging of the visitor with a tag readable by the second media property (which is arranged by the BT company **30**) might include finding the device used by the visitor **10** to access the second media by using personal identifiable information about the visitor **10**. As there may be no connection between the device used by the visitor to access the first media property (computer **11**, for example) and the device used by the visitor to access the second media property (TV, for example) besides the commonality of the user (visitor) **10**, personal identifiable information about the visitor **10** could be used to allow the second media property to learn which device the visitor **10** uses to access the second media property and tag the visitor **10**. The second media property could tag the device used by the visitor **10** to access the second media property by placing a tag on the device itself or in a central database of the second media property, for example).

Although the BT company **30** stores the visitor's collected profile, in the above-described implementation it does not transfer the collected profile to the second media property **40**, **50** but simply asks the second media property **40**, **50** to tag the visitor as a BT company visitor or arrange for a tag to be placed (**620**) that is readable by the second media property **40** and that marks the visitor as a BT company visitor. As the BT company **30** buys ad space from the proprietor of the second media property **40** and delivers therein an ad based on the collected profile, the BT company **30** has no economic incentive to transfer the profile information itself (such as the fact that the visitor searched for "car insurance") to the second media property **40**. The second media company's proprietor is being paid for the ad space and therefore just needs to know that the visitor **10** has been profiled by the BT company **30**, which will pay the second media property's proprietor for an opportunity to deliver an ad to this visitor **10** within the ad space of the second media property **40**.

Suppose, for example, a person searches for "mortgage" on Google (Google is a BT company **30** in this example). Using the method above, Google calculates that advertisers are willing to pay $3 per click on a mortgage-related ad, that the expected click-through on a mortgage-related ad is 0.3%, and therefore Google will earn $9 for every thousand mortgage-related ads delivered to people that searched for "mortgage" on Google when those people are found later, anywhere on the web (i.e., this is "Rev(profile)"). Google further knows that it costs Google $3 CPM to deliver a thousand ads on weather.com (i.e., "P(mp)") to computers that were tagged by weather.com as Google visitors. Google therefore can calculate a profit of $6 CPM (without taking into account other costs, i.e., "C") for delivering a thousand mortgage-related ads to Google visitors who searched for "mortgage" on Google when found later within the ad space of weather.com. Google will therefore arrange for weather.com to tag the person who searched for "mortgage" on Google as a Google visitor (by redirecting the visitor to weather.com with the request to tag the person as a Google visitor, for example).

In the case where a second media property controls ad space with prices that fall within a range, the BT company **30**—in addition to arranging for the second media property (e.g., **50**) to tag (**620**) its visitor—may also provide the second media property **50** with the price the BT company **30** is willing to pay the second media property **50** for delivering an ad within the second media property's ad space. In FIG. **3**, second media property **50** is shown as an ad network's site (where the ad network represents the ad space of different sites, **60**, **61**), as described above. The price delivered from the BT company **30** enables the second media property **50** to determine which ad space it should allocate to the BT company **30** when the tagged visitor **10** visits the second media property **50**. Although some of the ad space (e.g., on site **60**) might be too expensive, i.e., above the cap defined by the price the BT company **30** is willing to pay, other ad space (e.g., on site **61**) might have a cost that would be covered by the price the BT company **30** is willing to pay. However, obviously, the BT company **30** will not arrange for tag placement if the price it is willing to pay for delivering an ad to the profiled visitor **10** is less than the lowest price demanded by a second media property **50** for delivering an ad within that ad space, i.e., price cap<min[P(mp)].



Given that some kind of profiles such as behavioral profiles are time-sensitive (in other words, their value diminishes with time), the BT company **30**—in addition to arranging the placement of a tag readable by the second media property **40**, **50**—may also provide the second media property **40**, **50** (via the tag, for example) with a time period within which the BT company **30** will agree to deliver ads to the profiled visitor **10** within the ad space of the second media property **40**, **50**. Suppose, for example, a BT company **30** collected a profile of a visitor **10** who searched for "flowers." The BT company **30** might arrange for the visitor **10** to be tagged with a tag, readable by a second media property **40**, marking the visitor **10** as the BT company's visitor and setting a time limit of two days, which means that the second media property **40** can call upon the BT company **30** to serve an ad to the tagged visitor **10** only when the visitor **10** is found within the second media property's ad space up to two days after the visitor **10** was tagged (the tag may have a time stamp identifying the date and time the tag was placed to help the second media property **40** calculate the date before which the second media property **40** can call upon the BT company **30** to serve an ad).

The calculation that takes place in steps **4** and **5** of the above-described method may take place not at the time of profile collection as described above but beforehand. Conducting the calculation before the profile is collected can shorten the time it takes the server **30** to select the media properties. The calculation might be done beforehand for other reasons.

Specifically, step 4 (which states that the BT company **30** calculates the expected revenues from delivering ads based on the collected profile, where the revenues are calculated based on the kind of collected profile, i.e., "Rev(profile)") may take place in advance. If for example, a collected profile describes the content read by a visitor, then, if other profiles were previously collected of the same kind of profile, there is no need to check how much advertisers are willing to pay for delivering ads, as it was already checked for profiles of the same kind.

The word "calculating" expected revenues can encompass a scenario in which there are no arithmetic calculations, but rather simply an act of locating the correct information. In this example, the information concerning how much advertisers are willing to pay for delivering their ads to visitors **10** that read a specific content is located, and no arithmetic calculation is needed.

For another example, if the expected revenues for delivering an ad for someone who searched for "mortgage" has

recently been calculated, then there is no need to calculate it again, and the information can simply be located.

Although the examples describe calculation of revenues from delivering an ad at a media property **40**, **50**, depending on the method of payment for the media property, different calculations of expected revenues can take place.

If the media property only gets paid for when a visitor visiting it takes action, then the revenues per profile-based ad delivery should also be based on an action. Such a visitor action can be a click on an ad, a request for information from the advertiser (following a click on the ad), a registration with the advertiser, an act of buying a product or service from the advertiser, etc.

For example, if the media property **40** is paid at the rate of $0.40 per click on an ad presented to the media property's visitor, the BT company **30** will check how much the advertiser will pay the BT company **30** per visitor click when viewing an ad based on the collected profile. If the price per click paid by the advertiser at least exceeds the price per click paid for the media property, then the BT company **30** can arrange for the tagging of the visitor **10** with a tag readable by the selected media property (the one that will cost $0.40 per click).

In some scenarios, the BT company **30** might be paid for every ad delivered to a visitor, but the media property might trigger payment for every visitor click on an ad. Conversely, the BT company **30** might be paid for a visitor click on an ad, but the media property might trigger payment for every delivered ad regardless of whether a click took place or not. In those scenarios, so as not to expose itself to the risk of loss, the BT company **30** preferably translates the payment it receives (whether per ad delivery or ad click or per action) to the payment method applied to the media property. For example, if the BT company **30** is paid $0.25 per click on an ad by a visitor who searched for a "DVD" but a media property triggers payment for every ad delivery at $0.50 CPM (regardless of whether a click took place), the BT company **30** can translate the payment per click it receives to payment for ad delivery. In this example, the BT company **30** can calculate that, with an expected click-through of 0.4% on DVD-related ads by people who searched for "DVD" up to seven days before they are presented with an ad, the BT company **30** will generate $1 CPM (0.4% CTR*1,000 ads*$0.25 per click=$1), i.e., Rev(profile)≈$1 CPM. Because $1 CPM is more than the $0.50 cost of the media property (i.e., Rev(profile)>P(mp)), the BT company **30** will make a gross profit of $0.50 CPM and therefore (assuming costs are low or ignored) arrange for tag placement.

Likewise with respect to step 5 (which states that the BT company **30** selects media properties for delivery of an advertisement based on a profile collected on a first media property where the selection is made by the BT company **30** based on a calculated expected profit), the calculation on which the media property selection is based could be a calculation done beforehand. If the collected profile is of the same kind as another profile that was collected recently (for example, both profiles describe "searching for flights") then the information concerning how much revenues would be generated from such a profile is already available, and there is no need to recalculate. Also, the profit has also been calculated, because the cost of ad space at the different media properties probably does not change in a short period of time. A look-up table can be used that lists, based on the kind of profile, the media properties that should be selected. In such a scenario, the steps of the method will be:

1. The BT company **30** calculates expected revenues from delivering ads based on different collected profiles.

2. The BT company **30** calculates expected profits (or losses) for the delivery of ads based on different collected profiles within the ad space of different available media properties **40**, **50**.

3. The BT company **30** builds a table wherein each kind of profile is assigned media properties where ads will be delivered based on the profile, and wherein the selection of media properties is made based on the previously calculated profit. The table is updated on a regular basis to make sure it is up to date.

4. The BT company **30** collects a profile.

5. The BT company **30** arranges for placement of a tag readable by a selected media property, where the selected media properties are taken from the table described in step 3 above.

The above is just one possible implementation. Instead of a table, a database or any other data structure can be used. The calculation could be done entirely in advance, entirely when the profile is collected, or a combination wherein some of the calculation is done in advance and some when the profile is collected.

Accordingly, the method can be described in the following more general steps:

1. The BT company **30** collects a profile.

2. The BT company **30** arranges (**610**, **620**) for a tag (readable by a selected media property **40**, **50**, or both) to be placed, where the media property is selected based on the expected profit from the delivery of an ad (**720**) based on the collected profile within the ad space of the media property.

Although the above method focuses on profit calculation that takes into account expected revenues from delivery of an ad based on a collected profile, media property ad space cost and other costs, other parameters beyond costs and revenues might be taken into account. For example, an advertiser might insist that its ads appear on media properties that have certain content and not on other media properties, a media property might not agree to show ads from a certain category (for example, a sports media property might not agree to show sports-related ads, to avoid promoting competitors), etc.

## PUBLIC NOTICE REGARDING THE SCOPE OF THE INVENTION AND CLAIMS

The inventor considers various elements of the aspects and methods recited in the claims filed with the application as advantageous, perhaps even critical to certain implementations of the invention. However, the inventor regards no particular element as being "essential," except as set forth expressly in any particular claim.

Although the invention has been described in terms of preferred embodiments and generally associated methods, the inventor contemplates that alterations and permutations of the preferred embodiments and methods will become apparent to those skilled in the art upon a reading of the specification and a study of the drawings.

I claim:

**1**. A method of directing electronic advertisements, the method comprising:

for each of a multitude of different electronic visitors to a first media property, responsive to receiving information about at least one of a plurality of profile attributes possibly applicable to the visitor, automatically electronically authorizing a third-party second media property to allow display, to the electronic visitor when the visitor visits the second media property at a time after the visitor visits the first media property, of an advertisement correlated with the profile-attribute information

received about the visitor, subject to a visitor-specific condition for display of the advertisement that a price charged by the second media property is less than a profile-attribute-dependent price that an advertiser is willing to pay for display of the advertisement.

**2**. The method of claim **1**:

(i) further comprising building a look-up data structure associating at least one selected of a plurality of possible profile attributes with at least one selected of a plurality of second media properties; and

(ii) wherein the method comprises, responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor, authorizing said at least one selected second media property on the lookup data structure associated with the profile-attribute information received about the visitor, only during a specified time period after receiving profile-attribute information about the visitor, by arranging for placement of a tag readable by said at least one selected second media property.

**3**. The method of claim **1** further comprising building a look-up data structure associating at least one selected of a plurality of possible profile attributes with at least one selected of a plurality of second media properties, and wherein the method comprises authorizing those selected second media properties on the lookup data structure associated with the profile-attribute information received about the visitor.

**4**. The method of claim **1** wherein authorizing responsive to receiving information comprises authorizing responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor.

**5**. The method of claim **1** wherein authorizing responsive to receiving information comprises recognizing an action conducted on the first media property by the visitor.

**6**. The method of claim **1** wherein authorizing responsive to receiving profile-attribute information comprises authorizing responsive to receiving a search request by the visitor to the first media property.

**7**. The method of claim **1** wherein authorizing responsive to receiving profile-attribute information comprises authorizing responsive to receiving information about a characteristic of the visitor.

**8**. The method of claim **1** wherein authorizing responsive to receiving profile-attribute information comprises authorizing responsive to receiving information about a profile attribute of the visitor and categorizing the profile attribute within at least one of a plurality of predefined categories.

**9**. The method of claim **1** wherein authorizing comprises placing a tag on the electronic visitor, wherein the electronic visitor is a computer, and wherein the tag is readable by the second media property.

**10**. The method of claim **1** wherein: (i) the method comprises, responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor, authorizing display of the advertisement by arranging for placement of a tag readable by the second media property, and (ii) authorizing comprises authorizing display of the advertisement only during a specified time period after receiving profile-attribute information about the visitor.

**11**. The method of claim **1** wherein the second media property comprises media-property equipment controlling ad space that is in a different medium than the medium of the first media property.

**12**. The method of claim **1** wherein the second media property comprises equipment controlling ad space only temporarily.

**13**. The method of claim **1** wherein authorizing responsive to receiving profile-attribute information comprises arranging for placement of a tag associated with the electronic visitor by the third party second media property.

**14**. The method of claim **13** wherein the condition is a specified time period after receiving profile-attribute information about the visitor.

**15**. The method of claim **13** wherein the condition is given to the second media property at the time arranging for placement of a tag takes place.

**16**. The method of claim **15** wherein the condition is given by incorporating it in a URL used to redirect the electronic visitor to the second media property to enable the second media property to place a tag associated with the visitor's computer.

**17**. The method of claim **13** wherein arranging for placement of a tag comprises redirecting the electronic visitor to the second media property for the second media property to place a tag on the electronic visitor readable by the second media property.

**18**. A tangible computer-server device programmed to implement a method of directing electronic advertisements, the method comprising:

for each of a multitude of different electronic visitors to a first media property, responsive to receiving information about at least one of a plurality of profile attributes possibly applicable to the visitor, automatically electronically authorizing a third-party second media property to allow display, to the electronic visitor when the visitor visits the second media property at a time after the visitor visits the first media property, of an advertisement correlated with the profile-attribute information received about the visitor, subject to a visitor-specific condition for display of the advertisement that a price charged by the second media property is less than a profile-attribute-dependent price that an advertiser is willing to pay for display of the advertisement.

**19**. The computer-server device of claim **18** wherein the server is programmed to implement a method further comprising building a look-up data structure associating at least one selected of a plurality of possible profile attributes with at least one selected of a plurality of second media properties, and wherein the method comprises authorizing those selected second media properties on the lookup data structure associated with the profile-attribute information received about the visitor.

**20**. The computer-server device of claim **18** wherein the server is programmed to implement a method:

(i) further comprising building a look-up data structure associating at least one selected of a plurality of possible profile attributes with at least one selected of a plurality of second media properties; and

(ii) wherein the method comprises, responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor, authorizing said at least one selected second media property on the lookup data structure associated with the profile-attribute information received about the visitor, only during a specified time period after receiving profile-attribute information about the visitor, by arranging for placement of a tag readable by said at least one selected second media property.

**21**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein autho-

rizing responsive to receiving information comprises authorizing responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor.

**22**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein authorizing responsive to receiving information comprises recognizing an action conducted on the first media property by the visitor.

**23**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein authorizing responsive to receiving profile-attribute information comprises authorizing responsive to receiving a search request by the visitor to the first media property.

**24**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein authorizing responsive to receiving profile-attribute information comprises authorizing responsive to receiving information about a characteristic of the visitor.

**25**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein authorizing responsive to receiving profile-attribute information comprises authorizing responsive to receiving information about a profile attribute of the visitor and categorizing the profile attribute within at least one of a plurality of predefined categories.

**26**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein authorizing comprises placing a tag on the electronic visitor, wherein the electronic visitor is a computer, and wherein the tag is readable by the second media property.

**27**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein:

(i) the method comprises, responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor, authorizing display of the advertisement by arranging for placement of a tag readable by the second media property, and

(ii) authorizing comprises authorizing display of the advertisement only during a specified time period after receiving profile-attribute information about the visitor.

**28**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein the second media property comprises media-property equipment controlling ad space that is in a different medium than the medium of the first media property.

**29**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein the second media property comprises equipment controlling ad space only temporarily.

**30**. The computer-server device of claim **18** wherein the server is programmed to implement a method wherein authorizing responsive to receiving profile-attribute information comprises arranging for placement of a tag associated with the electronic visitor by the third party second media property.

**31**. The computer-server device of claim **30** wherein the server is programmed to implement a method wherein the condition is a specified time period after receiving profile-attribute information about the visitor.

**32**. The computer-server device of claim **30** wherein the server is programmed to implement a method wherein arranging for placement of a tag comprises redirecting the electronic visitor to the second media property for the second media property to place a tag on the electronic visitor readable by the second media property.

**33**. The computer-server device of claim **30** wherein the server is programmed to implement a method wherein the condition is given to the second media property at the time arranging for placement of a tag takes place.

**34**. The computer-server device of claim **33** wherein the server is programmed to implement a method wherein the condition is given by incorporating it in a URL used to redirect the electronic visitor to the second media property to enable the second media property to place a tag associated with the visitor's computer.

**35**. A system comprising one or more computers programmed to implement a method of directing electronic advertisements, the method comprising:

for each of a multitude of different electronic visitors to a first media property, responsive to receiving information about at least one of a plurality of profile attributes possibly applicable to the visitor, automatically electronically authorizing a third-party second media property to allow display, to the electronic visitor when the visitor visits the second media property at a time after the visitor visits the first media property, of an advertisement correlated with the profile-attribute information received about the visitor, subject to a visitor-specific condition for display of the advertisement that a price charged by the second media property is less than a profile-attribute-dependent price that an advertiser is willing to pay for display of the advertisement.

**36**. The system of claim **35** wherein the method further comprises building a look-up data structure associating at least one selected of a plurality of possible profile attributes with at least one selected of a plurality of second media properties, and wherein the method comprises authorizing those selected second media properties on the lookup data structure associated with the profile-attribute information received about the visitor.

**37**. The system of claim **35** wherein the method:

(i) further comprises building a look-up data structure associating at least one selected of a plurality of possible profile attributes with at least one selected of a plurality of second media properties; and

(ii) comprises, responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor, authorizing said at least one selected second media property on the lookup data structure associated with the profile-attribute information received about the visitor, only during a specified time period after receiving profile-attribute information about the visitor, by arranging for placement of a tag readable by said at least one selected second media property.

**38**. The system of claim **35** wherein authorizing responsive to receiving information comprises authorizing responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor.

**39**. The system of claim **35** wherein authorizing responsive to receiving information comprises recognizing an action conducted on the first media property by the visitor.

**40**. The system of claim **35** wherein authorizing responsive to receiving profile-attribute information comprises authorizing responsive to receiving a search request by the visitor to the first media property.

**41**. The system of claim **35** wherein authorizing responsive to receiving profile-attribute information comprises authorizing responsive to receiving information about a characteristic of the visitor.

**42**. The system of claim **35** wherein authorizing responsive to receiving profile-attribute information comprises authoriz-

ing responsive to receiving information about a profile attribute of the visitor and categorizing the profile attribute within at least one of a plurality of predefined categories.

**43**. The system of claim **35** wherein authorizing comprises placing a tag on the electronic visitor, wherein the electronic visitor is a computer, and wherein the tag is readable by the second media property.

**44**. The system of claim **35** wherein:

(i) the method comprises, responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the visitor, authorizing display of the advertisement by arranging for placement of a tag readable by the second media property, and

(ii) authorizing comprises authorizing display of the advertisement only during a specified time period after receiving profile-attribute information about the visitor.

**45**. The system of claim **35** wherein the second media property comprises media-property equipment controlling ad space that is in a different medium than the medium of the first media property.

**46**. The system of claim **35** wherein the second media property comprises equipment controlling ad space only temporarily.

**47**. The system of claim **35** wherein authorizing responsive to receiving profile-attribute information comprises arranging for placement of a tag associated with the electronic visitor by the third party second media property.

**48**. The system of claim **47** wherein the condition is a specified time period after receiving profile-attribute information about the visitor.

**49**. The system of claim **47** wherein arranging for placement of a tag comprises redirecting the electronic visitor to the second media property for the second media property to place a tag on the electronic visitor readable by the second media property.

**50**. The system of claim **47** wherein the condition is given to the second media property at the time arranging for placement of a tag takes place.

**51**. The system of claim **50** wherein the condition is given by incorporating it in a URL used to redirect the electronic visitor to the second media property to enable the second media property to place a tag associated with the visitor's computer.

* * * * *

## CERTIFICATE OF SERVICE

I, Naveen Modi, hereby certify that on August 5, 2024, the foregoing brief was filed using the Court's CM/ECF system and a copy served on the parties' counsel of record via ECF.

Date: August 5, 2024 BY: /s/Naveen Modi

Naveen Modi
Paul Hastings LLP
2050 M Street NW
Washington, D.C. 20036
Tel.: (202) 551-1700
Fax: (202) 551-1705

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared with Microsoft Word for Microsoft 365 using a proportionally spaced typeface and includes 13,998 words.

Date: August 5, 2024 BY: /s/Naveen Modi

Naveen Modi
Paul Hastings LLP
2050 M Street NW
Washington, D.C. 20036
Tel.: (202) 551-1700
Fax: (202) 551-1705